UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MAYRA F. PENA,
PLAINTIFF

:
:
:
:
v.                                  :          C.A. No. 15-CV-00179-S-LDA
:
:
HONEYWELL INTERNATIONAL INC.,       :
DEFENDANT.                          :
:

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT HONEYWELL, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 27)

Now comes Mayra Pena, the plaintiff in the above-entitled matter, pursuant to Rule 56 of the Federal Rules of Civil Procedure and L.R. cv 56 of the Local Rules of the United States District Court for the District of Rhode Island, by and through her attorneys, and hereby submits the within Memorandum of Law in Opposition to Defendant Honeywell, Inc.'s Motion for Summary Judgment (Doc. No. 27). For the reasons set forth herein, the Court should deny Defendant's motion.

## INTRODUCTION

This case arises out of a vulnerable, yet capable employee's frantic three (3) month odyssey to keep her job by trying to convince her employer she could still do it as long as it granted her the simplest accommodation imaginable. An accommodation that was requested at the behest of the employee's own experienced, treating psychiatrist. An accommodation that was feasible for the employer to grant. An accommodation that would have cost the employer nothing. An accommodation that would have created no undue hardship on the employer — either financially or on its business operations. An accommodation that was so simple that even a child could

comprehend it.  The accommodation this employee needed was simply this:  To continue being assigned to work in the same departments in which she had been working for the last eleven (11) years and not be assigned to work in the Molding Injection Room (the "Molding Room") — the only work area in the entire factory that she claimed caused an exacerbation of a pre-existing psychological disorder, anxiety.

Nonetheless, in the end, despite all of Pena's efforts, Honeywell violated her rights under federal and state law by denying her request for a reasonable accommodation of a disability even though the accommodation sought was feasible for Honeywell to provide and granting it would not have created an undue hardship on the employer.  Furthermore, adding insult to injury, Honeywell kicked Pena while she was down, terminating her employment for "job abandonment" despite the fact that it knew she had been trying to get back to work for approximately three (3) months.  Here, Honeywell has implemented a two-pronged approach to mask its unlawful conduct: (1) by claiming it did not understand Pena's need for an accommodation; and (2) by claiming Pena did not act in good faith in engaging Honeywell in an interactive process.  As explained below, Honeywell's arguments are preposterous.

It simply defies logic that Honeywell did not understand the nature of Pena's disability and the specific accommodation she needed.  Indeed, Pena told her employer specifically why she could not work in the Molding Room — it made her feel "nervous" and it was "harmful to [her] emotionally."  Pena then followed this up by having her treating psychiatrist write three (3) separate letters explaining specifically why she could not work in the Molding Room — the changes in the work environment; increased noise levels, chemical odors, and the presence of robotics in the room significantly exacerbated her pre-existing anxiety.  Pena filled out an employer-provided accommodation form explaining specifically why she could not work in the Molding Room. Pena wrote: "The noise, speed and overall environment gives me (sic) anxiety, palpitations."  Finally, Pena

was so desperate to keep her job that she actually retained the services of a lawyer from Rhode Island Legal Services — whose sole job is to advocate for low-income and disabled clients — and this lawyer wrote letters to the employer explaining specifically why Pena could not work in the Molding Room

Here, Honeywell <u>knew</u> that Pena had mental impairments because it granted Pena FMLA medical leave from November 29, 2012 to January 14, 2013 for seasonal depression.  Honeywell <u>knew</u> that Pena suffered from a disability because her psychiatrist wrote in a letter that he was treating her for anxiety.  Honeywell <u>knew</u> that the work flow in the Molding Room was different from other areas and that this different work flow would be a reasonable explanation for why Pena feel "nervous" and why working in that department would exacerbate her anxiety symptoms. Honeywell <u>knew</u> that in the Molding Room, employees cannot control the work flow, since machines in that department put out pieces every thirty (30) seconds as opposed to machines in other departments where employees press a button when they are ready for a new task.  Honeywell <u>knew</u> that some employees expressed a dislike for the Molding Room because they could not control the work flow.  Honeywell <u>knew</u> that some employees complained that Pena was the only employee who did not have to work in the Molding Room directly contradicting Honeywell's assertion that the Molding Room is the easiest department to work in.  Otherwise, why would employees complain that Pena did not have to work there?  Wouldn't Pena's absence from the alleged easiest department create attractive opportunities for these employees?  Finally, Honeywell <u>knew</u> that Pena had worked in the Molding Room during her training and shortly thereafter and, therefore, her claim that working there caused an increase stress level was based on firsthand knowledge and experience and not conjecture.  Indeed, Pena tried her best to make it work, but the change in environment was just too much for her.

Honeywell's claim that Pena did not act in good faith and engage in an interactive process is equally outrageous. Indeed, Pena did everything in her power to convince her employer she could perform the essential functions of her job with a reasonable accommodation, even going as far as hiring a lawyer to advocate on her behalf. Simply put, Dr. Greer's first letter of March 4, 2013 explaining unambiguously and with sufficient clarity why Pena could not work in the Molding Room and the accommodation she needed should have put this matter to bed immediately without any further discussion or inquiry. However, Honeywell saw an opportunity to rid itself of a burdensome, disabled employee so it rejected Pena's First Doctor's Letter without any rational explanation. Indeed, Honeywell's purported reason for rejecting the First Doctor's Letter — that it was vague — is unsupportable by any common sense or logic. When Dr. Greer provided two more letters that were undeniably even more specific regarding Pena's need for an accommodation, Honeywell rejected those as well, ultimately firing Pena and blaming her for not fulfilling her obligations under the ADA.

As part of Honeywell's plan to rid itself of this burdensome, disabled employee, Honeywell created a condition it knew would be difficult, if not impossible, for Pena to meet. It requested that Pena provide documentation from her medical records to support her claim that working in the Molding Room exacerbated her anxiety. Honeywell knew Pena's psychiatrist would not be able to produce this medical documentation because it knew he was relying on Pena's self-reporting of symptoms to treat her. When Pena and her doctor could not meet this condition, Honeywell had the ammunition it needed to fire Pena, creatively categorizing her conduct as "job abandonment" and conveniently blaming her.

Sadly, Honeywell's termination caused Pena to become permanently disabled and forced her to go on public assistance. Indeed, Pena's medical condition worsened after Honeywell fired her such that it caused an exacerbation of her pre-existing psychological disorders. As such, on

September 20, 2013, left with no alternative because she could not find a job due to her medical condition, because of her age (52 at the time), because she cannot speak English, and because she could not pay her bills, Pena filed for SSDI benefits.  When Pena submitted her SSDI application, her attorney advised her to use March 8, 2013 — her last day of work — as the date of the onset of her disability as opposed to September 20, 2013, the date of the application.  Not surprisingly, Honeywell has tried to exploit this seemingly insignificant fact to argue that Pena is not a qualified disabled person under the ADA in a further attempt to deprive Pena of her legal rights.  Once again, Honeywell's argument defies logic.  Indeed, Honeywell knew that Pena was trying to get back to work for a period of three months — from her last day of work on March 8, 2013 until her last communication from her lawyer on May 6, 2016.  If Pena was truly unable to work as of March 8, 2013 due to her disabilities, why would she have bothered to get three (3) letters from her psychiatrist stating she was able to work with an accommodation?  Why would she have hired a lawyer to fight to get her job back?

Finally, Honeywell's argument that Pena did not want to work in the Molding Room for "social reasons" is absurd.  Indeed, no rational person would stay out of work for three (3) months and risk losing their job simply because they preferred to work elsewhere, particularly someone with Pena's resume — an unskilled, middle-aged woman who does not speak English and lacks a formal education.  This argument makes absolutely no sense and yet another attempt by Honeywell to mask its unlawful conduct.

### FACTS AND TRAVEL OF THE CASE

Plaintiff Mayra Pena ("Pena") is a fifty-seven (57) year old female person and a native of the Dominican Republic. (Pena Dep. at 9:21-23).  In 1987, Pena moved to the United States settling in Brooklyn, New York. (Id. at 10:19-23).  In or about 1989, Pena move to Rhode Island. (Id. at 10:24-25).  Pena suffers from disabilities within the meaning of the ADA and analogous state law (Pena

Aff.). Pena suffers from anxiety with panic attacks, as well as Major Depressive Disorder Recurrent, Severe. (Ex. A-E); (Pena Aff.). Yet despite Pena's disabilities, she was a productive member of society, always able to hold down a job (Pena Aff.).

On January 4, 2003, Pena began working at Defendant Honeywell, Inc.'s ("Honeywell") Cranston, Rhode Island facility as an "Associate Assembler," a position that involves assembling parts in a factory setting. (Pena Dep. at 14:4-25). At the time, Pena was employed by a temporary employment agency. (Pena Dep. at 41:13-15). At this facility, Honeywell made safety gear and personal protective equipment, including eye and face protection, fall protection, safety footwear, safety signage, hearing protection, hand protection, protective clothing, and head protection. Honeywell Protective Equipment, available at https://www.honeywell.com/industries/personal-safety/protective-equipment (last visited March 24, 2017). Pena's job was to participate in the process of assembling these products so they could be shipped to their final destination.

### The Cranston, Rhode Island Facility

The manufacturing floor in the facility consisted of the following areas: Injection Molding (the "Molding Room"), Logo, the Respiratory Department ("HEPA") and SCBA. (Ryan Dep. at 23:24-35, 24:1-4.). When Pena first started working at the Cranston, Rhode Island Facility, prior to Honeywell's purchase of it, whenever she went near the Molding Room, she noticed that the smell and the noise bothered her (Pena Dep. at 41:13-42:1). Pena expressed to supervisors at the time that she did not want to work in the Molding Room (Pena Aff.), and she was never asked to work there until 2012, eleven (11) years after she had started working at the facility. (Id.).

The Molding Room was an enclosed area with four walls, which contained twenty (20) injection molding presses, a conveyor, face shield machine, multiple drill press machines, and auxiliary equipment. (Ryan Dep. at 35:2-9, 45:16-18). In addition to being one of the only enclosed spaces, one of the main differences between the Molding Room and the other departments is that in

the Molding Room, workers could not control the flow of work. (Id. at 50:16-51:1). In the Molding Room, pieces are expelled from the machine at regular intervals — every 30 or 60 seconds (Id.). This meant that the worker has a limited amount of time to complete tasks before the next piece is expelled regardless of whether or not the assembler is ready for it.[1] In other departments, workers control the workflow by pressing a button when they are ready for the next piece. (Id. at 49:22-24). Some workers expressed a preference for not working in the Molding Room. (Id. at 49:16-18).

### Pena's Disabilities

During the time Pena was employed at Honeywell, she suffered from psychological disorders — anxiety and depression as well as diabetes. (Pena Aff.). In 2010, Pena began receiving medical treatment for her anxiety and depression from a psychiatrist, James D. Greer, M.D. ("Dr. Greer") (Ex. B). Dr. Greer diagnosed Pena with Major Depressive Disorder Recurrent, Severe. (Id.) During Pena's employment with Honeywell, she also suffered from seasonal depression caused by a change in the seasons — essentially lasting the entire winter. (Pena Dep. at 9:8-12, 28:2-8). To deal with her seasonal depression, Pena would travel to the Dominican Republic where the warmer climate would alleviate her depressive symptoms. (Id. at 9:2-12). Honeywell designated these leaves-of-absence as FMLA medical leave under the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (Doc. No. 27-1 at 4, n.3). Pena's most recent FMLA medical leave for seasonal depression prior to her termination was from November 29, 2012 to January 14, 2013. (Id.); (Pena Dep. at 27:9-11).

