# EXCERPTED DEPO. TR.
# CONNOR RYAN

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

---

MAYRA F. PENA,
      PLAINTIFF

V.                      C.A. NO:   15-CV-00179-S-LDA

HONEYWELL INTERNATIONAL INC.
      DEFENDANT.

---

DEPOSITION OF CONOR RYAN, taken on behalf of
the Plaintiff, pursuant to Notice of Deposition, at the
LAW OFFICE OF MARK P. GAGLIARDI, LLC, 120 Wayland
Avenue, Suite 7, Providence, Rhode Island, scheduled at
2:00 p.m. on Wednesday, November 30, 2016, before
Dawn M. Baker, RPR and Notary Public in and for the
State of Rhode Island.

-oOo-

15

1      A.   Then I took the value stream leader position

2  in Cranston, and then I took the position of value

3  stream leader in Smithfield.

4      Q.  Okay.

5          MR. GAGLIARDI:  You know what?  I'm going to

6  have to take a real quick break.  I didn't print out

7  the rest of my outline.  Let me go get it.  I'll be

8  right back.

9          THE WITNESS:  Okay.

10         (Off the record.)

11     Q.  BY MR. GAGLIARDI:  All right.  So I'm going

12 to represent to you -- I'm sorry.  Strike that.

13         What was your job title during the time

14 period March to June 2013?

15     A.  HSE site leader.

16     Q.  Is that the same as HSE manager?

17     A.  Correct.

18     Q.  All right.  So let's talk about that.  What

19 were your job duties as the HSE site leader?

20     A.  I was in overall responsibility over the HSE

21 management systems within the Cranston, Rhode Island

22 location.

23     Q.  Is it fair to say that you were in charge --

24 you were responsible for safety at that facility?

25     A.  Safety is everyone's responsibility at

1    Honeywell, but my job -- Honeywell has corporate HSE

2    management systems, and my job was to deploy and

3    oversee those at Honeywell.

4         Q.   What do you mean by "management systems"?

5         A.   So take, for example, like lockout-tagout as

6    the specific safety management system where emergency

7    response would be a separate management system.

8         Q.   Okay.   You were in charge of those systems?

9         A.   Correct.

10        Q.   Okay.   Let's talk about the Cranston

11   facility.   How many people worked at the Cranston

12   facility, approximately?   This is in 2013.

13        A.   To give you an exact number, I'm not going to

14   be able to from 2013.   I want to say in manufacturing

15   there was around 130 people.

16        Q.   Okay.

17        A.   And -- but there was also a distribution

18   center.   I'm not positive if customer service had moved

19   to Smithfield at that time, and there's also several

20   employees that were tied to the Cranston, Rhode Island

21   location that did not actually work out of the

22   Cranston, Rhode Island location.   So I can't give you

23   an accurate number.

24        Q.   All right.   So let's do it like this:   So

25   tell me about this Cranston facility.   How many

23

1  different scenarios on what could or could be perceived

2  as discrimination [sic].

3      Q.  Okay.  Have you received any training since

4  then?

5      A.  I believe it's an annual requirement.  So it

6  comes up every -- every year, I believe, or it could be

7  every other year.

8      Q.  Okay.  And what is that requirement?

9      A.  Same thing, watch the video.

10     Q.  Okay.

11     A.  You may have to take a quiz and pass it.

12     Q.  What about did you receive any training on

13  the Americans with Disabilities Act?

14     A.  I don't believe so, no.

15     Q.  Okay.  So what kind of discrimination did the

16  company teach you about?  Was it sexual harassment or

17  other types of discrimination?

18     A.  I believe it was -- included sexual

19  harassment, references to race, religion, and the basic

20  discrimination, I would say.

21     Q.  Okay.  How many different departments were

22  there in 2013 in the manufacturing part of the

23  facility?

24     A.  Areas that were -- had their own titled name

25  would have been injection molding, logo, the

1    respiratory department, and SCBA, and I think that

2    covers it.

3        Q.  What's SCBA?

4        A.  Self-contained breathing apparatus.

5        Q.  Okay.

6        A.  So those are like -- you know, a tank that a

7    firefighter wears that has air in it.  That's what the

8    area was named after.

