UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

MAYRA F. PENA,
    PLAINTIFF

v.                                                                            C.A. NO. 15-CV-00179-S-LDA

HONEYWELL INTERNATIONAL INC.,
    DEFENDANT.

## PLAINTIFF MAYRA PENA'S STATEMENT OF DISPUTED FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and LR cv 56 of the Local Rules of the United States District Court for the District of Rhode Island, Plaintiff Mayra Pena hereby sets forth this Statement of Disputed Facts ("PSDF") in connection with her Opposition to Defendant Honeywell International Inc.'s Motion for Summary Judgment. Pena states that the following facts are disputed:

1. Honeywell's Cranston facility is comprised of several production/assembly areas, including the respiratory department, molding department, logo department, quickloc/cedars department, and the SCBA area. Transcript Deposition of Conor Ryan on November 30, 2016 ("Ryan Dep."), 32:10-15, attached hereto as <u>Exhibit A;</u> Transcript Deposition of Mayra Pena on November 3, 2016 ("Pena Dep."), 17:14-17, 23:6-25, attached hereto as <u>Exhibit B.</u>

   **<u>Plaintiff's Response:</u> Undisputed.**

2. In the molding room, Honeywell manufactured finished goods and work in process for assembly. (Ryan Dep. 24:10-24). Works in process are products in the process of manufacture that have not yet reached the finished good state. (Ryan Dep. 25:4-11).

   **<u>Plaintiff's Response:</u> Undisputed.**

3. The injection molding department was not the loudest department in Honeywell's Cranston facility. (Ryan Dep. 37:16-38:4).

   **<u>Plaintiff's Response:</u> Objection. This is statement of an opinion, not a statement of a fact. Answering further and without waving the objection, this fact is**

Disputed. Ryan testified that "the injection molding area didn't even meet the requirement for use of hearing protection via Honeywell or via OSHA" (Ryan Dep. at 38:1-3), while Pena testified that Honeywell required employees to wear earplugs for their own safety in the molding area (Pena Dep. at 21:21-23).

4. The molding area did not meet the requirements for use of hearing protection pursuant to Honeywell policy and Occupational Safety and Health Administration ("OSHA") regulations. (Ryan Dep. 38:1-4).

   <u>Plaintiff's Response:</u> Disputed. Pena refers to her response to No. 3 for clarification.

5. The respiratory department was the loudest department in the Cranston facility. (Pena Dep. 20:13-20; Ryan Dep. 30:12-13; 37:16-38:4; 39:8-11).

   <u>Plaintiff's Response:</u> Disputed. Pena testified at her deposition that the HEPA/respiratory department machines "weren't really that loud." (Pena Dep. at 21:13-20).

6. Plaintiff frequently worked in the respiratory department. (Pena Dep. 16:4-7; Ryan Dep. 30:12-13; 37:16-38:4; 39:8-11).

   <u>Plaintiff's Response:</u> Undisputed.

7. In 2013, when Plaintiff worked at Honeywell, there were approximately twenty to twenty-five employees working in the injection molding department. (Ryan Dep. 31:8-14).

   <u>Plaintiff's Response:</u> Undisputed.

8. In the molding department, the machines run continuously and a new part comes out of the machine every thirty seconds; in other departments, the operator controls when the machines operate. (Ryan Dep. 50:16-51:1).

   <u>Plaintiff's Response:</u> Undisputed.

9. The thirty-second cycle in the molding department does not create a hectic situation for employees, but it would make it more noticeable to supervisors if an employee was not keeping up with the pace. (Ryan Dep. 51:15-25; 53:11-20; 54:13-24).

   <u>Plaintiff's Response:</u> Objection. This is statement of an opinion, not a statement of a fact. Answering further and without waving the objection, this fact is Disputed. Some Honeywell employees indicated that they prefer to work in areas other than the Molding Room because they do not have to rush to keep up with the flow machines. (Ryan Dep. at 49:16-24; Dyer Dep. at 35:3-5; Gouveia Dep. at 36:20-37:25).

10. Some Honeywell employees indicated that they preferred to work in areas other than the molding department because other areas allowed employees to work at their own pace, whereas in the molding department employees had to keep up with the pace of

the machines. (Ryan Dep. 49:16-24; Dyer Dep. 35:3-5; Transcript Deposition of Jose Gouveia on December 3, 2016 ("Gouveia Dep."), 36:20-37:25, attached hereto as Exhibit C.

**Plaintiff's Response:** Undisputed.

11. Employees also preferred to work in areas other than the molding department because the machines were closer together in other departments and employees were able to more easily socialize. (Ryan Dep. 53:21-54:7).