---

[1] This process is similar to the JOB SWITCHING episode of the iconic television series "I Love Lucy." This episode included the famous chocolate scene where two characters attempt, but fail miserably, to keep up with products expelling from a machine that they had no control over. Original Air date September 15, 1952, Desilu Productions. Available for viewing at https://youtu.be/Jm1VEO9C4VQ.

### Pena's Regular Job Duties

For Pena's entire tenure at the Cranston, Rhode Island Facility, her core department was
HEPA (Pena Dep. at 17:4-7), a department where workers could control the flow of work unlike in
the Molding Department. In October 2012, Honeywell decided to cross-train its workers (Pena
Dep. at 24:23-25:4; Ryan Dep. at 47:19-48:6; Gouveia Dep. at 39:21-40:7), and it informed Pena she
would have to be trained to work in the Molding Room (Pena Dep. at 25:11-13). Honeywell's
purported reason for cross-training its workforce was that it needed every employee to be capable of
working in any department in case of an emergency. (Pena Dep. at 24:23-25:4; Ryan Dep. at 47:1-11;
99:25-100:12; Dyer Dep. at 41:3-24). Pena informed her supervisor that she could not work in the
Molding Room because it "was harmful for [her] to work in that area." (Pena Dep. at 24:1-6). Pena
was assured that she would only have to complete the two-week training and that she would not
have to work in the Molding Room on a regular basis. (Id. at 24:11-13). Pena begrudgingly worked
in the Molding Room for two weeks and her anxiety symptoms worsened such that she needed an
increase in the dosage of her medication and required FMLA leave. (Id. at 25:18-22).

### Pena Requests a Reasonable Accommodation — Staying in Her Normal Work Setting, the HEPA Department

On January 14, 2013, Pena returned from her FMLA medical leave. (Pena Dep. at 27:9-11.).
Shortly thereafter, Pena was assigned to work in the Molding Room for four (4) hours per day, two
to three times per week. (Id. at 40:9-22). Despite Pena's best efforts, on February 21, 2013, she
informed a supervisor named Mayra Fermin ("Fermin") that she could not work in the Molding
Room anymore because it made her feel "panicked and depressed" (Id. at 42:17-20). Pena became
startled by some of the machines in the room and was affected by both the smell and the noise of
the room (Id. at 32:21-23; 41:18-20; 42:17-20). Pena informed Fermin that she could obtain a

doctor's note if necessary. (Id.). After the conversation, Pena was re-assigned to perform her regular job duties in HEPA. (Dyer Dep. at 43:16-18; 44:1-3).

On March 7, 2013, Pena was re-assigned a second time to work in the Molding Room. Again, Pena told her supervisor she could not work in the Molding Room because it made her feel "nervous." (Pena Dep. at 53:23-24). This time, Pena had a discussion with Jose Gouveia, Honeywell's Human Resources Manager. (Pena Dep. at 51:9-14; Ryan Dep. at 15:13-17). Also present for the discussion, were Connor Ryan, Health, Safety, Environmental Leader ("Ryan"), and Kevin Dyer, First Shift Manufacturing Supervisor ("Dyer"). (Id.). Pena explained to all present that the machines in the Molding Room made her feel "nervous," that she was "depressed," and that working in that department would cause her "emotional harm." (Pena Dep. at 43:21-24). Gouveia told Pena that she had to work in the Molding Room and that there was no other work at the plant for her to perform. (Ryan Dep. at 80:8-12; Gouveia Dep. at 64:8-11, 17-20). Gouveia then instructed Pena to obtain a doctor's note to support her position. (Gouveia Dep. at 38:25; 39:1; 41:3-5; 41:9-11; 42:8-11). Gouveia also told Pena that since she had so many medical problems, she should file for Social Security Disability benefits. (Pena Dep. at 43:9-20). Since Pena could not work in the Molding Room and Honeywell told her there was no other work for her to do that day, Pena left work and went home. (Id. at 52:18-53:2). Later that day, Pena's husband brought to Honeywell a letter from Pena's treating psychiatrist, Dr. Greer, explaining the nature of Pena's disabilities and the accommodation she needed (the "First Doctor's Letter") (Pena Dep. at 50:15-19; Gouveia Dep. at 48:5-7); (Ex. A). The First Doctor's Letter provided:

> **Ms. Pena is a patient under my care at this agency where she has received both counseling and medication services. Currently, she is reporting exacerbation of her anxiety symptoms which are interfering with her ability to function. She reports these specifically occur when she is being sent to the Molding room as opposed to the more typical duties to which she is accustomed. I am requesting that you assist her in other placements than in**

**this setting as her condition is being directly exacerbated by working conditions there. She is completely capable of working in other settings.**
(Ex. A).

The following day, Pena came back to work at Honeywell's request to discuss the contents of the First Doctor's Letter. (Pena Dep. at 51:9-14; Ryan Dep. at 15:13-17). Pena reiterated that working in the Molding Room made her feel "nervous." Gouveia understood at the time based on Pena's statements and from reading the First Doctor's Letter that Pena had a medical condition that was impeding her ability to work in the Molding Room. (Gouveia Dep. at 57:17-22; 58:4-8; 59:9-13). Gouveia also understood at the time that the accommodation Pena needed was to remain in her same position in HEPA and not work in the Molding Room. (Gouveia Dep. at 59:9-25; 60:1-3). Gouveia never asked Pena why she could not work in the Molding Room or why it made her feel nervous. (Gouveia Dep. at 45:10-20). Yet despite the specific details provided in the First Doctor's Letter and Gouveia's clear understanding that Pena was requesting an accommodation because of a medical condition, Honeywell claimed that the First Doctor's Letter was "too vague" and refused to allow Pena to return to work unless she agreed to work in the Molding Room. (Pena Dep. at 52:5-10, Ryan Dep. at 75:11-15). As such, Pena remained out of work indefinitely. (Gouveia Dep. at 64:9-20).

During the time period following March 8, 2013 when Pena was attempting to get back to work, she sought medical treatment from Dr. Greer on the following dates: March 4, 2013; March 12, 2013; March 18, 2013; and April 22, 2013. Dr. Greer's medical treatment notes indicate that Pena medical condition was worsening due to her unsettled work situation, specifically her attempts to convince Honeywell to grant her the accommodation she was requesting:

On March 4, 2013, Dr. Greer's treatment note provided:

**Pt in reporting that she has been doing better with depression but has been experiencing worsening anxiety/panic symptoms associated with changes in work setting in her company. I wrote letter to Honeywell**

requesting they not place her there but noted that she is capable of functioning in other settings. Assessment: Situational Stress. (Ex. D).

On March 12, 2017, Dr. Greer's treatment note provided:

Pt in after 1 week, reporting that she gave employer her letter who rejected in [sic] reportedly wanting unnecessary details of her condition. Agreed I would call supervisor Kevin Dyer and discuss her situation without going into excessive detail, as well as my opinion that the current position may result in her going out on Worker's Comp. Release Signed. (Ex. E).

On March 18, 2017, Dr. Greer's treatment note provided:

Pt reports increased stress associated with lack of resolution of work situation, presents as highly anxious and increasingly labile. Called HR dept at Honeywell and left message. Assessment: Situational stress exacerbating depressive and anxiety symptoms. (Ex. F).

On April 22, 2013, Dr. Greer's treatment note provided:

Pt in reporting that she has been more depressed, reporting frequent episodes of tearfulness, feeling hopeless. She is still not working and has no income. She presents letter from employer stating that they have not yet received records, called and discussed with HIS, she will go there and clarify request, they will send records today. Appearance: reasonably dressed Affect: constricted Behavior: calm Mood: depressed Speech: coherent Thought Content: denies delusions; denies hallucinations, denies suicidal ideations, denies homicidal ideations. Assessment: Depression worsened by situation stress. (Ex. G).

On April 2, 2013, Elizabeth A. Jennison, M.D., Associate Director of Health Services at

Honeywell ("Dr. Jennison"), wrote Dr. Greer requesting medical documentation from Pena's

medical records to support his medical opinion that Pena's anxiety worsened when she went to work

in the Molding Room. (Ex. H).

On April 2, 2013, Pena's husband returned to Honeywell a completed "Request for a

Reasonable Accommodation Form" that Honeywell had mailed to Pena on or about February 21,

2013.  (Ex. I).  The Request for a Reasonable Accommodation Form contained two sections, one

for the employee to complete and one for the employee's physician to complete.  Each section

asked a series of questions.  Pena's daughter asked her mother the questions in Spanish and hand

wrote the answers in English on the form under the Employee Section.  (Pena Dep. at 56:13-19).

Pena's daughter wrote on the form:

> **Unable to work in molding.  The noise, speed and overall environment gives (sic) me anxiety, palpitations.**
>
> **Continue to work in HEPA, not molding.**
>
> **I have performed the requirements of my job in HEPA without any problems.  I had been offered many permanent positions in molding while still working through an agency and refused because I knew 11 years ago I could not do this job.**

(Ex. I).

Dr. Greer did not write answers to the questions in the Employee's Physician's Section of

the form, but instead, he wrote a separate letter in which he answered the questions in narrative

form (the "Second Doctor's Letter"); (Ex. B).  Dr. Greer gave the Second Doctor's Letter to Pena's

husband, who delivered it to Honeywell.

The Second Doctor's Letter provided:

> **Ms. Pena presented me with a request for information regarding a "Reasonable Accommodation Request Form" which she is submitting. Ms. Pena has been a patient under my care at this agency since 2010, and has been involved in mental health treatment since approximately 2005. She carries diagnosis of Major Depressive Disorder, Recurrent, Severe. She receives both counseling services as well as medication management for this condition.**
>
> **Given the continued presence of some symptoms despite these treatment interventions, it is to be expected that she will continue to experience some level of symptoms for the indefinite future.**
>
> **With regards to her situation at work, she reports that she was functioning well in her previous position but when moved to a new one experienced significant increases in her level of stress which have had a**

**notable negative impact on her condition. She is eager to return to work in her previous capacity but I can state with a reasonable degree of medical certainty that continued assignment to the more recent work setting will result in worsening stress and further exacerbation of her condition. I would be happy to provide further information should you require it.**

(Id.).

As can be seen plainly, the Second Doctor's Letter is more specific than the First Doctor's Letter, but relays to Honeywell, the same exact information as the First Doctor's Letter — that Pena had a psychological disorder that was affecting her job and that the accommodation she needed was to stay working in her previous department and not be assigned to work in a new area (i.e., the Molding Room).

On April 8, 2013, Honeywell wrote to Pena acknowledging its receipt of the two documents Pena's husband delivered – the Request for a Reasonable Accommodation Form completed by Pena with the assistance of her daughter and the Second Doctor's Letter answering in narrative form the questions on the form. (Ex. J).  In its letter, Honeywell requested Pena to authorize Dr. Greer to provide to it Pena's medical records in order to "assess her request." (Id.).  However, Pena did not want to agree to this because she believed it was an unnecessary intrusion into her medical history and because there were things in her personal life, such as her sons' prior legal problems, that she did not want her employer to know about. (Pena Dep. at 84:1-85:3).