9        Q.  What's the molding room?

10       A.  The injection molding room was where we

11   manufactured finished goods and WIP for assembly.

12       Q.  WIP?

13       A.  Work in process.  So you could create a

14   hardhat in injection molding that ultimately needs to

15   put a customer's logo on it, so that hat would go to

16   the logo department to be finished, or you could finish

17   it right off the injection molding press itself.

18       Q.  So the molding room is the same thing as

19   injection molding?

20       A.  Correct.

21       Q.  And what kind of product -- so they --

22   finished goods are made in the injection molding room,

23   correct?

24       A.  A combination of finished goods and WIP.

25       Q.  Okay.  So a hardhat -- hardhats are made in

1    the injection molding room?

2         A.   Correct.

3         Q.   Okay.

4         A.   But they could go to another assembly area to

5    ultimately be finished.

6         Q.   Okay.

7         A.   So like a hardhat from injection molding

8    could then go to the logo department and be turned into

9    a finished good there.  So until it reaches the

10   finished good state, that -- that would be an example

11   of what you'd call WIP.

12        Q.   Okay.  And do you remember in 2013 which

13   department Mayra Pena was working in?

14        A.   We didn't necessarily have departments.  It

15   was -- she was an associate assembler.

16        Q.   Okay.  Which is -- which means what?

17        A.   Which means she's -- can move to any

18   manufacturing area.  She's not necessarily tied to one

19   specific area in the plant.

20        Q.   All right.  So let me try to understand this

21   correctly.  So the departments that you listed,

22   injection molding, logo, respiratory department, SCBA,

23   were those -- when you say department, were they areas

24   of the plant, or were they sort of enclosed rooms?

25        A.   So you initially asked what departments.  I

30

1    would go on a conveyor.

2          Q.  So these are cartridges for respirators?

3          A.  Correct.

4          Q.  Okay.  Let's look at page 2.

5          A.  This is the same station.

6          Q.  All right.  Page 3?

7          A.  This is the bagging machine from the

8    cartridge line.

9          Q.  Is it the same area?

10         A.  Yes.

11         Q.  What about page 4?

12         A.  Page 4 is the HEPA bagging station, H-E-P-A,

13   in the respiratory area.

14         Q.  And page 5?

15         A.  This appears to be the -- a window injection

16   molding press.

17         Q.  So this is the molding room?

18         A.  Correct.

19         Q.  And page 6?

20         A.  This is the injection molding room.

21         Q.  Of the areas that you listed --

22              MR. GAGLIARDI:  Why don't we call this

23   Exhibit 2.

24              (Plaintiff's Exhibit 2 marked for

25   identification.)

1    there any machines in there?

2        A.  Yeah.  There were, I want to say, 20

3    injection molding presses.  There was conveyers that

4    would be on specific stations.  There was a face shield

5    machine.  There was a minister punch press.  There was

6    a few drill press machines.  And there would have been

7    some other auxillary equipment to -- I forget the name

8    of it but used on the automatic injection molding

9    machines.

10       Q.  Okay.  What about the quickloc/cedars area?

11   Any machines there?

12       A.  Yeah.  There were, I want to say, four or

13   five seating machines.

14           THE REPORTER:  Seating?

15           THE WITNESS:  Seating, S-E-A-T-I-N-G.

16       Q.  BY MR. GAGLIARDI:  Okay.  And in SCBA?

17       A.  SCBA just had a lot of auxillary equipment.

18   I mean, machine-wise, like I don't -- if you consider

19   like a Branson welder a machine.  I consider it more of

20   auxillary equipment, it's not necessarily a machine,

21   depending on what your definition is.  But it was --

22   SCBA was mainly manual assembly with the use of

23   auxillary equipment depending on what was being made.

24   So they could run jobs that did not use any auxillary

25   equipment and they could use one that -- that needed

1   far as machines.  And if you count like the Branson

2   welders and if mouth bit was still there during that

3   time, it would be right there with the injection

4   molding area.  The SCBA area, if you count auxillary

5   equipment as machines, maybe, but from what I call a

6   machine, no, it didn't have -- it didn't have as many.