    **Plaintiff's Response:** Undisputed.

12. No employee other than Plaintiff has refused to work in the molding department. (Ryan Dep. 48:18-49:24; Transcript Deposition of Kevin Dyer on December 12, 2016 ("Dyer Dep."), 47:19-48:6, attached hereto as Exhibit D; Gouveia Dep. 39:21-40:7).

    **Plaintiff's Response:** Undisputed.

13. In 2012, Honeywell decided that all employees who worked in the production and assembly areas should be cross-trained in all departments. (Pena Dep. 24:23-25:4; Ryan Dep. 47:1-11; 99:25-100:12; Dyer Dep. 41:3-24).

    **Plaintiff's Response:** Undisputed.

14. It was important to have cross-trained employees to meet the demands of Honeywell customers. (Ryan Dep. 87:2-12).

    **Plaintiff's Response:** Objection. This is statement of an opinion, not a statement of a fact. Answering further and without waving the objection, this fact is Disputed. Kevin Dyer testified that Honeywell needed all Associate Assemblers to be cross-trained so they would be able to work in the Molding Room on an as needed basis to account for unexpected exigencies such as a worker being out, vacations, or an unexpected large order. (Dyer Dep. at 41:3-20).

15. It was Honeywell's business practice to move associate assemblers to departments where customer demand was greatest and, as a result, an employees' inability to work in any particular area would burden the production process. (Ryan Dep. 89:11-90:6; 91:14-18; Dyer Dep. 41:3-24).

    **Plaintiff's Response:** Disputed. Pena refers to her Response to No. 14. Pena further states that Dyer also testified that it was feasible was feasible for Honeywell to re-assign the task of working in the Molding Room to other workers. (Dyer Dep. at 58:5-16).

16. It was particularly important for employees to cycle into the molding department because the molding department runs twenty-four hours per day and does not shut down for employee lunch and other breaks. (Ryan Dep. 47:1-11; 92:8-18; Dyer Dep. 42:12-24).

    **Plaintiff's Response:** Undisputed.

17. To fill positions when employees took breaks, vacation time, or otherwise, employees working in other areas would move to the molding department. (Ryan Dep. 47:1-11; 92:8-18; Dyer Dep. 42:12-24; Gouveia Dep. 27:22-28:19).

    **Plaintiff's Response:** Undisputed.

18. Honeywell trained all of its employees, including Plaintiff, in all assembly departments for which training was required, including the molding department. (Pena Dep. 23:20-25; 25:13-17; 27:15-16; Ryan Dep. 99:25-100:12; Dyer Dep. 41:3-24).

    **Plaintiff's Response:** Undisputed.

19. Honeywell hired Plaintiff in or about 2008 as a machine operator and associate assembler in its Cranston, Rhode Island facility. (Pena Dep. 16:1-19; Ryan Dep. 25:12-15).

    **Plaintiff's Response:** Undisputed.

20. Plaintiff was previously employed by North Safety Products starting in or about 2002, and Honeywell hired Plaintiff when it took over the facility in or about 2008. (Pena Dep. 15:3-20; 16:1-7).

    **Plaintiff's Response:** Undisputed.

21. Plaintiff completed her training for the molding department in October 2012. (Pena Dep. 25:13-17; 27:15-16).

    **Plaintiff's Response:** Undisputed.

22. Following her training, Honeywell asked Plaintiff to work in the molding department. (Pena Dep. 40:11-17).

    **Plaintiff's Response:** Undisputed.

23. Plaintiff working in the molding department was consistent with her position as an associate assembler. (Ryan Dep. 25:12-19).

    **Plaintiff's Response:** Disputed. Kevin Dyer testified that Honeywell needed all Associate Assemblers to be cross-trained so they would be able to work in the Molding room on an as needed basis to account for unexpected exigencies (such as a worker being out, vacations, or an unexpected large order), rather than on a consistent basis. (Dyer Dep. at 41:3-20). Furthermore, Pena was informed that she only needed to be trained to work in the molding room and that she would not have

to work there on a regular basis. (Pena Dep. at 24:11-13). Pena only worked in Molding for 20% to 30% of her entire work week and did not work there at all over a two week period from February 21, 2013 to March 7, 2013. (Pena Dep. 27:9-11; 40:9-22; Pena Aff.)

24. Over a month after Plaintiff's training in the molding department, she took medical leave commencing on November 29, 2012. (Pena Dep. 27:17-28:8).

**Plaintiff's Response:** Undisputed.

25. Plaintiff admits this medical leave was at least in part due to her depression because of the season. (Pena Dep. 27:17-28:8).