On April 22, 2013, Honeywell sent a follow up letter to the April 8, 2013 letter seeking medical information from Dr. Greer in support of his opinion that Pena's medical condition worsened when she went to work in the Molding Room. (Ex. K).

Shortly thereafter, Pena retained the services of Veronika Kot, a Staff Attorney employed by Rhode Island Legal Services, a non-profit organization that assists low-income and disabled people. (Pena Dep. at 53:8-11).  On April 23, 2013, Attorney Kot wrote a letter to Honeywell on behalf of Pena summarizing all of the previous attempts Pena had made to obtain an accommodation of her disabilities. (Ex. L).

On April 30, 2013, Attorney Kot wrote to Honeywell a second time, informing Honeywell that Pena would continue to cooperate and would provide a third doctor's letter. (Ex M.). On May 6, 2013, Attorney Kot wrote to Honeywell yet again, including a third letter from Dr. Greer dated April 29, 2013 (the "Third Doctor's Letter"); (Ex. C, N). The Third Doctor's Letter provided:

> I'm writing to clarify the concerns I expressed about Ms. Pena's ongoing stress related to new duties she was recently assigned to in the workplace. Ms. Pena has worked for the HONEYWELL Corporation for 11 years prior to February of 2013 when she was assigned a new work setting in the molding room. She has reported repeatedly and consistently that she finds this new environment to be highly stressful, referencing a variety of factors which included increased noise levels, chemical odors and the presence of robotics in the molding room which have resulted in a significant exacerbation of her anxiety symptoms. More recently the stress of this issue has also resulted in worsening or her depression.

> As I am not conversant with the make-up of the molding room area, I cannot specifically identify particular issues there which might exacerbate her stress, but can state within a reasonable degree of medical certainty that there is a direct causal relationship between her working in that setting and the exacerbation of her symptoms.

(Ex. C).

On May 22, 2013, Jacqueline R. Rolfs, Esq, in-house counsel for Honeywell ("Attorney Rolfs"), responded to Attorney Kott's April 30, 2013 letter. (Ex. O). In her response, Attorney Rolfs claimed Honeywell did not give Pena an accommodation because Pena's physician did not provide medical documentation explaining why her anxiety worsens when she works in the Molding Room. (Id.). Attorney Rolfs letter also takes issue with the fact that Dr. Greer relied on Pena's self-reporting of her symptoms. (Id.).

Because no medical documentation existed to explain why Pena's anxiety worsened when she moved to the Molding Room — other than Dr. Greer's medical opinion expressed in the three (3) doctor's letters — neither Dr. Greer, nor Attorney Kott ever responded further to Honeywell's request.

On June 17, 2013, Honeywell terminated Pena for job abandonment. (Ex. P).

On September 20, 2013, Pena applied for SSDI benefits on the recommendation of Dr. Greer. (Ex. Q).

On April 16, 2014, Pena filed a Charge of Discrimination with the Rhode Island Commission for Human Rights ("RICHR") alleging disability discrimination.

On January 26, 2015, the RICHR issued a Notice of Right to Sue Letter.

On April 16, 2015, Pena filed suit in the Rhode Island Superior Court.

On May 6, 2015, Honeywell removed the case to the United States District Court for the District of Rhode Island pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.

On February 10, 2017, Honeywell moved for summary judgment (Doc. No. 27).

## LEGAL STANDARD

A motion for summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a rational factfinder could find for either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  The moving party carries the burden of demonstrating that no genuine issue of material fact exists. Id.

In considering whether a genuine triable issue exists, the Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991).  The party seeking summary judgment must show that there is "'an absence of evidence to support the nonmoving party's case.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477

U.S. 317, 325 (1986)).  Summary judgment will be denied if "there is enough competent evidence to

enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985

F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1985)).

Moreover, in cases like the one at hand, which involve questions of motive and intent, the

movant's burden is particularly rigorous.  Unsettled issues regarding motive and intent will often

preclude summary judgment. See Medina v. Adecco, 2008 WL 2428207 at * 1 (D.P.R. July 12, 2008);

see Lipsett v. Univ. of P.R., 864 F.2d 881, 895 (1st Cir. 1988).  Moreover, the court should deny

summary judgment when the non-moving party can point to specific facts detailed in affidavits and

depositions — that is, names, dates, incidents, and supporting testimony giving rise to an inference

of discriminatory animus. Id.

### ARGUMENT

Pena's claims encompass three (3) categories: (1) Discriminatory discharge on the basis of a

disability (RICRA, RI FEPA, CRPDA, and ADA); (2) Failure to Provide a Reasonable

Accommodation of a Disability (RICRA, RI FEPA, CRPDA, and ADA); and (3) Retaliation

(RICRA, RI FEPA, CRPDA, and RI WPA).

For the reasons stated herein, triable issues of fact exist on all of Pena's claims and,

therefore, the Court should deny Honeywell's Motion for Summary Judgment.  First, genuine issues

of material fact exist as to whether Honeywell's decision to terminate Pena was motivated, in part,

because she is disabled.  Second, genuine issues of material fact exist as to whether Honeywell failed

to provide Pena with a reasonable accommodation of a disability.  Third, genuine issues of material

fact exist as to whether Pena can provide a sufficient explanation for why she claimed in her SSDI

application that she was "unable to work because of a disabling condition as of March 8, 2013."

Fourth, genuine issues of material fact exist as to whether Honeywell's decision to terminate Pena

was motivated, in part, because she engaged in protected conduct.  Fifth, Pena is not required to

prove pretext in order to prevail on her claims, but rather, only that it is more likely than not that Honeywell's decision to fire her was motivated, in part, because she is disabled.

I.   **GENUINE ISSUES OF MATERIAL FACT EXIST AS TO WHETHER HONEYWELL'S DECISION TO TERMINATE PENA WAS MOTIVATED, IN PART, BECAUSE SHE IS DISABLED.**

To succeed on a claim for discriminatory discharge on the basis of a disability, Pena must prove that Honeywell terminated her employment because of a disability. R.I. Gen. Laws § 28-5-7(1)(ii); R.I. Gen. Laws § 42-87-1; R.I. Gen. Laws § 42-112-1.12.  Specifically, Pena must prove that: (1) she was "disabled" within the meaning of the law; (2) she was a "qualified individual," meaning she could perform the essential functions of her job with or without a reasonable accommodation; and (3) Honeywell discharged her in whole, or in part, because of her disability. See Katz v. City Metal Co., Inc., 87 F.3d 26, 30 (1st Cir. 1996).

Here, based on the evidence-on-the-record, a reasonable jury could find that Honeywell terminated Pena's employment because of a disability and, therefore, summary judgment is inappropriate on Pena's discriminatory discharge claim.

A.   **AT ALL TIMES RELEVANT TO THIS MATTER, PENA WAS DISABLED WITHIN THE MEANING OF THE LAW.**[2]

To prove she was disabled, Pena must establish that she had: (1) a physical or mental impairment; (2) that substantially limits; (3) one or more of her major life activities. R.I. Gen. Laws § 42-87-1(1).  "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working. Id. § 42-87-1(5).

---

[2]   In its moving papers, Honeywell does not argue that Pena is not disabled within the meaning of the law, implying that she is able to satisfy the first prong of a *prima facie case* of a disability claim (Doc. No. 27-1 at 14) ("Honeywell is entitled to summary judgment on Plaintiff's disability discrimination claims . . . because Plaintiff cannot satisfy the second or third elements of her *prima facie case*.").  Accordingly, Pena will only briefly address this element.

"Substantially limits" includes an impairment that substantially limits one major life activity, but need not limit other major life activities in order to be considered a disability. Id. § 42-87-1(7)(i). An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active. Id. § 42-87-1(7)(ii). Furthermore, the determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as [m]edication . . ." Id. 5 42-87-1(7)(iii).

Here, at all relevant times, Pena's disabilities were anxiety, depression, and diabetes. (Pena Aff.).

**B.     PENA WAS A "QUALIFIED INDIVIDUAL," MEANING SHE WAS ABLE TO PERFORM THE ESSENTIAL FUNCTIONS OF AN ASSOCIATE ASSEMBLER WITH OR WITHOUT A REASONABLE ACCOMMODATION.**

To prove she was a "qualified individual," Pena must prove she possessed the necessary skill, experience, education and other job-related requirements for the Associate Assembler position and that she could have performed the essential functions of this position at the time of her termination if Honeywell had made reasonable accommodations for her disabilities. R.I. Gen. Laws § 42-87-1 et. seq.; R.I Gen. Laws § 28-5-1 et. seq.; 42 U.S.C. § 12101 et. seq.

**1.     Pena possessed the necessary skill, experience, education and other job-related requirements for the Associate Assembler position.**

Pena had been performing the job duties of this position since 2003 when she was placed at the Cranston facility while working for a temporary employment agency. (Pena Dep. at 14:4-25, 41:13-15). Pena was cross-trained to work in every department at the Cranston facility. (Pena Dep. at 27:15-16). Furthermore, Pena had no meaningful discipline regarding her abilities to perform her job duties. (Pena Aff.).

2. **Pena could have performed the essential functions of the Associate Assembler position at the time of her termination if Honeywell had made reasonable accommodations for her disabilities.**

The reasonable accommodation Pena sought was a restructuring of her job duties that precluded her from working in the Molding Room. (Pena Aff.). Pena was capable of performing the essential functions of the Associate Assembler position in all departments except the Molding Room and, in fact, had been doing so for the past eleven (11) years. (Pena Aff.); (Ex. A).

3. **Working in the Molding Room Is Not an Essential Function of the Associate Assembler Position, But Rather, a Marginal Function.**

Honeywell argues that the ability to work in every department at the Cranston facility including the Molding Room is an "essential function" of the Associate Assembler position. Thus, Honeywell claims that if Pena could not work in the Molding Room because of a disability, then she could not perform an essential function of the position and, therefore, she was not a qualified disabled person within the meaning of the law and, thus, not entitled to a reasonable accommodation. Under the ADA, the term "essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n). The term "essential functions" does not include the marginal functions of the position. Id.

While Pena has the burden of showing that she is capable of performing the essential functions of the Associate Assembler position, Honeywell "bear[s] the burden of proving that a given job function is an essential function." Ward v. Massachusetts Health Research Institute, Inc., 209 F.3d 29, 35 (1st Cir. 2000) (defending the burden by arguing that the employer "has better access to the relevant evidence" to prove essential job functions). The Equal Employment Opportunity Commission's (EEOC) regulations provide seven factors relevant to whether a job duty is essential:

(1) The employer's judgment as to which functions are essential;
(2) Written job descriptions prepared before advertising or interviewing applicants for the job;
(3) The amount of time spent on the job performing the function;
(4) The consequences of not requiring the incumbent to perform the function;
(5) The terms of a collective bargaining agreement;
(6) The work experience of past incumbents in the job; and/or
(7) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

Here, when considering these seven (7) factors, a reasonable jury could conclude that working in the Molding Room was not an essential function of the Associate Assembler position, but rather a marginal function and, therefore, Pena was a qualified disabled person within the meaning of the law. Accordingly, summary judgment is inappropriate.

### (1) The employer's judgment as to which functions are essential

While the First Circuit states that courts should "generally give substantial weight to the employer's view of job requirements," Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (quoting Ward, 209 F.3d at 34), this view, "though important, is not dispositive." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 25 (1st Cir. 2001). "The purpose of these provisions is not to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth." Id.