7        Q.  All right.

8        A.  Logo, like I said, had the corona treatment

9   machine.  It had three pad print machines.  It had the

10  ink mixing machine.  It had the degreaser.  So there

11  was less machines there.

12       Q.  Did you have an opportunity in your capacity

13  as an HSE manager to spend time in each of these

14  different areas?

15       A.  Yes.

16       Q.  And in your experience, were there some areas

17  that were -- there was more noise or a louder work

18  environment than others?

19       A.  It depends what your definition of loud is.

20  If you go by decibels and OSHA, I think there was only

21  one area that triggered an actual hearing

22  conservation -- or use of hearing protection, and that

23  was in the respiratory department.  The SCBA area was

24  very -- was quieter than the other areas.  The

25  respiratory department did have -- was the loudest area

38

1    in the facility for specific tasks.  The injection

2    molding area didn't even meet the requirement for use

3    of hearing protection via Honeywell or via OSHA.  So --

4    and then the distribution center was --

5        Q.  Let me -- sorry.  I'm sorry.  Go ahead.

6    Finish.

7        A.  The distribution center was just forklift

8    traffic, not really noise.  And the materials

9    management area is the same thing.  The offices, the

10   standard office environment.

11       Q.  Well, the -- but there were some areas that

12   were louder than others, right?  Correct?

13       A.  As far as decibels, yeah.

14       Q.  Yeah, I'm not talking about what was

15   acceptable to OSHA standards.  I'm just talking about

16   loudness, the common-phrase terminology.  For example,

17   my son was playing video games last night, and I was

18   upstairs, and I went over the loft and told him to turn

19   it down, it's too loud.

20       A.  Okay.

21       Q.  I didn't need hearing equipment, but he was

22   too loud for my liking.  So the -- when I say loud, I

23   just mean the common meaning of the word loud.

24           MR. McNAMARA:  Objection.

25       Q.  BY MR. GAGLIARDI:  So were there areas that

39

```
 1    were noisier?  Let's just use that term.  Were there
 2    areas that were noisier than others?
 3         A.  Based on --
 4             MR. McNAMARA:  Objection.  Go ahead.
 5             THE WITNESS:  Based on industrial hygiene
 6    sampling, the decibel levels in certain areas were
 7    higher than others.
 8         Q.  BY MR. GAGLIARDI:  Okay.  And you said that
 9    the respiratory department had -- was the loudest in
10    terms of decibels, right?
11         A.  Correct.
12         Q.  And the SCBA was the lowest, right?
13         A.  Uh-huh.
14         Q.  And where did the -- if you had to rank the
15    loudest areas from highest to loudest to quietest, how
16    would you rank them?
17         A.  The cells in respiratory -- I'd say the
18    respiratory area had the cells with the highest noise.
19    Then it would be -- underneath that would be injection
20    molding.  Then --
21         Q.  Okay.
22         A.  -- then I would think logo.  I'd say
23    cedars/quickloc.  Then SCBA.  Then like the
24    distribution center/materials management areas and then
25    the office environment.
```

1          THE WITNESS:  The injection molding

2   department was never shut down for lunch and breaks.

3   So what we -- what the operation would do, it would

4   take employees that happened to be working in the other

5   areas that day, and when it came time for the employees

6   that were assigned to injection molding for that day to

7   go to lunch or breaks, we would move the associate

8   assemblers from the other areas into injection molding,

9   and then when they came back from their break, the

10  operators would either go take their break/lunch and go

11  back to their area.

12          Q.  BY MR. GAGLIARDI:  Okay.  And Mr. Gouveia

13  writes, "She said everybody knows she does not like to

14  go to the molding department."  Did you have any

15  first-hand knowledge in 2013 that Mayra Pena did not

16  want to go to the molding department?

17          A.  Before I believe we sat down in the office,

18  no.

19          Q.  Okay.  But at some point you learned that

20  Mayra Pena did not want to go into the molding

21  department, correct?

22          A.  During the -- during the meeting we had with

23  myself, Joe, and Kevin, she made it clear that she did

24  not like or want to work in that area.

25          Q.  Okay.  Did she state why she did not want to

1    work in the molding room?