**Plaintiff's Response:** Undisputed.

26. Prior to her medical leave commencing on November 29, 2012, Plaintiff had previously taken several other medical leaves of absence totaling 23 weeks, including from October 14, 2011 to November 21, 2011; from December 16, 2011 to February 13, 2012; and from June 22, 2012 to August 6, 2012. (Pena Dep. 26:5-27:4).

**Plaintiff's Response:** Undisputed.

27. Given these previous medical leaves, Plaintiff had no remaining Family and Medical Act ("FMLA") leave. (See Pena Dep. 26:5-27:10).

**Plaintiff's Response:** Undisputed.

28. Plaintiff returned from medical leave on January 14, 2013.

**Plaintiff's Response:** Undisputed.

29. Upon her return from medical leave, Plaintiff worked in the molding department for four hours per day, two to three times per week. (Pena Dep. 27:9-11; 40:9-22).

**Plaintiff's Response:** Undisputed.

30. Plaintiff worked this schedule without incident for over a month and did not complain about working in the molding department until late February 2013. (Pena Dep. 41:4-7).

**Plaintiff's Response:** Undisputed.

31. In late February 2013, Plaintiff approached Jose Gouveia ("Mr. Gouveia"), Senior Human Resources Generalist at Honeywell, to report that one of the production leaders, Mayra Fermin ("Ms. Fermin"), asked her to go to the molding department. (Pena Dep. 42:24-43:4; Gouveia Dep. 9:13-19).

**Plaintiff's Response:** Undisputed.

32. Plaintiff claims that she told Mr. Gouveia that she did not want to work in that department because "it was harmful to [her] emotionally." (Pena Dep. 43:21-24).

    **Plaintiff's Response:** Undisputed.

33. On March 7 and March 8, 2013, Plaintiff met with Mr. Gouveia; Kevin Dyer ("Mr. Dyer"), Plaintiff's supervisor; and Conor Ryan ("Mr. Ryan"), the Health Safety and Environmental Site Leader. (Pena Dep. 51:9-14; Ryan Dep. 15:13-17).

    **Plaintiff's Response:** Undisputed.

34. At the March 7, 2013 meeting, the Honeywell personnel requested a letter from Plaintiff's doctor. (Pena Dep. 51:9-14).

    **Plaintiff's Response:** Undisputed.

35. The next day, on March 8, 2013, Plaintiff provided a letter from her physician, Dr. James Greer, dated March 4, 2013. (Pena Dep. 50:15-19).

    **Plaintiff's Response:** Undisputed.

36. Plaintiff stated in her deposition that she had produced a letter prior to the letter she produced on March 8, 2013; however, despite discovery requests directed at such documentation, Plaintiff has not produced this alleged letter and her lawyer was also unaware of such a letter. (Pena Dep. 49:3-50-17).

    **Plaintiff's Response:** Disputed. Pena was confused. Pena only received three (3) doctor's letters from Dr. Greer dated: (1) March 4, 2013; (2) April 2, 2013, and (3) April 29, 2013. (Ex. A-C; Pena Aff.).

37. Dr. Greer's March 4, 2013 note stated: "Currently [Plaintiff] is reporting exacerbation of her anxiety systems which are interfering with her ability to function. She reports that these specifically occur when she is being sent to the molding room as opposed to the more typical duties to which she is accustomed." (Pena Dep. 49:3- 7; Pena Dep., Exhibit D; Gouveia Dep., Exhibit 2).

    **Plaintiff's Response:** Undisputed.

38. Mr. Ryan, as Health Safety and Environmental Site Leader, reviewed Dr. Greer's March 4, 2013 note to determine what accommodations an employee requested and whether Honeywell could make such accommodations. (Ryan Dep. 62:10-17; 64:22- 65:7; 85:16-20).

    **Plaintiff's Response:** Undisputed.

39. Dr. Greer's March 4, 2013 note did not state that Plaintiff had been diagnosed with any disability, but, rather, only mentioned that the Plaintiff was "reporting exacerbation of her anxiety symptoms." (Pena Dep. 49:3-7; Pena Dep., Exhibit D; Ryan Dep. 72:4-73:5; 73:25-74:8, and Ryan Dep., Exhibit 4).

**Plaintiff's Response:** Disputed. Dr. Greer's March 4, 2013 note clearly states that Pena was suffering from symptoms of anxiety, a disability within the meaning of the law. (Ex. A).

40. Mr. Ryan could not make any sense of the request for accommodation in Dr. Greer's March 4, 2013, which provided: "I am requesting that you assist her in other placements than in this setting . . ." (Ryan Dep. 77:20-78:2).