Here, Honeywell's claim that working in the Molding Room is an essential function of Pena's job should be viewed with skepticism. As fully-explained in Section I, Part B, sub-part 5 infra, this position is not only self-serving, but it is also "newly-minted" as Honeywell did not come up with this creative argument until a year after it terminated Pena and only after she filed a Charge of Discrimination in RICHR accusing Honeywell of disability discrimination and only because it was in desperate need of a defense.

Moreover, Honeywell's claim that working in the Molding Room is an essential function of Pena's job is unsupported by the evidence-on-the-record. Indeed, the only evidence-on-the-record to which Honeywell cites in support of its position pertains to the cross-training of employees (Doc. No. 27-1 at 20-21); (Pena Dep. at 23:20-25, 25:13-17, 27:15-16; Ryan Dep. at 99:25-100:2; Dyer Dep. at 41:3-24). And contrary to Honeywell's wishes, being crossed-trained to work in all departments does not presumptively translate to mean that the ability to work in the Molding Room was a fundamental job duty and, thus, an essential function. In fact, Dyer, Pena's supervisor, testified at his deposition that Honeywell needed all Associate Assembler to be cross-trained so they would be able to work in the Molding Room "on an as needed basis" to account for various exigencies such as a worker being out, vacations, and an unexpected large order, similar to a school having a substitute teacher on call. (Dyer Depo. at 41:3-20).

Dyer testified:

**Q.** **Who made the decision to implement the cross-training program?**
A. It was a business director from day one. Data Versatile Law Workforce.
**Q.** **Okay. Did they explain to you why they wanted to implement that policy?**
A. Yes.
**Q.** **What was the reason they gave you?**
A. In case somebody was out, vacation, this, that. We need to move people with business needs. You know, you might get an order that comes in for 50,000 of this and you need to move everybody there tomorrow.
**Q.** **Okay. So it wasn't necessarily that you would need somebody to work in a department for permanently but just sort of an as-need basis, correct?**
A. Yes.
**Q.** **Sort of like a substitute teacher in a school?**
A. Yes.

(Id.).

Furthermore, to the extent that Honeywell argues that the Associate Assemble Job Description is evidence that working in the Molding Room is an essential job function, this argument should fail. Indeed, the Associate Assemble Job Description only requires that an Associate Assembler "be cross-trained within the cell and between and among cells based on business need." (Ex. T), not able to work in all departments. Furthermore, Pena has met this

requirement as she has been crossed-trained to work in the Molding Room (Pena Depo. at 23:20-25, 25:13-17, 27:15-16). Moreover, the requirement to be cross-trained is consistent with Dyer's testimony that Honeywell needed employees to be cross-trained to work in the Molding Room on an as needed basis.

Furthermore, the job description is inadmissible evidence and, therefore, should not be considered at the summary judgment stage because there is no evidence-on-the-record establishing that the job description was in effect during Pena's employment.

In any event, the language in the job description is vague regarding this issue, and since at the summary judgment stage, all reasonable inferences must be made in Pena's favor, this factor should way in Pena's favor.

### (2) Written job descriptions prepared before advertising or interviewing applicants for the job

To the extent the second factor applies, there is no evidence-on-the-record whether Honeywell used its Associate Assembler job description for hiring purposes. Honeywell has not alleged it did.

### (3) The amount of time spent on the job performing the function

This factor favors Pena. As previously stated, Dyer's deposition testimony shows that the requirement to work in the Molding Room was only on an "as needed" basis. (Dyer Depo. at 41:3-20). When Pena returned from FMLA medical leave on January 14, 2013, she was assigned to work in the Molding Room two to three times a week for four (4) hours at a time, which represents eight (8) to twelve (12) hours per week or only 20% to 30% or her forty (40) hour work week. (Pena Dep. at 27:9-11; 40:9-22). In other words, Pena was not assigned to work in the Molding Room 70% to 80% of the time.

### (4) **The consequences of not requiring the incumbent to perform the function**

This factor weighs heavily in Pena's favor.  It was feasible for Honeywell to re-assign the task of working in the Molding Room to other workers.  (Dyer Dep. at 58:5-16).  Not only did Honeywell have a sufficient workforce to accomplish this, doing so did not create an undue hardship on Honeywell or negatively impact its business operation in anyway.  In fact, when Pena refused to work in the Molding Room on February 21, 2013 and March 7, 2013, Honeywell merely assigned another worker there. (Dyer Dep. at 59:4-8).  There is no evidence-on-the-record that Honeywell suffered any adverse consequences from Pena's refusal to work in the Molding Room on these two days.  No drop in sales.  No drop in production.  No lost business.  No customer complaints.

The remaining factors include:  (5) the terms of a collective bargaining agreement, which is inapplicable; (6) the work experience of past incumbents in the job, and/or (7) the current work experience of incumbents in similar jobs.  There is little direct evidence as to factors (6) and (7).

### 4.   **Summary Judgment Is Inappropriate When There Is a Dispute About an Essential Function.**

Summary judgment is rarely appropriate when there is a dispute about an essential function because the inquiry "involves fact-sensitive considerations and must be determined on a case-by-case basis." Gillen, 283 F.3d at 25.  The First Circuit supports this concept. See, e.g., Ward, 209 F.3d at 35 (reversing summary judgment because "a reasonable factfinder could conclude that a regular and predictable schedule is not an essential function of [plaintiff's] position"); Rooney v. Sprague Energy Corp., 483 F.Supp.2d 43, 52–54 (D. Me. 2007) (finding that a factfinder could conclude that tank gauging or loading caustic soda were not essential functions of the Terminal Operation position); Cruz v. McAllister Bros., 52 F.Supp.2d 269, 285 (D.P.R.1999) (denying summary judgment because, inter alia, "there is a genuine issue as to the essential functions of an assistant port engineer" on the question of whether physical labor is an essential function of the job).

Although summary judgment on the essential function issue has been granted and affirmed, those cases are far more clear-cut than this case. See, e.g., Rios–Jimenez v. Principi, 520 F.3d 31, 42 (1st Cir.2008) (affirming grant of summary judgment, finding that attendance was an essential function of employee's supervisory job); Mulloy, 460 F.3d at 146 (affirming a grant of summary judgment, finding that an essential function of the employee's position—electrical engineer for a golf ball manufacturer—was to be physically present at the manufacturing plant); Kvorjak v. Maine, 259 F.3d 48, 57–58 (1st Cir. 2001) (affirming a grant of summary judgment, finding that an essential function of the employee's supervisory job was to be physically present).

Here, a reasonable fact finder could conclude that the working in the Molding Room does not constitute an essential job function because it is so infrequently performed as to be described as a "marginal function," or can be performed by other workers without any adverse consequences to the employer. Furthermore, whether Honeywell's written job descriptions accurately represent current practices in the company and describe the essential functions of the Associate Assembler position is a factual, not a legal, determination. As such, Summary judgment is not appropriate on this issue.

5. **Honeywell Never Raised the Issue of Whether Pena Was a Qualified Disabled Person Until AFTER Pena Filed a Charge of Discrimination in the Rhode Island Commission for Human Rights and, Therefore, Honeywell's "Newly-Minted" Argument Is Pretext.**

If Honeywell truly believed that working in the Molding Room was an essential function of the Associate Assembler position, then the time to raise this issue should have been when Pena first made her reasonable accommodation request on March 7, 2013 or during the interactive process. If Pena could not have worked in the Molding Room, she would not have been able to perform the essential functions of her job, she would not have been a qualified disabled person within the meaning of the law, and Honeywell would have had no obligation under the law to provide her with a reasonable accommodation of a disability. Accordingly, seeking medical documentation of why

Pena could not work in the Molding Room would have been a futile exercise for Honeywell because the reason why Pena could not work in the Molding Room would have been irrelevant.  Indeed, while Honeywell claims it did not understand why going to the Molding Room worsened Pena's medical condition, it is indisputable that Honeywell knew Pena refused to work there and desired to remain working in HEPPA (Gouveia Dep. at 37:10-15; Ryan Dep. at 47:19-24; Pena Dep. at 43:21-24).  If Honeywell truly believed from the onset that working in the Molding Room was an essential function of the Associate Assembler position, then once Pena refused to work there — irrespective of whether or not it was for medical reasons — Honeywell had the right to terminate her employment on the grounds that she could not perform an essential function of her job.  Instead, Honeywell inconvenienced Pena, her doctor, her lawyer, its managers, its doctor, and its lawyer, wasting three months (from March 7, 2013 to June 16, 2013) trying to arrive at an accommodation that it now claims would not have allowed her to perform an essential function of her job anyway.

Not surprisingly, the first time Honeywell made this claim is on June 3, 2014 in its Position Paper in response to Pena's Charge of Discrimination in the Rhode Island Commission for Human Rights (Ex. U).  Indeed, Honeywell should have raised this "newly-minted" defense before it fired Pena as opposed to concocting it almost a year later.  In any event, this "newly-minted" defense is overwhelming evidence of pretext. See Hodgens v. General Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998) (One way a plaintiff may demonstrate pretext is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and" . . . "infer that the employer did not act for the asserted non-discriminatory reasons.").

**D.    HONEYWELL DISCHARGED PENA IN WHOLE, OR IN PART, BECAUSE OF HER DISABILITY.**

In cases like the one at hand, which involve questions of motive and intent, the movant's burden is particularly rigorous.  Unsettled issues regarding motive and intent will often preclude summary judgment. Adecco, 2008 WL 2428207, at * 1; see Lipsett v. Univ. of P.R., 864 F.2d 881, 895 (1st Cir. 1988).  Here, Honeywell knew about Pena's lengthy record of medical problems and mental impairments and, therefore, Honeywell had ample motive to rid itself of a burdensome, disabled employee — at least a reasonable jury could conclude so.

**1.    Honeywell knew about Pena's past FMLA medical leaves for seasonal depression.**

Pena had taken FMLA medical leave routinely throughout her employment due to seasonal depression, which would usually commence in the Fall. (Doc. No 27-1 at 4, n. 3); (Pena Depo. at 26:5-27:4; 28:4-8).  Pena claims her employer was aware of why she needed to take FMLA medical leave. (Pena Aff.).  Pena's most recent FMLA medical leave for seasonal depression prior to her termination was from November 29, 2012 to January 14, 2013 (Pena Depo. at 27:17-28:8).  On March 8, 2013, less than two months later, Honeywell refused to accommodate Pena's request for a reasonable accommodation and sent her home from work (Pena Dep. at 52:5-10; Ryan Dep. at 80:8-12; Gouveia Dep. at 64:8-11, 17-20).

**2.    Honeywell knew that Pena suffered from psychological disorders — anxiety and depression.**

Dr. Geer's three letters informed Honeywell prior to Pena's termination that Pena suffered from anxiety and Major Depressive Disorder. (Exs. A-C).  Also, after Honeywell received the First Doctor Letter, Honeywell's managers Gouveia, Connor, and Dyer, all had actual knowledge that Pena suffered from anxiety. (Gouveia Dep. at 67:5-6; Jennison Dep. at 24:2-10; Ex. A-C).

### 3. Honeywell knew that Pena had been receiving counseling and medication from a mental health provider since 2010.

The Letterhead from Dr. Greer's employer, *The Providence Center,* includes language in the left hand margin listing the services it provides: "Mental health and substance abuse care and treatment services to adults, children, adolescents, and families" (emphasis added) and managers from Honeywell read the entire contents of this letter on March 8, 20913 prior to terminating Pena (Jennison Dep. at 24:2-10; Ryan Dep. at 71:25-72:7, 74:9-16; Gouveia Dep. at 55:6-16; Ex. A).