2        A.  I don't recall the specific reason that she

3    stated.  I mean, I remember the doctor's note

4    referenced -- based on what's written here -- is

5    exaggerated [sic], or whatever, anxiety.

6        Q.  Exacerbation?

7        A.  Yeah.  Whatever.  There you go.

8        Q.  I like how you remember all these acronyms

9    very clearly.  Okay.  So that was -- you saw that in a

10   doctor's note, right?

11       A.  Correct.

12       Q.  Okay.  Did she tell you that -- did Mayra

13   Pena tell you or anyone else that she didn't want to go

14   into the molding room because of any type of medical

15   condition she had?

16       A.  I'm not aware of it.  I mean, like I said,

17   the way I got involved in this was that doctor's note.

18       Q.  Okay.  To your knowledge, has any other

19   employee other than Mayra Pena either refused to work

20   in the molding room or state they didn't want to work

21   in the molding room?

22       A.  I would say, based on my knowledge, there

23   were employees that preferred to work in certain areas

24   over others.

25       Q.  I don't know if that answers my question.

1          MR. GAGLIARDI:  Can you --

2          (Last question read back.)

3          THE WITNESS:  Like I said, there's employees

4    that preferred, but off the top of my head, to remember

5    exact names and instances, I can't.

6          Q.  BY MR. GAGLIARDI:  Well, irrespective if you

7    remember the names, do you recall any instances where

8    an employee other than Mayra Pena stated to you or

9    anyone else they did not want to work in the molding

10   room?

11         A.  Like I said, I -- I can't remember.

12         Q.  Can you -- do you recall if there was any

13   employee that refused to work in the molding room other

14   than Mayra Pena?

15         A.  Flat out refusal?  No.

16         Q.  And you said that there were employees that

17   preferred to work in one area as opposed to another?

18         A.  Yeah.  You would get rumblings of that.

19         Q.  And what were some of the reasons that

20   employees gave?

21         A.  For not wanting to work in injection molding,

22   in injection molding you have to keep up with the

23   machine whereas in most of the other areas you ran at

24   your own pace.

25         Q.  All right.  So do you --

1    A. The injection molding area, in the summer I

2 would say it was -- it was a little bit hotter in

3 injection molding than it was in other areas.

4    Q. Would you agree that the injection molding

5 area is a more hectic pace than other areas?

6      MR. McNAMARA: Objection.

7      THE WITNESS: What do you mean by a hectic

8 pace?

9    Q. BY MR. GAGLIARDI: A hectic work pace.  You

10 just testified that in some areas you could operate --

11 you could control the machine and control the pace

12 while in injection molding you couldn't.  Right?

13    A. That was the -- I'd say the difference, but

14 the other areas did have certain standards that they

15 needed to meet on an hourly basis.

16    Q. Okay.  So when you say that injection molding

17 you couldn't control the speed of the machine, can you

18 be more specific?

19    A. So the machine runs at a cycle on its own.

20 So every 30 seconds a part is coming out.

21    Q. Okay.

22    A. Whereas in this case -- in Exhibit 1, you can

23 see in the boxes on the conveyor.  This operator has to

24 take the cartridge, put it in the machine, and tell the

25 machine to work.  Whereas in injection molding, it's

51

1   just working regardless.

2        Q.   Okay.  Did you ever see that old classic clip

3   of the Lucille Ball episode?  I know that's way before

4   our time.

5        A.   I think I remember.  With the soda or

6   whatever?

7             MR. McNAMARA:  Before my time too.

8        Q.   BY MR. GAGLIARDI:  Have you ever seen that

9   classic episode where Lucille Ball -- Lucy's working in

10  this factory that makes chocolates, and it's coming out

11  of the conveyor belt, and she's supposed to be putting

12  them together, and she falls behind and starts eating

13  them all to cover?  Have you ever seen that?

14       A.   I believe so, yeah.

15       Q.   So is that -- so is that sort of like the

16  injection molding where things are coming out of a

17  conveyor belt?