    **Plaintiff's Response:** Objection. This is statement of an opinion, not a statement of a fact. Answering further and without waving the objection, this fact is Disputed. The letter is clear and unambiguous, and it speaks for itself. (Ex. A).

41. Dr. Greer's March 4, 2013 note did not explain how the molding department "exacerbat[ed]" Plaintiff's anxiety symptoms, but no other department had this effect. (Ryan Dep. 75:11-15; Ryan Dep., Exhibit 4; Dyer Dep. 62:21-63:3; Gouveia Dep. 49:5-10, 54:3-10, 57:6-16).

    **Plaintiff's Response:** Undisputed.

42. Based upon this litany of issues with Dr. Greer's March 4, 2013 note, Honeywell was not able to draw any conclusions about Plaintiff's medical condition. (Ryan Dep. 75:11-15).

    **Plaintiff's Response:** Disputed. Gouveia testified that after he read Dr. March 4, 2013 letter, he understood that Pena was suffering from anxiety, it was worsening when she went to the molding room, and that the accommodation she was seeking was to stay in HEPA. (Gouveia Dep. 57:17-22, 58:4-8, 59:9-13,59:9-25, 60:1-3). Dr. Jennison testified that after reading the March 4, 2013 letter, she concluded that Pena was being treated for anxiety, which she knew to be a psychological disorder and a disability within the meaning of the ADA. (Jennison Dep. at 22:18-23, 23:2-17, 24:2-10).

43. The Honeywell personnel told Plaintiff that the March 4, 2013 note was not sufficient and she would not be excused from working in the molding room at eleven o'clock as scheduled. (Pena Dep. 52:5-10).

    **Plaintiff's Response:** Undisputed.

44. In response to the Honeywell personnel telling Plaintiff that the note was insufficient, Plaintiff told the Honeywell personnel that she was going to go home and called her daughter to pick her up. (Pena Dep. 52:18-53:2).

    **Plaintiff's Response:** Undisputed that Pena called her daughter to pick her up so she could go home. Disputed as to the reason why she went home. Pena went home after being told by Ryan and Gouveia informed that the only work they had was in Molding, and if she could not do it then she could go home. (Ryan Dep. at 80:8-12; Gouveia Dep. at 64:8-11, 17-20).

45. Plaintiff never returned to work after this day. (Gouveia Dep. 64:9-20).

   **Plaintiff's Response:** Undisputed.

46. Unbeknownst to anyone at Honeywell, Plaintiff went to see Attorney Veronica Kot ("Ms. Kot") at Rhode Island Legal Services within a week after her final day of work on March 8, 2013. (Pena Dep. 53:6-11).

   **Plaintiff's Response: Disputed. During the March 8, 2013, meeting, Pena informed Gouveia that she intended to speak to an attorney for assistance regarding the accommodation request. (Ex. V).**

47. Ms. Kot instructed Plaintiff not to have any communication from anyone at Honeywell and that Ms. Kot would be the one to talk to Honeywell, not her. (Pena Dep. 55:10-18).

   **Plaintiff's Response:** Undisputed.

48. Unaware that Plaintiff had retained counsel and of her attorney's directive not to respond to Honeywell, it continuously attempted to contact Plaintiff to clarify her condition to enable it to provide a proper accommodation. (Transcript Deposition of Elizabeth Jennison, M.D. on December 9, 2016 ("Jennison Dep."), Exhibit 2, attached hereto as Exhibit E; Pena Dep., Exhibit H; Gouveia Dep. 87:8-25; Gouveia Dep., Exhibit 5; Affidavit of Attorney Jacqueline Rolfs ("Rolfs Aff."), ¶¶ 2-4, attached hereto as Exhibit F).

   **Plaintiff's Response:** Undisputed.

49. It was important for Honeywell to understand the reasons underlying Plaintiff's anxiety symptoms because the various areas within the Honeywell facility contained many of the same features as the molding department. (Dyer Dep. 53:18-20; Jennison Dep. 30:18-24; 31:7-21; 38:3-20; 39:13-16; 42:6-10).

   **Plaintiff's Response: Disputed. Dr. Greer's March 4, 2013 note clearly states that in his medical opinion Pena "is completely capable of working in other settings" within Honeywell. (Ex. A).**

50. Mr. Gouveia sent Plaintiff a Reasonable Accommodation Request Form for her to complete with Dr. Greer. (Pena Dep. 59:17-60:2; Pena Dep., Exhibit F; Gouveia Dep. 70:24-71:3).

   **Plaintiff's Response:** Undisputed.

51. In addition, on April 2, 2013, Dr. Elizabeth Jennison, Honeywell's Associate Director of Health Services, wrote to Dr. Greer, asking for "additional documentation to understand the medical necessity for [Plaintiff's] request." (Pena Dep., Exhibit G; Jennison Dep., Exhibit 2).