### 4. Gouveia told Pena: "Why don't you apply for SSDI if you have so many problems?"

Pena testified at her deposition:

Q.    Okay. Do you remember some time at the end of February going to Jose Gouveia and telling him that you had a problem because Myra Fermin kept sending you to the molding department?

**A.    Yes. I went to see him because I was being denied my breaks as well.**

Q.    Right. We've already talked about that. What I'm asking you about now is did you go to him to tell him that you had a problem because Myra Fermin was asking you to work in the molding department?

**A.    I did explain that to him also, and he told me if I had so many health problems, why didn't I apply for Social Security.**

Q.    Isn't it true that what he actually said to you later was that when you were out on leave that you should apply for Temporary Disability Insurance or short-term disability benefits?

**A.    Not temporary. He said if I had so many problems with panic, depression, diabetes, why didn't I apply for Social Security, and I told him I wouldn't because Social Security would not give me what I'm making working for the company.**

(Pena Dep. at 42:24-43:20).

### 5. Gouveia claims he told Pena to apply for TDI.

There is a genuine dispute over whether Gouveia advised Pena to apply for SSDI benefits as Pena claims or TDI benefits[3] as Gouveia claims (Gouveia Dep. at 69:4-70:23). Nonetheless, even giving Gouveia the benefit of the doubt that he advised Pena to file for TDI as opposed to SSDI and that it got lost in translation, Gouveia's suggestion to Pena that she apply for some form of

---

[3] Presumably, when Gouveia used the term TDI, he meant Rhode Temporary Disability Insurance, a state-funded temporary disability insurance programs that Rhode Island employees can utilize through their employers.

disability insurance leads to a very strong inference that Gouveia must have believed that Pena was unable to work due to a medical issue.

6. **Dr. Jennison only received and reviewed one of Dr. Greer's three letters and she never received or reviewed Pena's completed Request for Reasonable Accommodation Form.**

Dr. Jennison claims part of her job duties at Honeywell is to provide an "advisory opinion" on accommodation requests (Jennison Dep. at 47:25-48:3). Yet Dr. Jennison only read one of the three doctor's letters Dr. Greer provided, and she did not read Pena's completed Request for Reasonable Accommodation Form. (Jennison Dep. at 44:21-45:1). In fact, Dr. Jennison does not recall even speaking with anyone at Honeywell about Pena's need for an accommodation. (Jennison Dep. at 47:2-24). Thus, a reasonable jury could conclude that Gouveia or someone else at Honeywell purposefully kept Dr. Jennison out of the loop in order to force Pena's termination.

7. **Honeywell did not consult with a psychiatrist and only relied on the opinion of its own in-house doctor who specializes in occupational medicine.**

During Dr. Jennison's entire thirty (30) year medical career, she had never practiced medicine in an area other than occupational medicine. (Jennison Dep. at 14:2-4). Indeed, Dr. Jennison's only exposure to treating patients with psychological disorders occurred in medical school in 1987 during a mandatory six (6) week rotation. (Jennison Dep. at 18:12-19:20). As the Associate Director of Health Services at Honeywell, Dr. Jennison's job duties primarily encompassed setting forth the company's policy for manufacturing facilities to follow to maintain workplace safety with regard to, for example, chemicals. (Jennison Dep. at 14:4-15:22). Thus, a reasonable jury could conclude that Gouveia, Dr. Jennison or someone else at Honeywell purposefully did not consult with a trained psychiatrist in order to stonewall Pena's efforts to remain employed and force her termination.

8. **On March 7, 2013, Gouveia told Pena that she had to work in the Molding Room and that there was no other work for her to do. (Ryan Dep. at 80:8-12; Gouveia Dep. 64:8-11, 17-20).**

This is untrue. Kevin Dyer testified that Honeywell needed all Associate Assemblers to be cross-trained so they would be able to work in the Molding Room on an as needed basis to account for unexpected exigencies (such as a worker being out, vacations, or an unexpected large order), rather than on a consistent basis. (Dyer Dep. at 41:3-20). Since this was to be a temporary assignment, another employee simply could have been rotated into the Molding Room and Pena could have remained in HEPA. (Dyer Dep. at 58:5-16). Thus, a reasonable jury could conclude that Gouveia lied to Pena so she would remain out of work indefinitely, so he could eventually have a reason to terminate her.

9. **Gouveia emphasized how Pena was pointing her finger in his face and being disrespectful. (Gouveia Dep. at 63:22-25); (Ex. V).**

Oddly, Gouveia made repeated references in his notes and at his deposition as to how disrespectful Pena was towards him during his interactions with her. (Id.) Since Pena was not terminated for insubordination, it is curious why Pena pointing her finger in Gouveia's face would have any relevance to the issues in dispute. Gouveia's obsession with Pena pointing her finger at him is evidence that he took umbrage with her conduct and that, therefore, job abandonment was not the real reason Honeywell terminated her.

II. GENUINE ISSUES OF MATERIAL FACT EXISTS AS TO WHETHER HONEYWELL FAILED TO PROVIDE PENA WITH A REASONABLE ACCOMMODATION OF A DISABILITY.

Under the ADA, "the term 'discriminate' includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . ., unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A);

Rhode Island law is identical. R.I. Gen. Laws § 42-87-1.1(2)(i) ("Discrimination" . . . [i]ncludes those acts prohibited . . on the basis of disability by 42 U.S.C. § 12101 et seq., and . by chapter 5 of title 28."); R.I. Gen. Laws § 42-112-1 ("All persons within the state, regardless of . . . disability . . . have . . . the same rights to make and enforce contracts . . ."). Unlike other enumerated constructions of "discriminate," this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability." Rather, any failure to provide reasonable accommodations for a disability is necessarily "because of a disability" -- the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability -- and no proof of a particularized discriminatory animus is exigible. See Bultemever v. Fort Wayne Community Schs., 100 F.3d 1281, 1283-84 (7th Cir. 1996). Hence, an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business. See 42 U.S.C. § 12112(b)(5)(A); Me. Rev. Stat. Ann. tit. 5, 4553(2)(B); see also Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1300 (D.C. Cir. 1998) (en banc).

To survive a motion for summary judgment on a failure-to-accommodate claim, a plaintiff ordinarily must furnish significantly probative evidence that: (1) he is a qualified individual with a disability within the meaning of the applicable statute; (2) he works (or worked) for an employer whom the ADA covers; (3) the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and (4) the employer's failure to do so affected the terms, conditions, or privileges of the plaintiffs employment. Higgins v. New Balance Athletic Shoe Inc., 194 F.3d 252, 264 (1st Cir. 1999); see Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1515 (2d Cir. 1995); Kralik v. Durbin, 130 F.3d 76, 78 (3d Cir. 1997). But cf. Gaines v. Runyon, 107 F.3d 1171, 1175 (6th Cir. 1997) (requiring 194 F.3d 265 that the accommodation be both reasonable and necessary for the plaintiff to perform the essential functions of his job). As discussed below,

Pena's failure-to-accommodate claim satisfies "these rather undemanding requirements." Higgins,

194 F.3d at 265.

**A. PENA IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY" WITHIN THE MEANING OF THE LAW.**

See Section I, Part B supra.

**B. PENA WORKED FOR AN EMPLOYER WHOM THE LAW COVERS.**

RI FEPA and CVPDA cover Honeywell because it employs more than four people. The

ADA covers Honeywell because it employs more than fifteen people.  Honeywell is also covered

under RICRA as there is no employee threshold requirement.

**C. HONEYWELL, DESPITE KNOWING OF PENA'S MENTAL LIMITATIONS, DID NOT REASONABLY ACCOMMODATE THOSE LIMITATIONS.**

An employer must provide a reasonable accommodation to the known physical or mental

limitations of a qualified individual with a disability unless it can show that the accommodation

would impose an undue hardship. See 42 U.S.C. § 12111(9), 12112(b)(5)(A); 29 C.F.R. § 1630.2(o).

Here, there is no dispute that Honeywell never accommodated Pena's disabilities.

When an individual needs an accommodation, the employee must let the employer know

that she needs an adjustment or change at work for a reason related to a medical condition. EEOC

Enforcement Guidance on the ADA and Psychiatric Disabilities at 1117. See, e.g., Schmidt v.

Safeway Inc., 864 F. Supp. 991, 997, 3 AD Cas. (BNA) 1141, 1146-47 (D. Or. 1994) ("statute does

not require the plaintiff to speak any magic words. . . The employee need not mention the ADA or

even the term "accommodation."). See also Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 694

(7th Cir. 1998) ("[a] request as straightforward as asking for continued employment is a sufficient

request for accommodation"); Bultemever,100 F.3d at 1285 (an employee with a known psychiatric

disability requested reasonable accommodation by stating that he could not do a particular job and

by submitting a note from his psychiatrist); McGinnis v. Wonder Chemical Co., 5 AD Cas. (BNA)

219 (RD. Pa. 1995) (employer on notice that accommodation had been requested because: (1) employee told supervisor that his pain prevented him from working and (2) employee had requested leave under the Family and Medical Leave Act). Nothing in the ADA requires an individual to use legal terms or to anticipate all of the possible information an employer may need in order to provide a reasonable accommodation. The ADA avoids a formulistic approach in favor of an interactive discussion between the employer and the individual with a disability, after the individual has requested a change due to a medical condition.

Here, Pena provided her employer with three (3) doctors' notes from her treating psychiatrist; a completed Request for Reasonable Accommodation Form; and a letter from her lawyer each setting forth in excruciating detail the specific accommodation needed — stay in HEPA and not be assigned to the Molding Room — and the reasons why — the change in the environment, specifically the speed of the machines caused a worsening of her pre-existing anxiety symptoms.

1. **There is a genuine issue of a material fact as to whether Honeywell acted in good faith in engaging Pena in an interactive process.**

To the extent that Pena's request for a reasonable accommodation was not direct and specific enough for Honeywell to understand, which Pena claims is preposterous, it became necessary for Honeywell "to initiate an informal, interactive process" with Pena in order to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome [her] limitations." 29 C.F.R. S 1630.2(o)(3) cited in Kvorjak, 259 F.3d at 52. An employer may be liable for a failure to engage in this interactive process if the plaintiff can demonstrate that "had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." Kvorjak, 259 F.3d at 52; Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir. 1996) (ADA) (upholding judgment for defendant but noting that "[t]here may well be situations in

which the employer's failure to engage in an informal interactive process would constitute a failure

to provide reasonable accommodation that amounts to a violation of the ADA"). However, a

plaintiff who refused to participate in the interactive process may not base an ADA claim on the

failure of that process. Phelps v. Optima Health, Inc., 251 F.3d 21, 27-28 (1st Cir. 2001) (ADA).

      The First Circuit has said:

> In some cases, an employee's request for an accommodation may trigger a duty on the part of the employer to engage in an interactive process. As part of this process, the employer is "expected to engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." Although the degree of interaction required varies in accordance to the circumstances of each case, the process requires open communication by both parties, and an employer will not be held liable if it makes "reasonable efforts both to communicate with the employee and provide accommodations based on the information it possessed . . ." Where a breakdown in the process has been identified, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." For instance, "[a] party that obstructs or delays the interactive process is not acting in good faith."
> Though the issue of good faith is relevant in examining the interactive process, a showing of discriminatory intent or animus is not required in cases alleging a failure to accommodate. Instead, "an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the propose accommodation would create undue hardship for its business." Furthermore, the "duty to provide a reasonable accommodation is a continuing one, however, and not exhausted by one effort.