18            MR. McNAMARA:  Objection.

19            THE WITNESS:  That hectic, no.  An injection

20  molding machine comes, like I said, every 30 --

21  generally every 30 seconds a part is coming off the

22  machine, and it's going to travel either directly out

23  or it's going to go on the conveyor that would reach

24  the operator and the operator would produce that piece,

25  and then the next cycle time another one would come.

53

1          A.   I don't know.   That's why I'm asking.

2               MR. GAGLIARDI:   Let's read back his

3     testimony.

4               (Several questions and answers read back.)

5          Q.   BY MR. GAGLIARDI:   So I guess I -- I used the

6     word hectic, but it was -- my inference from your

7     statement was that it was a faster pace in the

8     injection molding.   Do you --

9          A.   Yeah, but --

10         Q.   -- disagree with that?

11         A.   -- you referenced the, whatever, Lucy show.

12    It wasn't hectic like that.   I believe in that case

13    you've got something flying at you every second,

14    second, second.   So hectic -- what I would say, is that

15    hectic?   Yes.   What I would say, every 30 seconds

16    hectic?   No.   I mean, the -- could there be some

17    buildup if they didn't keep up with the pace?   Yes.

18    Was it more obvious for supervision to see if somebody

19    was not keeping up in the injection molding environment

20    as opposed to the respiratory and other areas?   Yes.

21    Was it -- another reason is it was more of a social

22    environment in respiratory than it was in injection

23    molding.   Outside of the cells that I referenced I

24    think there was one, two -- only two cells in injection

25    molding where you worked close to somebody.   Close

1   make -- so -- but there were employees -- other --

2   there was at least one other -- there were employees

3   other than Mayra Pena who did not want to work in the

4   molding room because it was a quicker pace, right?

5           MR. McNAMARA:  Objection.

6           THE WITNESS:  Preferred not to work in

7   injection molding.  Did they specifically state the

8   cases because it's a quicker environment?  No, not to

9   my knowledge.

10      Q.  BY MR. GAGLIARDI:  I thought I asked you why,

11  and you said because you could control your own pace

12  in --

13      A.  You also asked if the cycle time pace was

14  faster in injection molding, and, like I said, in

15  respiratory, even though the machine is not pushing it

16  out, the cycle time is faster.

17      Q.  Okay.

18      A.  Like in the case of -- like I said, Exhibit

19  1, this is a 5-to 7-second cycle which means every 5

20  to 7 seconds -- I'm the operator -- I need to do

21  something.  Where in this case in injection molding,

22  every 30 seconds a piece is going to come to you, you

23  do your thing, and then another piece is coming out.

24  So I don't necessarily see it as -- from a cycle time,

25  apples to apples.

```
 1                MR. McNAMARA:  Mark, could we take a quick

 2   bathroom break?

 3                MR. GAGLIARDI:  Sure.  Yeah.

 4                (Recess taken)

 5                (Alicia M. Connor, Esquire now present.)

 6                MR. GAGLIARDI:  All right.  Back on.  Could

 7   you read -- could you please read the last question and

 8   the response?

 9                (Last question and answer read back.)

10        Q.  BY MR. GAGLIARDI:  Okay.  So let's go to --

11   let's revisit March 8, 2013.  Tell me everything that

12   led to your being involved in the situation.

13        A.  So the normal process when an employee would

14   ask for an accommodation at work is the SCBA site

15   leader would be involved with reviewing the request

16   along with the supervisor and when needed, the HR

17   manager.  So what I recall is I was given the note from

18   Mayra Pena.  It did not meet what we would call an

19   acceptable note to -- for an accommodation, and in that

20   case, I told the supervisor, you know, it's not

21   acceptable.

22                And I believe we got Joe involved at that

23   time, and the three of us chatted, and we said let's

24   have Mayra come in and explain, you know, what is on

25   this note and to explain to her what we would need from
```

1   in.  I'm not a hundred percent positive, but the

2   supervisor came to me with a note saying -- Kevin Dyer

3   came to me with a note, reviewed the note, in which

4   I -- I would have stated that it's not something we can

5   use for an accommodation because there was no -- it

6   wasn't really -- it wasn't asking for an accommodation.