   **Plaintiff's Response:** Undisputed.

52. Dr. Jennison's letter requested that Dr. Greer, "please clarify how [Plaintiff's] anxiety symptoms could allow her to work in many areas of the plant, while interfering with her ability to function in one area of the plant, the molding room, for which she is equally qualified and trained? Please provide documentation from your medical records that support this opinion."(Pena Dep., Exhibit G; Jennison Dep., Exhibit 2).

    **Plaintiff's Response:** **Undisputed.**

53. Dr. Jennison's question in her April 2, 2013 letter was fundamental to Honeywell assessing her accommodation request, as several of the other areas contained many of the same features as the molding department. (Dyer Dep. 53:18-20; Jennison Dep.30:18-24; 31:7-21; 38:3-20; 39:13-16; 42:6-10).

    **Plaintiff's Response:** **Disputed. Plaintiff refers to her Response to No. 49 for clarification.**

54. Dr. Jennison recognized that placing Plaintiff in another area that was geographically different but had the same features as the molding room could place her in a position that would not be safe for her. (Jennison Dep. 38:14-20; 39:13-16; 42:6-10; 42:17- 22).

    **Plaintiff's Response:** **Disputed. Plaintiff refers to her Response to No. 49 for clarification.**

55. Honeywell requested some medical documentation that provided an understanding of Plaintiff's specific difficulties or limitations and—in light of the fact that the other departments contained similar or identical features—an explanation from Dr. Greer as to how he came to the conclusion that it was the workplace that was causing Plaintiff's limitations. (Dyer Dep. 53:18-20; Jennison Dep. 30:18-24; 31:12-21; 42:6-22).

    **Plaintiff's Response:** **Undisputed.**

56. In April 2013, Plaintiff submitted to Honeywell a letter from Dr. Greer dated April 2, 2013, and an incomplete Reasonable Accommodations Request Form. (Gouveia Dep. 76:19-77:6, Gouveia Dep., Exhibits 3 and 4).

    **Plaintiff's Response:** **Undisputed that Plaintiff submitted to Honeywell a letter from Dr. Greer dated April 2, 2013. Disputed that the Reasonable Accommodation Request Form was incomplete. Dr. Greer answered all of the questions on the form in a letter dated April 2, 2013 that he wrote in lieu of writing responses on the form. (Ex. I).**

57. The April 2, 2013 letter from Dr. Greer stated that Plaintiff "carries diagnosis of Major Depressive Disorder, Recurrent, Severe." (Gouveia Dep., Exhibit 3).

    **Plaintiff's Response:** **Undisputed.**

58. Honeywell first learned of a depression diagnosis for Plaintiff through Dr. Greer's April 2, 2013 letter. (See Gouveia Dep., Exhibit 3).

    **Plaintiff's Response:** Disputed. Pena refers to her responses to Nos. 26 and 27, in which Honeywell states that Pena had previously taken several other medical leaves of absence under the FMLA totaling 23 weeks.

59. Dr. Greer's note did not provide any detail as to how or why Plaintiff's symptoms allowed her to work in any department except for the molding department. (Jennison Dep. 37:1-38:7;Jennison Dep., Exhibit 3).

    **Plaintiff's Response:** Undisputed.

60. The physician's portion of the Reasonable Accommodations Request form was left completely blank. (Jennison Dep., Exhibit 4).

    **Plaintiff's Response:** Undisputed.

61. On April 8, 2013, Mr. Gouveia sent a letter to Plaintiff recounting that Honeywell had communicated with Plaintiff and her physician to release her medical records to its medical department. (Pena Dep., Exhibit H; Gouveia Dep. 87:8-25; Gouveia Dep., Exhibit 5).

    **Plaintiff's Response:** Undisputed.

62. Mr. Gouveia's April 8, 2013 letter stated: "You have informed us you signed a release to give your physician permission to send your medical records to our medical department; however, no[] medical records have been received. As a result, and at the moment, we have insufficient information to assess your request." (Pena Dep., Exhibit H; Gouveia Dep., Exhibit 5).

    **Plaintiff's Response:** Undisputed.

63. Mr. Gouveia's April 8, 2013 letter reported to Plaintiff, "[w]hile we await the medical information required to assess your request, you have the option to return to work and perform your regular job (including the rotations in the Injection Molding Department required of all employees in your position); or, remain on an unpaid medical leave of absence; or, use any paid time off that is available for you, such as vacation or PTO." (Pena Dep., Exhibit H; Gouveia Dep., Exhibit 5).