Enica v. Principi, 544 F.3d 328, 338-39 (1st Cir. 2008) (citations and footnote omitted).

      Furthermore, the First Circuit has recognized that the employer's duty to engage in an

interactive process is particularly important when an employee is suffering from a mental disability.

See Kvorjak, 259 F.3d at 52-53; Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir.1998); Jacques v.

Clean-Up Group, Inc., 96 F.3d 506, 515 (1st Cir.1996). See also Bultemever, 100 F.3d at 1285,

quoting Beck v. University of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996) (stating "[i]n a

case involving an employee with mental illness, the communication process becomes more difficult"

and "[i]t is crucial that the employer [is] aware of the difficulties, and help the other party determine

what specific accommodations are necessary'"); <u>Campbell v. Wal-Mart Stores, Inc.</u>, 272 F.Supp.2d 1289, 1276, 1289-1290 (N.D. Olda.2003) (recognizing that mental illness may prevent individual from comprehending need to request accommodation or ability to do so).

Here, there is overwhelming evidence that Honeywell did not act in good faith in engaging Pena in an interactive process. Indeed, once Pena provided Honeywell with the First Doctor's Letter, there should have been no need to continue any further in the process. Honeywell's request for additional information was unnecessary and is evidence of Honeywell's intent to obstruct Pena's attempts to continue working. Furthermore, Honeywell's request to Pena for medical documentation to support her claim that she could not work in the Molding Room was equally unnecessary and more evidence of Honeywell's obstructionist efforts. Finally, Honeywell's reason for not granting Pena's request for an accommodation, basically disagreeing with her doctor's medical opinion, is not a permissible reason under the ADA or analog state law for denying a request for an accommodation. Indeed, under the ADA, the only reasons the employer can deny a request for a reasonable accommodation is if it not feasible or if it would create an undue hardship. R.I. Gen. Laws § 28-5-7(1)(iv). If disagreeing with an employee's doctor's medical opinion could be the basis for a denial, it would effectively turn the interactive process into a battle of expert witnesses, which is not what Congress intended when it enacted the ADA. Here, the evidence-on-the-record does not support either potential defense for Honeywell, but more importantly, Honeywell has not asserted either defense. (<u>See</u> <u>generally</u> Doc. No 27-1).

### D. HONEYWELL'S FAILURE TO REASONABLY ACCOMMODATE PENA'S DISABILITIES AFFECTED THE TERMS, CONDITIONS, OR PRIVILEGES OF HER EMPLOYMENT.

Honeywell's refusal and failure to accommodate Pena's disabilities ultimately lead to her termination. Honeywell told Pena she had to work in the Molding Room and that it had no other work for her to do. Thus, when Honeywell gave Pena this *Hobson's Choice*, it paved the way for Pena's ultimate termination for "job abandonment" on June 16, 2013.

III.   GENUINE ISSUES OF MATERIAL FACT EXISTS AS TO WHETHER PENA CAN PROVIDE A SUFFICIENT EXPLANATION FOR WHY SHE CLAIMED IN HER SSDI APPLICATION THAT SHE WAS "UNABLE TO WORK BECAUSE OF A DISABLING CONDITION AS OF MARCH 8, 2013."

Honeywell argues that because Pena asserted on her SSDI application that she was "unable to work because of a disabling condition as of March 8, 2013" it logically follows that as of March 8, 2013, she was unable to perform the essential functions of her position and, therefore, she was not a qualified disabled person entitled to an accommodation under the ADA. (Ex. Q).  However, "[T]he SSDI scheme and the ADA scheme [are] separate and distinct . . . .  Consequently, receipt of benefits under the former scheme does not create any presumption (conclusive or rebuttable) with respect to a parallel ADA claim." DeCaro v. Hasbro, Inc., 580 F.3d 55, 62 (1st Cir. 2009) (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999)).  As explained below, the definition of disabled within the meaning of the ADA for the purposes of prosecuting a disability discrimination claim is entirely different from the definition of disabled within the meaning of the Social Security Act ("SSA") for the purposes of obtaining SSDI benefits.  Here, contrary to Honeywell's position, Pena stating on a SSDI application "I am unable to work because of my disabling condition on March 8, 2013.  I am still disabled" is not at all inconsistent with her position that as of that same date she was a qualified individual under the ADA. Cleveland, 526 U.S. at 804 ("an individual might qualify for SSDI under SSA's administrative rules and . . . remain capable of 'perform[ing] the essential functions' of her job") (internal citations omitted).  Accordingly, Pena's statement on her SSDI application that she was disabled as of March 8, 2013 was truthful and accurate at the time it was made.

An ADA plaintiff "may not simply ignore seeming contradictions between statements made in an application for SSDI benefits and elements of an ADA claim . . . [,][r]ather, [she] must explain such seeming contradictions." DeCaro, 580 F.3d at 62.  Indeed, such statements "may or may not be inimical to an employment discrimination claim.  Everything depends on interpretation: how the

jurors view the statements and the receipt of benefits in the context of the overall explanation." Id.
Here, Honeywell claims that at Pena's deposition, she failed to provide an explanation of these
inconsistent statements. However, Honeywell is guilty of adopting a misleading interpretation of
Pena's testimony. Honeywell's counsel is also guilty of failing to ask the right questions.

To the contrary, Pena is able to explain any seeming contradiction in that: (1) the definition
of qualified individual with a disability under the ADA is different from the definition of being
totally disabled under the ADA; (2) the statements Pena made in her SSDI application were true and
accurate at the time she made them; and (3) Pena would have been able to continue working at
Honeywell if she were not denied a request for a reasonable accommodation. Finally, Pena should
not have to choose between obtaining disability benefits so she can feed herself and vindicating
important civil rights under the ADA.

## A.   THE DEFINITION OF QUALIFIED INDIVIDUAL WITH A DISABILITY UNDER THE ADA IS DIFFERENT FROM THE DEFINITION OF TOTALLY DISABLED UNDER THE SSA.

To truly comprehend the difference between being disabled under the ADA and being
disabled for the purpose of receiving SSDI benefits, one must consider both the differences between
the purposes of each statute as well as the differences between the definitions of disability under
each respective framework.

The ADA is designed "to provide a clear and comprehensive national mandate for the
elimination of discrimination against individuals with disabilities" and "to provide clear, strong,
consistent, enforceable standards addressing discrimination against individuals with disabilities." 42
U.S.C. § 12101 (b)(1), (b) (2). Such mandates and standards further "the Nation's proper goals
regarding individuals with disabilities . . . to assure equality of opportunity, full participation
independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101 (a) (7).
The ADA's ultimate design is to ensure individuals with disabilities who want to work and are
qualified to work have an equal opportunity to do so. See 42 U.S.C. § 12101 (a) (8) (noting that

discrimination "denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous").

The definition of disability under the ADA sheds light on the broad remedial purposes of the statute. The ADA prohibits covered employers from discriminating "against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). Under the ADA, a qualified individual "means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. 12111 (8). Disability is defined as "(A) physical or mental impairment that substantially limits one or more major life activities; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102 (1). It focuses on what an individual can do rather than what she cannot do. See 135 Cong. Rec. 510, 711 (daily ed. Sept. 7, 1989) (statement of Sen. Harkin).

On the other hand, the SSA, is a social insurance program designed to provide guaranteed income to individuals with disabilities when they are found to be generally incapable of gainful employment. Its purpose is to provide a basic level of financial support for people who, because of a disability, cannot support themselves. Indeed, in enacting the SSA, Congress recognized society's obligation to provide assistance to people whose disabilities prevent them from supporting themselves financially. See generally 42 U.S.C. §§ 1381, 1382c (a)(3)(B). This obligation is reflected in the SSA definition of disability.

To qualify as disabled for the purposes of obtaining SSDI benefits, the applicant must be unable to engage in gainful employment by reason of any physical or mental impairment which is either expected to result in death or to last for a continuous period of not less than twelve (12) months. Cleveland, 526 U.S. at 801 (citing 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her]

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. (citing 42 U.S.C. § 423 (d)(2)(A)).

The most salient difference between the two statutory schemes is that the ADA takes into consideration a claimant's need for a reasonable accommodation of a disability, while the SSA does not. Cleveland, 526 U.S. at 803.  In fact, a person applying for SSDI benefits need not even refer to the possibility of a reasonable accommodation when she applies for SSDI. Id.

When Pena stated on her SSDI application that she was unable to work as of March 8, 2013, she meant that she was totally disabled only for the purposes of SSDI. (Pena Aff.).  Pena made this statement taking into account her age, education, work experience, the fact that Honeywell terminated her after failing to provide her a reasonable accommodation; and the fact that her mental impairment was of such severity that she was unable to engage in any other kind of substantial gainful work which exists in the national economy. (Id.).  Indeed, at the time Pena filed her SSDI application, she was a fifty-three (53) year old, unskilled worker without a formal education, whose only training was working as an assembler in a factory.  (Id.).  Given the specific circumstances of Pena's situation at the time of her SSDI application and the lack of available assembler or factory jobs in general, Pena was unable to engage in substantial, gainful work. (Id.).

Therefore, Pena's statement on her SSDI application and her allegations under the ADA are not at all contradictory.  Indeed, Pena is disabled within the meaning of both the SSA and the ADA and, therefore, both statements are true when considering them in the context of their proper statutory framework. See Overton v. Reilly, 977 F.2d 1190 (7th Cir. 1992)( a person can have a disability for SSA purposes and still be a "qualified individual with a disability" for Rehabilitation Act purposes).

### B. THE STATEMENTS PENA MADE IN HER SSDI APPLICATION WERE TRUE AND ACCURATE AT THE TIME SHE MADE THEM.

On March 7, 2013, Gouveia gave Pena the choice of either working in the Molding Room or going home. (Ryan Dep. at 80:8-12; Gouveia Dep. at 64:8-11, 17-20).  Thus, began Pena's three (3) month journey in quest for a reasonable accommodation so she could return to work (Pena Depo. at 81:4-5) ("When I was seeing Veronica Kot, I wanted my job back").  Importantly, Pena did not apply for SSDI benefits until September 20, 2013, only _after_ she had exhausted every possible effort of getting the needed accommodation. (Pena Aff.); (Pena Depo. at 82:7-9) ("For about four or five months during the time that the lawyer was in constant communication with [Honeywell], and they were declining").

On September 20, 2013 Pena filed for SSDI benefits. (Ex. Q). As discussed _supra_, when an applicant applies for SSDI benefits, eligibility does not contemplate the need for a reasonable accommodation of a disability.  In other words, when Pena wrote on her SSDI application: "I am unable to work because of my disabling condition on March 8, 2013.  I am still disabled" it was the functional equivalent to stating: "As of March 8, 2013, without a reasonable accommodation, I am unable to work because of my disabling condition." See Cleveland, 526 U.S. at 803.  Thus, when Pena made that statement in September 2013 after exhausting all efforts to obtain a reasonable accommodation, the statement was in fact true and accurate.