7   And in this case -- I forget if he made me aware then

8   or if I knew right around that time that they were

9   having a problem with getting her to work in injection

10  molding, and so we said let's get Joe involved, and

11  what I remember, we said, okay, well, let's have Mayra

12  come in here and explain what the note was and explain

13  to her why the note wasn't acceptable.  And we asked

14  her to get a note that fit what we would accept for an

15  accommodation note.

16      Q.  All right.  So -- well -- so -- all right.

17          MR. GAGLIARDI:  I'm sorry.  Can you -- can

18  you read my question and his response, the most recent?

19          (Last question and answer read back.)

20      Q.  BY MR. GAGLIARDI:  Okay.  All right.  So you

21  knew at that time that Mayra did not want to work in

22  the molding room, correct?

23      A.  I remember that there was -- she -- they were

24  having an issue, and she was expressing she didn't want

25  to work there.

70

1    seeing this specific one?  No.

2        Q.  All right.  Let's take a look at the first

3    note.

4        A.  And this is -- we didn't review this as part

5    of the deposition.

6            MR. GAGLIARDI:  You know what?  I'm going to

7    do this:  I want to do this in two separate exhibits.

8    Let's do -- Exhibit 4.  Let's do Exhibit 5 on the other

9    one.

10           (Plaintiff's Exhibit 5 marked for

11   identification.)

12       Q.  BY MR. GAGLIARDI:  All right.  Let's take a

13   look at Exhibit 4.  Did you review this note, this

14   document, on March 8, 2013?

15       A.  Like I said, I think that was the day I

16   handed it in.  It could have been a day -- a few days

17   before or after but around that time.

18       Q.  Around that time, right?  You didn't -- the

19   first time you looked at -- you saw this note wasn't

20   yesterday when you met --

21       A.  No.

22       Q.  -- Mr. McNamara, right?

23       A.  No.

24       Q.  And I presume you read the entire note,

25   right?

75

1          A.   Increases.

2          Q.   Makes worse, right?

3          A.   Increases is what --

4          Q.   Yeah.  All right.  So what did you learn

5     about Mayra Pena's medical condition after reading this

6     note?  Did you learn anything about any medical

7     condition she was suffering from?

8          A.   From her or from this note?

9          Q.   From -- after -- you read the note, right?

10         A.   Uh-huh.

11         Q.   What conclusions did you draw about Mayra

12    Pena's medical condition after reading this note?

13         A.   Based on this note, I couldn't draw any

14    conclusions because it was very vague, and it wasn't

15    direct.

16         Q.   Okay.

17         A.   Like I said, it says she is reporting.  It

18    doesn't say she has.  It says -- it just says --

19         Q.   Okay.  So -- and when you read this, you

20    didn't understand the term "anxiety," right?

21         A.   Based on what I understood as anxiety, was

22    nervous feelings.

23         Q.   Okay.  So after you read this -- at the very

24    least, Mayra Pena told her doctor that she was

25    suffering from anxiety, right?  You agree with that?

79

1    time.

2         Q.   Let's look at the next paragraph.  "She is

3    completely capable of working in other settings."  Did

4    you understand what he meant by that?

5         A.   I assume all other associate assembler

6    positions, but I'm not sure exactly what "other

7    settings" meant.  It's not specific to the work that

8    she does.

9         Q.   All right.  So this doctor's note in

10   Exhibit 4 was unacceptable to you, correct?

11        A.   Yes.

12             MR. GAGLIARDI:   Exhibit 6.

13             (Plaintiff's Exhibit 6 marked for

14   identification.)

15        Q.   BY MR. GAGLIARDI:   Let's take a look at

16   Exhibit 5.  You already have it.  Have you seen this

17   document before today?

18        A.   Like I said, I'm not sure.

19        Q.   Why don't you take a minute to read over this

20   letter.

21        A.   Okay.

22        Q.   At that meeting on March 8th, did you have

23   this -- you had this doctor's note in hand, the

24   doctor's note in Exhibit 4, right?

25        A.   Yes.

80

1          Q.  Okay.  All right.  Let's look at Exhibit 3

2     again, and let's look at page 2, the second full

3     paragraph.  Second to the last sentence, "Conor Ryan

4     explained that the letter stated she experiences

5     exacerbated anxiety."  Who did you explain that to?