    **Plaintiff's Response:** Undisputed.

64. Mr. Gouveia sent a follow-up letter to Plaintiff on April 22, 2013, detailing that he had sent a previous letter, but had not received any information from her physician. (Pena Dep., Exhibit I).

    **Plaintiff's Response:** Undisputed.

65. In his April 22, 2013 letter, Mr. Gouveia reminded Plaintiff of her option to return to work or to continue on an unpaid leave of absence, and requested that Plaintiff please let Honeywell know if her physician would be providing the requested information. (Pena Dep., Exhibit L; Gouveia, Exhibit 6).

    **Plaintiff's Response:** **Undisputed.**

66. On April 22, 2013, Plaintiff's then-counsel, Ms. Kot, for the first time made her presence known to Honeywell when she called Mr. Gouveia to discuss the accommodation request. (Rolfs Aff., ¶ 2).

    **Plaintiff's Response:** **Undisputed.**

67. On April 22, 2013, upon learning that Ms. Kot was representing Plaintiff, Honeywell's in house employment counsel, Jacqueline Rolfs ("Ms. Rolfs"), sent a letter to Ms. Kot, directing her to review the written correspondence sent to Plaintiff to understand Honeywell's request for additional information. (Rolfs Aff. ¶¶ 1-3).

    **Plaintiff's Response:** **Undisputed.**

68. On April 23, 2013, Ms. Kot responded that Plaintiff had provided two doctor's notes and that "[i]n response she received a letter demanding a release of all her sensitive medical records, including mental health records, signed by Mr. Gouveia. This of course represents an unnecessary and prohibited intrusion upon her privacy." (Rolfs Aff., Exhibit B).

    **Plaintiff's Response:** **Undisputed.**

69. On April 25, 2013, Ms. Rolfs sent a letter to Ms. Kot attaching the correspondence between Honeywell, Plaintiff, and Dr. Greer. (Rolfs Aff., Exhibit C).

    **Plaintiff's Response:** **Undisputed.**

70. Her April 25, 2013 letter further detailed the Honeywell's numerous attempts to communicate with Plaintiff about her accommodation request. (Id.).

    **Plaintiff's Response:** **Undisputed.**

71. Ms. Rolfs' April 25, 2013 letter also clarified:
    > Contrary to the assertion in your letter, Dr. Jennison did not ask to see all of Ms. Pena's medical records. Instead, she asked how Ms. Pena's symptoms could allow her to work in all areas of the plant except the molding area, where she had successfully worked on several occasions, and asked for documentation from the medical records to support this opinion. To date, Honeywell has received no response to this letter. (Id.).

    **Plaintiff's Response:** **Undisputed.**

72. Ms. Rolfs also mentioned in her April 25, 2013 letter that "Honeywell remains willing to work with your client to assess her reasonable accommodation request. However, without the cooperation of your client and her physician in providing responses to Honeywell's reasonable questions about the request, we cannot proceed further in that process." (Id.).

   **Plaintiff's Response:** Undisputed.

73. Ms. Kot responded on April 30, 2013, alleging that Honeywell's requests were in violation of the ADA, stating that she would be providing another letter from Plaintiff's doctor shortly, and accusing Honeywell of threatening to terminate Plaintiff. (Rolfs Aff., Exhibit D).

   **Plaintiff's Response:** Undisputed.

74. Ms. Rolfs' April 25, 2013 communication does not convey any termination message, but, instead, states that "Honeywell remains willing to work with your client to assess her reasonable accommodation request. . . ." (Rolfs Aff., Exhibit C).

   **Plaintiff's Response:** Undisputed.

75. On April 30, 2013, Ms. Rolfs sent Ms. Kot yet another letter, stating that Honeywell did not threaten to terminate Plaintiff and that Honeywell's reasonable inquiries about the nature of Plaintiff's condition and the need for accommodation in no way violated the ADA. (Rolfs Aff., Exhibit E).

   **Plaintiff's Response:** Undisputed.

76. On May 6, 2013, Ms. Kot provided a memo to Ms. Rolfs from Dr. Greer dated April 29, 2013, in which he stated that Plaintiff "has reported repeatedly and consistently that she finds this new environment to be highly stressful, referencing a variety of factors which included increased noise levels, chemical odors and the presence of robotics in the molding room which have resulted in a significant exacerbation of her anxiety symptoms." (Rolfs Aff., Exhibit F; Pena Dep., Exhibit J).

   **Plaintiff's Response:** Undisputed.

77. The memo to Ms. Kot from Dr. Greer dated April 29, 2013 conveyed only Plaintiff's self-reports to Dr. Greer and did not convey any medical assessment. (Rolfs Aff., Exhibit F; Pena Dep., Exhibit J).