### C. HAD DEFENDANT GRANTED PENA'S REQUEST FOR A REASONABLE ACCOMMODATION, SHE WOULD HAVE BEEN ABLE TO CONTINUE WORKING.

At all relevant time, Pena was a "qualified individual" under the ADA because she was able to perform the essential functions of her job with a reasonable accommodation.  A careful examination of Pena's deposition testimony reveals Honeywell's obvious confusion regarding the distinction between being disabled under the ADA versus being disabled for purposes of SSDI benefits.  For example, Honeywell's counsel asked Pena:

Q. So you agree that since March 8, 2013 you have been unable to perform any work?
A. Yes.

Q. Do you understand that when you make a claim of disability discrimination, you are alleging that if you had received an accommodation, you could have performed your job?

      Ms. Connor: Objection.  Legal Conclusion.

A.  I was doing quite well, and they were the ones that harmed me.
(Pena Depo. at 77:25-78:1-9).

The line of questioning suggests Honeywell believes that disabled as a specific date for the purpose of an ADA claim is the same as disabled as a specific date for the purposes of an SSDI claim.  They are not.  As previously discussed, disability is defined differently under the ADA and SSA statutory framework.  Furthermore, Honeywell's counsel's deposition questions were confusing, particularly to Pena, who does not speak English, lacks a formal education, and does not understand that each statute defines disability differently.  Pena tried her best to express that she could have returned to work with a reasonable accommodation had her employer granted it, but that she was unable to work without the accommodation and, therefore, totally disabled as of March 8, 2013, the date her accommodation was denied. (Pena Aff.).  Through a Spanish interpreter, Pena testified:

Q. At what point did you become unable to work at all?
A. The same moment that they denied me my job without accommodating me, without any need to do that.

Q. Was that on March 8, 2013?
A. For about four or five months during the time that the lawyer was in constant communication with them, and they were declining.
(Pena Depo. at 82:1-9).

Pena's deposition testimony can reasonably be interpreted to mean that if Honeywell granted Pena the requested accommodation she would have returned to work, but because it did not, she became disabled as of March 8, 2013, the date of the denial (Pena Aff.).  Indeed, when Honeywell did not allow Pena to return to work after it received the First Doctor's Letter on March 8, 2013, it

was the functional equivalent to a denial of her request for a reasonable accommodation, which resulted in her termination approximately three (3) month later, and ultimately to her filing for SSDI benefits on September 20, 2013. Had Honeywell granted Pena's accommodation request, she would have gone back to work, and she would not have filed for SSDI benefits. (Pena Aff.). As such, because Pena was able to perform the essential functions of her job with an accommodation, she was a qualified individual within the meaning of the ADA.

In D'Aprile v. Fleet Services Corp., the First Circuit reversed a district court's grant of summary judgment where the plaintiff sought disability benefits after the defendant refused her request to work on a part-time basis. 92 F.3d 1, 2-3 (1st Cir. 1996). After the employer denied her request to work part-time, the plaintiff used her accrued vacation leave to work part-time hours until her leave expired. Id. Once plaintiff exhausted her vacation time, she submitted a doctor's note that she could no longer work and needed to be placed on disability. Id. at 3. The plaintiff then applied for and received disability benefits under her employer's disability insurance plan.[4] Id. at 4-5. In overturning the district court's granting of summary judgment, the court found there existed a genuine issue of material fact as to whether plaintiff could have worked with a reasonable accommodation. Id. at 5.

Here, similar to the D'Aprile decision, the court should deny summary judgment on the grounds that whether or not plaintiff could have worked with a reasonable accommodation despite certifying she was "totally disabled" on her SSDI application creates a genuine dispute of material fact that precludes summary judgment.

---

[4] The plaintiff did not seek SSDI benefits, but rather disability benefits under a private plan through her employer. Nonetheless, the analysis is the same in that totally disabled for the purposes of a private disability plan is a different definition of disabled within the meaning of the ADA.

### D. HONEYWELL KNEW THAT PENA HAD BEEN TRYING DESPERATELY TO GET BACK TO WORK AND THAT SHE ONLY FILED FOR SSDI BENEFITS UPON HER PSYCHIATRIST'S RECOMMENDATION

Not surprisingly, Honeywell ignores a plethora of evidence-on-the-record that proves Pena was trying to get back to work before she filed her application for SSDI benefits on September 20, 2013. Indeed, Dr. Geer's treatment notes, which Pena produced through discovery, tell everything Honeywell needs to know knew about why Pena claimed on her SSDI application to be totally disabled as of March 8, 2013. (Ex. D-G). Pena visited Dr. Greer on March 4, 2013, March 12, 2013, March 18, 2013, and April 22, 2013. (Id.).

On March 4, 2013, Dr. Greer's treatment note provided:

> **Pt in reporting that she has been doing better with depression but has been experiencing worsening anxiety/panic symptoms associated with changes in work setting in her company. I wrote letter to Honeywell requesting they not place her there but noted that she is capable of functioning in other settings. Assessment: Situational Stress.**

(Ex. D).

On March 12, 2017, Dr. Greer's treatment note provided:

> **Pt in after 1 week, reporting that she gave employer her letter who rejected in [sic] reportedly wanting unnecessary details of her condition. Agreed I would call supervisor Kevin Dyer and discuss her situation without going into excessive detail, as well as my opinion that the current position may result in her going out on Worker's Comp. Release Signed.**

(Ex. E).

On March 18, 2017, Dr. Greer's treatment note provided:

> **Pt reports increased stress associated with lack of resolution of work situation, presents as highly anxious and increasingly labile. Called HR dept at Honeywell and left message. Assessment: Situational stress exacerbating depressive and anxiety symptoms.**

(Ex. F).

On April 22, 2013, Dr. Greer's treatment note provided:

> **Pt in reporting that she has been more depressed, reporting frequent episodes of tearfulness, feeling hopeless. She is still not working and**

has no income. She presents letter from employer stating that they have not yet received records, called and discussed with HIS, she will go there and clarify request, they will send records today. Appearance: reasonably dressed Affect: constricted Behavior: calm Mood: depressed Speech: coherent Thought Content: denies delusions; denies hallucinations, denies suicidal ideations, denies homicidal ideations. Assessment: Depression worsened by situation stress.

(Ex. G).

This evidence supports Pena's assertion that she could perform the essential functions of her job with a reasonable accommodation.

E.   WHILE NOT REQUIRED TO DO SO, THE COURT SHOULD CONSIDER THE FACTORS SET FORTH IN EEOC ENFORCEMENT GUIDANCE ON THE EFFECT OF REPRESENTATIONS MADE IN APPLICATIONS FOR BENEFITS ON THE DETERMINATION OF WHETHER A PERSON IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY" UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990 (ADA).

The EEOC has published enforcement guidelines for dealing with issue of claimants who make statements on their SSDI applications that are allegedly inconsistent with statements about their disabilities in other claims, such ADA claims and workers' compensation claims entitled:

"EEOC Enforcement Guidance on the Effect of Representations Made in Applications for Benefits on the Determination of Whether a Person Is a "Qualified Individual with a Disability" Under the Americans with Disabilities Act of 1990" (ADA), EEOC NOTICE Number 915.002 (2-12-97), at https://www.eeoc.gov/policy/docs/qidreps.html (last visited March 28, 2017) (the "EEOC Enforcement Guidance").

The EEOC Enforcement Guidance provides:

This Enforcement Guidance explains why representations about the ability to work made in the course of applying for social security, workers' compensation, disability insurance, and other disability benefits do not bar the filing of an ADA charge.  It provides instructions to EEOC investigators for assessing what weight, if any, to give to such representations in determining whether a charging party (CP) is a "qualified individual with a disability" for purposes of the ADA.

A "qualified individual with a disability" is "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and who,

with or without reasonable accommodation, can perform the essential functions of such position." Because of the fundamental differences in the definitions used in the ADA and the terms used in disability benefits programs, an individual can meet the eligibility requirements for receipt of disability benefits and still be a "qualified individual with a disability" for ADA purposes. Thus, a person's representations that s/he is "totally disabled" or "unable to work" for purposes of disability benefits are never an absolute bar to an ADA claim.

### Americans with Disabilities Act

The definition of the term "qualified individual with a disability" reflects the ADA's broad remedial purpose to prohibit discrimination against individuals with disabilities who want to work and are qualified to work. Accordingly, the definition:

- requires an individualized assessment of a particular individual's capabilities;
- focuses on the essential functions of a particular position;
- looks at particular positions, not work in general; and
- considers whether a person can work with reasonable accommodation.

The ADA definition of "qualified individual with a disability" differs from the definitions used in the Social Security Act, state workers' compensation laws, disability insurance plans, and other disability benefits programs designed for different purposes.

### Social Security Act

Disability programs established under the Social Security Act are designed to provide income to individuals with disabilities who generally are unable to work. Unlike the ADA definition of "qualified individual with a disability," the Social Security Administration (SSA) definition of "disability":

- permits general presumptions about an individual's ability to work;
- considers all tasks as jobs are customarily performed without focusing on the essential functions of a particular position;
- looks generally at whether an individual can do work which exists in the national economy rather than whether s/he can perform the essential functions of a particular position; and
- does not consider whether a person can work with reasonable accommodation.

EEOC Enforcement Guidance provides the below factors for investigators to consider

when assessing the effect of representations made in connection with an application for SSDI

benefits on the determination of whether a claimant is a "qualified individual with disability"

investigators should consider the following factors.  Several of these factors weigh in Pena's favor of

Pena's argument that she is a "qualified disabled person:"

- the definitions of terms such as "disability," "permanent disability," "total disability," "inability to work," etc., under the relevant statute or contract pursuant to which CP  applied for disability benefits  (e.g., do they look at specific positions or general kinds of work? do these terms take into account reasonable accommodation?);

See discussion in Section III, Part A <u>supra</u>.

- whether CP asked for and was denied reasonable accommodation;

On March 8, 2013, Pena requested an accommodation and was denied.  (Pena Aff.).

- whether the representations are in CP's own words;

Pena's SSDI lawyer advised her to use March 8, 2013, her last day of work, as the date of the onset of her disability. (Pena Aff.).

- whether CP was working during the period of time referred to as a period of total disability;

Pena was not working during this time.

- whether the employer suggested that CP apply for benefits;

Gouveia advised Pena to file for SSDI benefits. (Pena Aff.).

- when the employer learned of the representations;

The employer learned that Pena filed for SSDI during the discovery phase of this case.

- other relevant factors, such as advances in technology or changes in the employer's operations that may have occurred since representations were made that may make it possible for CP to perform the essential functions of the position, with or without reasonable accommodation.
- when the representations were made, the period of time to which they refer, and whether CP's physical or mental condition has changed since the representations were made;
- the specific content of the representations, who made them, and the purpose for which they were made;
- whether the representations about CP's inability to work are qualified in any way (e.g., "I am able to work with certain restrictions");

F. **PENA SHOULD NOT HAVE TO CHOOSE BETWEEN APPLYING FOR DISABILITY BENEFITS AND VINDICATING HER RIGHTS UNDER THE ADA.**

As discussed above, Congress created one statutory framework to provide for the needs of disabled people who cannot support themselves financially (the SSA) and another one to provide for disabled people who are able to work with an accommodation (the ADA).  Honeywell is attempting to put Pena "in the untenable position of choosing between [her] right to seek disability benefits and [her] right to seek redress for a[]...violation of the ADA." Smith v. Dovenmuehle Motrtg. Co., 859 F.Supp. 1138, 1142 (N.D. Ill. 1994).  Indeed, when Pena chose to apply for SSDI benefits, while later setting forth an ADA claim, she was exercising two independent rights.