6          A.  The people in the room were Kevin, Joe,

7     myself, and Mayra.

8          Q.  And then he writes, "We then recommended that

9     we don't have work in another area, and that's the only

10    area that needs help and in this case she needs to go

11    home for refusing to do her job."  Is that accurate?

12         A.  Yes.

13         Q.  Did you tell Mr. Gouveia that the note was

14    unacceptable?

15         A.  I believe I did, yes.

16         Q.  Okay.  He didn't write that in this report,

17    did he?

18         A.  Based on what's written here, no.

19         Q.  Did Ms. Pena, in fact, go home that day?

20         A.  I believe she did.

21         Q.  Okay.  Is that accurate that there was no

22    other work for her to do other than in the molding

23    room?

24         A.  At the time, that would have been the

25    supervisor in value stream leaders.

1    condition was and how it was bothering her.  Most of

2    that conversation was done in Spanish, so I don't

3    recall all of it.  And then explaining to her what we

4    would need from -- for a doctor's note to have an

5    adequate restricted duty note.

6          Q.  Did you ask her if she has anxiety?

7          A.  I did not.

8          Q.  Isn't that what the doctor's note said, that

9    she was reporting an increased level of anxiety?

10         A.  Yes.  The doctor's note says she was

11   reporting an increased level -- or exacerbated anxiety,

12   whatever.

13         Q.  And we discussed earlier that some employees

14   prefer not to be in the molding room because they would

15   prefer to control their own -- the pace of the work

16   themselves, right?

17         A.  That's the perception, yeah.

18         Q.  And do you think it was -- did you consider

19   that -- the fact that employees can't control the pace

20   of the work in the molding room was the cause of her

21   increased anxiety?

22         A.  Once again, the discussion about her issue

23   and how it was caused was done in Spanish, so I didn't

24   understand it.

25         Q.  Wasn't there someone there translating?

1      A.  No.

2      Q.  Do you know why she was terminated?

3      A.  I believe it was for not coming to work.

4      Q.  Do you know why she didn't come to work?

5      A.  No.  Like I said, my conversation with her

6   was to get an updated note, and at that -- I didn't see

7   an updated note, and then by the time Exhibit -- which

8   one is this -- 5 came along with the reasonable

9   accommodation request, I was -- I was really not

10  involved in the process.

11     Q.  So you were involved in the process one day,

12  that's it?  March 8, 2013, that was your --

13     A.  As far as --

14     Q.  -- sole involvement?

15     A.  -- interaction with Mayra Pena, yes.

16        MR. GAGLIARDI:  All right.  I think -- I

17  think we're done.  Let me just -- just give me five

18  minutes with Alicia, and I'll be right back.

19        (Recess taken.)

20     Q.  BY MR. GAGLIARDI:  Okay.  MR. Ryan, just a

21  few follow-up questions, and then we're done.  I want

22  to talk about some of the training that the associate

23  assemblers receive from Honeywell.

24     A.  Okay.

25     Q.  My understanding is that associate assemblers

1   are cross-trained to work in any area in the

2   manufacturer's facility; is that correct?

3        A.   They're trained to work in most all areas.

4   There were a few positions that needed extensive

5   training.  Like the ones that I can only recall are

6   cartridge line operators and logo pad print operators

7   were considered a -- takes longer to train, and the

8   other positions all generally fell in the same -- same

9   bucket of, you know, can learn in, you know, a day to

10  three -- a day to three days time with the exception of

11  there was a few work orders in SCBA that would require

12  a little more extensive training.

13       Q.   What were those jobs?  Tell me specifically

14  those jobs that required more training.

15       A.   Cartridge line operator.

16       Q.   How many people worked in those jobs?

17       A.   Two per shift for the cartridge line.

18       Q.   Okay.

19       A.   Logo pad print and --

20       Q.   How many people worked in that?

21       A.   They would be trained by machine.  So there

22  was three -- three machines that people ran.  Well,

23  four if you include the corona.  And so they would be

24  trained either one, two, or all of those machines, but

25  there would be a maximum of five people, and depending