   **Plaintiff's Response: Disputed. The April 29, 2013 letter clearly states that Dr. Greer "can state with a reasonable degree of medical certainty that there is a direct causal relationship between [Ms. Pena's] working in that setting and the exacerbation of her symptoms," a medical assessment. Furthermore, the attached Progress Notes also include Dr. Greer's continued assessments that Ms. Pena's anxiety and depression continued to worsen due to the "situational stress" due to the changes in her work setting and inability to obtain an accommodation. (Ex. C).**

78. The conditions listed by Dr. Greer in his April 29, 2013 memo to Ms. Kot exist in other areas of the facility. (Ryan Dep. 30:12-13; 37:16-38:4; 39:8-11).

   **Plaintiff's Response:** Disputed. Plaintiff refers to her response to No. 5 for clarification.

79. To provide Plaintiff with the proper accommodation, Honeywell needed to know not only the conditions in the molding room that she found troubling, but also how these same conditions did not bother Plaintiff in other areas of the Honeywell facility. (Jennison Dep. 30:18-24; 31:7-21; 38:3-20; 39:13-16; 42:6-10; 42:17-22).

   **Plaintiff's Response:** Disputed. Plaintiff refers to her response to No. 53 for clarification.

80. In his April 29, 2013 memo to Ms. Kot, Dr. Greer did not propose any accommodation short of a permanent removal of molding room responsibilities from Plaintiff's job. (Rolfs Aff., Exhibit F; Pena Dep., Exhibit J).

   **Plaintiff's Response:** Undisputed.

81. Along with his memo, Dr. Greer included four progress notes, which provided no details of Plaintiff's condition, or how or why she would be unable to work in the molding department. (See Pena Dep., Exhibit J).

   **Plaintiff's Response:** Undisputed that Dr. Greer included four progress notes. Disputed that the four progress notes provided no details of Plaintiff's condition, or how or why she would be unable to work in the molding department. The progress notes speak for themselves.

82. Ms. Rolfs responded to Ms. Kot on May 22, 2013, indicating that the attachments to her most recent letter "do not provide any information as to why there is some connection between Ms. Pena's diagnosed depression and work in the molding room." (Rolfs Aff., Exhibit G; Pena Dep., Exhibit K).

   **Plaintiff's Response:** Undisputed.

83. The May 22, 2013 letter from Ms. Rolfs to Ms. Kot provided that Dr. Greer has not called Honeywell's doctor, Dr. Jennison, as requested. (Rolfs Aff., Exhibit G; Pena Dep., Exhibit K).

   **Plaintiff's Response:** Undisputed.

84. According to Plaintiff, Honeywell had set up an appointment with Dr. Greer for him to go to Honeywell to discuss Plaintiff's alleged condition, but "he didn't go because he didn't have the time." (Pena Dep. 54:21-25).

   **Plaintiff's Response:** Disputed that Dr. Greer did not have time to go to Honeywell to discuss Plaintiff's alleged condition. Rather, Dr. Greer testified that he "didn't

have time in [his] busy practice" to visit the workplace to observe the conditions of the Molding Room. (Greer Dep. at 60:22-25, 61:1-8). Ms. Pena's self-reports and Dr. Greer's observations of her behavior were sufficient for him to form opinion with a reasonable degree of medical certainty that there was, indeed, a direct causal relationship between the Molding Room and the exacerbation of Pena's symptoms. (Id. at 65:11-25, 66:1-11).

85. Ms. Rolfs' May 22, 2013 letter explained that the conditions that Plaintiff complained of existed throughout other areas that Plaintiff worked without issue. (Rolfs Aff., Exhibit G; Pena Dep., Exhibit K).

   **Plaintiff's Response:** Undisputed.

86. In several correspondence, Honeywell requested that Dr. Greer provide an explanation or medical records to elucidate how Plaintiff's alleged symptoms resulted from working in the molding room, when the conditions of the molding room that she complained of existed in other areas of the facility in which she worked without issue. (Jennison Dep. 30:18-24; 31:7-21; 38:3-20; 39:13-16; 42:6-10; 42:17-22; Rolfs Aff., Exhibit G; Pena Dep., Exhibit K).

   **Plaintiff's Response:** Undisputed.

87. Honeywell received its last correspondence from Plaintiff's attorney on or about May 6, 2013. (Rolfs Aff., Exhibit F; Pena Dep., Exhibit J).

   **Plaintiff's Response:** Undisputed.

88. By June 17, 2013, having received no additional information and with no contact whatsoever from Plaintiff, who had been out on a leave for over three months, Honeywell terminated her employment for job abandonment. (Pena Dep., Exhibit L; Gouveia Dep. 88:12-25: Gouveia Dep., Exhibit 6).