Furthermore, both the ADA and SSA permit people to work, which suggests that neither statute defines disability as being totally and completely unable to work. See Mohamed v. Marriott, 1996 WL 631687 at *6 (S.D.N.Y. Oct. 30, 1996) (since the SSA permits individuals to work and receive benefits at the same time, "the classes of individuals entitled to protection under the [Social Security Act and the ADA] are not mutually exclusive").

Thus, because both statutes permit claimants to work, Pena should not have to choose between being surviving and using the ADA to assist her in being a productive member of society.

IV. **GENUINE ISSUES OF MATERIAL FACT EXISTS AS TO WHETHER HONEYWELL'S DECISION TO TERMINATE PENA WAS MOTIVATED, IN PART, BECAUSE SHE ENGAGED IN PROTECTED CONDUCT.**

The retaliation provision in the ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a).  In order to establish a claim of retaliation under the ADA, a plaintiff must show (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action. Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997).  It is well

established that "requesting an accommodation, without filing a formal charge or engaging in other specific behaviors listed in § 12203(a), is nonetheless behavior protected from an employer's retaliation." Wright v. CompUSA, Inc., 352 F.3d 472, 477–78 (1st Cir. 2003). Even if he fails to bring a successful disability claim under the ADA, a plaintiff may nonetheless assert a claim for retaliation. Soileau, 105 F.3d at 16.

### 1. Pena engaged in protected conduct

Here, Pena claims that because she suffers from diabetes, she needed to eat at very specific intervals during the day and, therefore, she needed to take breaks at 9:00 AM and 12:00 PM. (Pena Aff.). Pena claims that in February 2013, a supervisor did not allow her to take her 12:00 PM break despite knowing that she needed to take the break because of her diabetes. (Id.). Pena complained to the supervisor and told her that she would get a doctor's note if she was not allowed to take her medically-necessary break on time. (Id.). Not surprisingly, this same supervisor assigned Pena to the Molding Room shortly thereafter. (Id.). Pena claims she told Gouveia about this incident, which is, in fact, memorialized in a document Gouveia created entitled "Notes to File" to keep track of his dealings with Pena's need for an accommodation. (Ex. V).

### 2. Pena suffered an adverse employment action.

Honeywell terminated Pena.

### 3. There was a causal connection between the protected conduct and the adverse employment action.

One way a plaintiff can prove causation is by showing a temporal proximity between the protected conduct and the adverse employment action. Courts have found that a three to four month period such as in this case is sufficient. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (noting that periods of three or four months have been held sufficient to establish the necessary causal connection). Here, Pena was terminated on June 17, 2013, within four (4) months of complaining to Gouveia that she was denied a medically-necessary break.

V.   To Prevail on Her Claims, Pena Need Not Prove Pretext, Only That Honeywell's Decision to Terminate her Was More Likely Than Not Based, in Whole, or in Part, on Discrimination or Because She Engaged in Protected Conduct.

Honeywell argues that it is entitled to summary judgment because Pena cannot establish a genuine issue of a material fact with regards to pretext, the third prong of the McDonnell Douglas burden-shifting analysis. (Doc. No. 47 at 18).  However, the central focus of the inquiry in discrimination cases "is always whether the employer is treating 'some people less favorably than others because of their [membership in a protected class].'" Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) (quoting Teamsters v. United States, 431 U.S. 324, 335 n. 15).  The method suggested in McDonnell-Douglas for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.

The U.S. Supreme Court has made clear, in handling discrimination cases the issue is simply proof by a preponderance of the evidence and, on summary judgment, proof sufficient to convince a reasonable jury to return a verdict for the plaintiff:

> we should not depart from the [c]onventional rul[e] of civil litigation [that] generally appl[ies] in Title VII cases. That rule requires a plaintiff to prove his case by a preponderance of the evidence, using direct or circumstantial evidence. We have often acknowledged the utility of circumstantial evidence in discrimination cases. For instance, in Reeves v. Sanderson Plumbing Products, Inc. . . . we recognized that evidence that a defendant's explanation for an employment practice is unworthy of credence is one form of *circumstantial evidence* that is probative of intentional discrimination. The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.

Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-100 (2003)(internal quotes and citations omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986) (a motion for summary judgment is defeated when the plaintiff has presented evidence "such that a reasonable jury could return a verdict for the [plaintiff]").

"Contrary to the argument made by [defendant], the complainants were not required to follow the McDonnell-Douglas paradigm in order to prevail." Trustee of Health and Hospitals of

City of Boston, Inc. v. Massachusetts Comm'n Against Discrimination, 449 Mass. 675, 687, 871

N.E.2d 444 (2007).  It is certainly one way to present a case, but it is not the only way. See Knight v.

Avon Prods., Inc., 780 N.E.2d 1255 (Mass. 2003). The first stage of the McDonnell-Douglas

paradigm gives rise to a presumption of discrimination. See Matthews v. Ocean Spray Cranberries,

Inc., 426 Mass. 122, 128, 686 N.E.2d 1303 (1997). But an inference of discrimination will suffice.

See Lipchitz v. Raytheon Co., 751 N.E.2d 360 (Mass. 2001).

    Furthermore, the opportunity provided to a plaintiff to show pretext is simply an

opportunity to present evidence from which the trier of fact can find unlawful discrimination.

Kragor v. Takeda Pharmaceuticals Am., Inc., No. 11-16052, n.1 (11th Cir. Dec. 20, 2012) (Tjoflat,

Carnes, and Jordan, JJ.).  In proving a case under Title VII, following the defendant's proffer of a

justification, a plaintiff need only show that the defendant was in fact motivated at least in part by

the prohibited discriminatory animus. Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117

(2nd Cir. 2000) (holding that defendant can prevail "by proving that a discriminatory motive, more

likely than not, motivated the defendants" (internal quotation marks omitted)). See also Aulicino v.

New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2nd Cir. 2009) (explaining that to prevail,

plaintiff must prove "that the defendant's employment decision was more likely than not based in

whole or in part on discrimination" (internal quotation marks omitted)); James v. New York Racing

Ass'n, 233 F.3d 149, 154 (2nd Cir. 2000) (explaining that defendant entitled to prevail "unless the

plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination").  A

plaintiff has no obligation to prove that the employer's innocent explanation is dishonest, in the

sense of intentionally furnishing a justification known to be false. The crucial element of a claim

under Title VII is discrimination, not dishonesty. Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d

134, 156-57 (2nd Cir. 2010).

To require a plaintiff to prove that the employer acted with conscious intent to deceive as to its reasons imposes a burden not envisioned by the statute. There are many circumstances in which a jury may justifiably find a prohibited discriminatory motivation notwithstanding a different explanation given by the employer in good faith without intent to deceive. One such circumstance exists where the adverse decision is made by two or more persons, some of whom are motivated by discrimination, while others are motivated by other reasons, and the employer's innocent explanation emanates from those who had no discriminatory motivation and were unaware of their colleagues' discriminatory motivation. In such cases, the explanation given by the employer will be based on incomplete information, but not an intent to deceive.   In short, what the statute prohibits is discrimination in employment. It does not require proof in addition of deceitful misrepresentation.

Id. at 157.

A pretext for discrimination means more than an unusual act or a business error; pretext means deceit used to cover one's tracks. Clay v. Holy Cross Hosp., 253 F.3d 1000, 1005 (7th Cir. 2001); Kulumani v. Blue Cross Blue Shield Ass'n, 224 F.3d 681, 685 (7th Cir. 2000).

Here, even if Pena is unable to prove pretext or that Honeywell is lying, there is still sufficient evidence on-the-record for which a jury could find that Honeywell terminated Pena for unlawful purposes. (See Parts III-VI, infra).

VI.   TO THE EXTENT THIS COURT REQUIRES PENA TO PROVE PRETEXT, A JURY COULD FIND THAT HONEYWELL'S PROFFERED REASON FOR TERMINATING PENA IS PRETEXT.

One way a plaintiff may demonstrate pretext is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and" . . . "infer that the employer did not act for the asserted non-discriminatory reasons." Hodgens v. General Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998).  In assessing discriminatory motive, a court may also consider other factors, including, inter alia, the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence and any contemporary statements by members of the decisionmaking body. Id. at 168-69; see also Straughn v. Delta Airlines, Inc., 250 F.3d 23, 35 (1st Cir. 2001) ("[t]he burden of

persuasion on pretext may be met, inter alia, by showing 'that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.'" (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000)). Moreover, "doubts about the fairness" of an employer's decision, while not necessarily dispositive, may be probative of whether the employer's reasons are pretexts for discrimination. General Dynamics Corp., 144 F.3d at 169 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981)). Finally, "[t]he reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as pretext." Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 n. 4 (1st Cir. 1989).

To the extent this Court requires Pena to provide sufficient evidence of pretext in order to survive summary judgment, there is more than adequate evidence for a reasonable jury to conclude that Honeywell's proffered reason for terminating Pena is pretext for discrimination. Indeed, Honeywell's contention that the only work available for Pena to do at the Cranston facility was in the Molding Room is inconsistent with Dyer's testimony that workers were only assigned there on an "as needed" basis. (Dyer Depos. at 41:3-20). This statement is also inconsistent with Pena's actual work assignments over a two week period — from February 21, 2013 to March 7, 2013 — when she was only assigned to work in the Molding Room twice and for only a short period of time. (Pena Dep. 27:9-11; 40:9-22). Finally, Honeywell has made inconsistent statements about whom at Honeywell had the final decision-making authority to grant or deny Pena's accommodation. Gouveia claims that Honeywell's legal and medical teams had the final say, while Dr. Jennison testified that Honeywell's H.R. people did. (Gouveia Dep. at 84:9-11; Jennison Dep. at 29:12-16). Finally, Dr. Jennison claims that her role in this matter was only to provide a medical opinion, yet she only viewed a small fraction of the information available, the First Doctor's Note and nothing more. (Jennison Dep. at 37:6-21, 44:21-45:1, 47:2-24, 47:25-48:3).

CONCLUSION

For the reasons stated above, Plaintiff Mayra Pena respectfully requests that the Court deny Defendant Honeywell, Inc.'s Motion for Summary Judgment.

MAYRA PENA

By Her Attorneys,

/s/Mark P. Gagliardi
Mark P. Gagliardi (#6819)
mark@gagliardilaw.net

/s/Alicia M. Connor
Alicia M. Connor (#9515)
alicia@gagliardilaw.net

LAW OFFICE OF MARK P. GAGLIARDI
120 Wayland Avenue, Suite 7
Providence, RI 02906
(401) 277-2030
(401) 277-2021 (fax)

Dated:  March 28, 2017

CERTIFICATE OF SERVICE

I hereby certify that on this **28**th day of March 20**17**, I caused the foregoing document to be electronically filed with the Court's CM/ECF system.  The following counsel-of-record have been served by electronic means.

Neal J. McNamara
nmcnamara@nixonpeabody.com

Aaron F. Nadich
anadich@nixonpeabody.com

Nixon Peabody, LLP
One Citizens Plaza, Suite 500
Providence, RI 02903-1345

/s/Mark P. Gagliardi