   **Plaintiff's Response:** Undisputed.

89. Plaintiff applied for SSDI benefits on September 20, 2013. (Pena Dep. 76:3-6).

   **Plaintiff's Response:** Undisputed.

90. On her SSDI Application, which was completed under the penalty of perjury, Plaintiff stated, "I became unable to work because of my disabling condition on March 8, 2013." (Pena Dep. 76:9-21; Pena Dep., Exhibit M).

   **Plaintiff's Response:** Undisputed.

91. Plaintiff further declared on her SSDI Application: "I am still disabled." (Pena Dep. 76:22-25; Pena Dep., Exhibit M).

   **Plaintiff's Response:** Undisputed.

92. Based upon her statements made in her SSDI Application, an Administrative Law Judge determined that Plaintiff had somatoform disorder and she was totally disabled as of her last day of work, stating: "The claimant has been under a disability as defined in the Social Security Act since March 8, 2013, the alleged onset date of disability." (Pena Dep. 77:12-24; Pena Dep., Exhibit N, p. 5).

    **Plaintiff's Response:** Undisputed.

93. Plaintiff received SSDI benefits retroactive to March 8, 2013, her last day of work. (Pena Dep. 77:12-24; Pena Dep., Exhibit N).

    **Plaintiff's Response:** Undisputed.

94. When asked about the statements in her SSDI Application during her deposition, Plaintiff stated: "The thing is that from that date, the dose of medication for the depression was increased, and also I also got four more pills because of the tachycardia, and also I got medication to help me sleep." (Pena Dep. 76:17-21).

    **Plaintiff's Response:** Undisputed.

95. Plaintiff was further asked at her deposition whether, by her statement, she meant that she was unable to do any work, to which she replied: "Yes, at that time when I stated that, yes, because I was under a lot of medications, and my depression increased." (Pena Dep. 76:22-77:4).

    **Plaintiff's Response:** Undisputed.

96. In addition, Plaintiff filed for bankruptcy in September 2014 and in that application she again stated that she was not employed and that she was disabled. (Pena Dep. 79:3-6).

    **Plaintiff's Response:** Undisputed.

97. Plaintiff did not and has not offered any explanation as to how her sworn statement in her SSDI Application that she was totally disabled as of her last day of work does not contradict her allegation in this suit that she was a qualified individual with a disability. (Pena Dep. 79:13-81:19).

    **Plaintiff's Response:** Disputed. Gouveia advised me to apply for SSDI and so did Dr. Greer. (Pena Aff.). My SSDI lawyer advised me to use March 8, 2013, my last day of work, as the date of the onset of my disability. (Id.). When I stated on my SSDI application that I was unable to work as of March 8, 2013, I meant that I was totally disabled only for the purposes of receiving SSDI benefits. (Id.). The SSDI application did not ask if I needed any accommodations of a disability in order to work and no one at any of the hearings asked. (Id.). Had I been asked, I would have responded, "Yes." (Id.). Had Honeywell granted my accommodation request, I would have gone back to work, and I would not have filed for SSDI benefits. (Id.). I filed for SSDI benefits because I could no longer work due to my worsening

depression caused by Honeywell firing me, and I needed a source of income to pay my bills. (Id.).

98. Plaintiff stated in an Interrogatory, in part: "I applied for Social Security on September 19, 2013. On October 16, 2015, I received a Fully Favorable decision and was determined to have been disabled since March 8, 2013." (Plaintiff's Responses to Defendant's First Set of Interrogatories, No. 15, attached hereto as Exhibit G).

   <u>Plaintiff's Response:</u> **Undisputed.**

MAYRA PENA<br>
By Her Attorneys,

/s/Mark P. Gagliardi
Mark P. Gagliardi (#6819)
mark@gagliardilaw.net

/s/Alicia M. Connor
Alicia M. Connor (#9515)
alicia@gagliardilaw.net

LAW OFFICE OF MARK P. GAGLIARDI
120 Wayland Avenue, Suite 7
Providence, RI 02906
(401) 277-2030
(401) 277-2021 (fax)

Dated: March 29, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this **29**th day of March 20**17**, I caused the foregoing document to be electronically filed with the Court's CM/ECF system. The following counsel-of-record have been served by electronic means.

Neal J. McNamara
nmcnamara@nixonpeabody.com

Aaron F. Nadich
anadich@nixonpeabody.com

Nixon Peabody, LLP
One Citizens Plaza, Suite 500
Providence, RI 02903-1345

/s/Mark P. Gagliardi