UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MAYRA F. PENA | ) |
| | ) |
| PLAINTIFF | ) |
| | ) |
| V. | ) |
| | ) |
| | )      C.A. NO:15-CV-00179-S-LDA |
| HONEYWELL INTERNATIONAL INC., | ) |
| | ) |
| DEFENDANT | ) |

## DEFENDANT HONEYWELL INTERNATIONAL INC.'S REPLY TO PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Defendant, Honeywell International Inc. ("Honeywell" or "Defendant") hereby replies to

Plaintiff Mayra Pena's ("Ms. Pena" or "Plaintiff") Opposition to Defendant's Motion for

Summary Judgment (the "Opposition").  After receiving Plaintiff's Opposition in dribs and drabs

and piecing it together,[1] it is clear that Plaintiff cannot support any of her claims with *evidence*

and, in fact, all of the evidence supports dismissing her claims on summary judgment.  Plaintiff

toils away for fifty-two pages attempting to explain away facts and evidence that are fatal to her

claim.  None of her explanations, however, have any support in evidence or *applicable* law.

### II.  LEGAL ANALYSIS

#### A.  Plaintiff's Opposition Was Unsupported as of Her Deadline for Filing

On February 10, 2017, Honeywell timely filed its Motion for Summary Judgment (the

"Motion"), accompanied by a Memorandum in Support of its Motion, and a separate Statement

---

[1]      At the eleventh hour on the date on which her Opposition was due, Plaintiff submitted her Opposition, Memorandum in Support of her Opposition, and Exhibit List.  She did not support her Opposition with a statement of undisputed or disputed facts, or any excerpts from deposition transcripts.  Plaintiff submitted these documents a day later, past the deadline.

of Undisputed Facts. (Docket, No. 1:14-cv-00223-M-LDA). Plaintiff's Opposition was due by March 13, 2017. On March 6, 2017, Plaintiff filed a Motion to Amend Summary Judgment Deadlines to which Honeywell did not object, requesting that her deadline for filing her Opposition be extended to March 21, 2017. This Court granted Plaintiff's motion. On March 21, 2017, Plaintiff filed another motion to extend her deadline for filing an Opposition to which Honeywell did not object. This Court granted Plaintiff's motion, making Plaintiff's Opposition due by March 28, 2017. (Id.).

At the eleventh hour on March 28, 2017, Plaintiff filed her Opposition, accompanied only by a memorandum in support thereof and an exhibit list. (Id.). Notably absent from Plaintiff's filing was (i) a Statement of Disputed and/or Undisputed Facts; and (ii) excerpts of deposition transcripts to support Plaintiff's Opposition. (Id.). Consequently, there was no evidence whatsoever to support Plaintiff's Opposition.

It was not until late-afternoon on March 29, 2017 that Plaintiff finally filed a statement of disputed facts, statement of undisputed facts, and an "Addendum" to her Opposition, which contained an affidavit of Mayra Pena and excerpts from deposition transcripts. (Id.; *Plaintiff's March 29 Addendum, Attachment No. 1*). Notably, Mayra Pena's affidavit was executed March 29, 2017—past Plaintiff's deadline for submitting her Opposition. (*Plaintiff's March 29 Addendum, Attachment No. 1*).

Plaintiff's failure to submit a Separate Statement of Disputed or Undisputed Facts renders all of the facts set forth in Honeywell's timely filed Statement of Undisputed Facts admitted. This Court's Local Rules are clear:

> (3) For purposes of a motion for summary judgment, **any fact alleged in the movant's Statement of Undisputed Facts shall be deemed admitted unless expressly denied** or otherwise controverted by a party objecting to the motion. An objecting party that is contesting the movant's Statement of Undisputed Facts **shall file a Statement of**

**Disputed Facts**, which shall be numbered correspondingly to the Statement of Undisputed Facts, and which shall identify the evidence establishing the dispute, in accordance with the requirements of paragraph (a)(2).

(4) If an objecting party contends that there are additional undisputed facts not contained in the moving party's statement of undisputed facts which preclude summary judgment, **that party shall file a separate Statement of Undisputed Facts** setting forth such additional undisputed facts.

LR Cv 56(a) (emphasis added).

Where a plaintiff fails to timely file an opposition to a defendant's statement of material facts in support of its motion for summary judgment, a plaintiff must file a motion for leave to file his belatedly filed evidence and statement of material facts, and the request for leave is considered under an excusable neglect standard. Dimmitt v. Ockenfels, 220 F.R.D. 113 (D. Me. 2004) (citing United States v. Proceeds of Sale of 3,888 Pounds Atl. Sea Scallops, 857 F.2d 46, 48–49 (1st Cir. 1988)). Where a plaintiff fails to show excusable neglect, the court may refuse to consider the belatedly filed evidence and statement of undisputed facts. Id.; Cf. Transamerica Life Ins. Co. v. Caramadre, No. CV 09-470 S, 2017 WL 752145, at *2 (D.R.I. Feb. 27, 2017) (stating, in ruling on a motion to reconsider, "[t]he Court was well within its discretion to enforce the final deadline that it set after it had granted several extensions . . ."); Lyons v. Wall, No. CA 08-498 ML, 2010 WL 5562272, at *2 (D.R.I. Oct. 26, 2010), report and recommendation adopted, No. CA 08-498 ML, 2011 WL 87345 (D.R.I. Jan. 10, 2011) (noting that, among other reasons, "the denial of [plaintiff's] Summary Judgment Motion was based in part on Plaintiff's failure to timely file a Statement of Undisputed Facts").

Here, Plaintiff has not filed a motion for leave to file the materials that she filed past the deadline on March 29, 2017; namely, (i) her "Addendum" to her Opposition, containing an affidavit of Mayra Pena and excerpts from deposition transcripts; (ii) her Statement of Disputed Facts; and (iii) her Statement of Undisputed Facts. (See Docket, No. 1:14-cv-00223-M-LDA).

3

Consequently, with respect to Plaintiff's Statement of Disputed Facts, the Local Rule is clear that Honeywell's facts set forth in its Statement of Undisputed Facts are deemed admitted. LR Cv 56(a)(3). With respect to her Addendum and Statement of Undisputed Facts, this Court should not consider such documents in determining whether summary judgment is appropriate. Plaintiff's failure to request this Court's leave to file such evidence and her failure to show any excusable neglect should preclude the consideration of these materials. See Dimmitt v. Ockenfels, 220 F.R.D. 113 (D. Me. 2004).

Even more troublesome than Plaintiff's failure to timely file the aforementioned materials is Plaintiff's submission of an affidavit **executed past the summary judgment deadline**. (*Plaintiff's March 29 Addendum, Attachment No. 1*). Surely, a party is not entitled to submit evidence for consideration in its opposition to a motion for summary judgment that it did not even collect until **after the deadline**. Moreover, given that it was Plaintiff's own affidavit, it is highly unlikely that she can show any excusable neglect for her failure to collect such evidence in a timely manner.

Plaintiff should not be permitted to blatantly disregard the deadline for filing her Opposition. She was not without options. Plaintiff could have (i) requested an extension for filing her Opposition before the deadline expired; or (ii) requested leave to file the aforementioned materials showing excusable neglect. She did not do either, but, instead, simply filed her belated materials after the deadline as if the rules did not apply to her. "Rules are rules—and the parties must play by them." Legault v. Zambarano, 105 F.3d 24, 29 (1st Cir. 1997). In considering Honeywell's Motion for Summary Judgment, this Court should not consider **any** of the materials submitted by Plaintiff after the expiration of her deadline for filing.

## B. **Plaintiff's SSDI Application**

Quite simply, Plaintiff's statement that she was unable to work in her SSDI Application and her confirmation of that statement at her deposition is dispositive of her claims for failure to provide a reasonable accommodation and discriminatory discharge (Counts I to VIII). Without a sufficient explanation as to why her statement in her SSDI application is consistent with her current claim that she could perform the essential functions of her job, these statements preclude a finding that she was a "qualified individual" within the meaning of the ADA. Sullivan v. Raytheon Co., 262 F.3d 41, 47 (1st Cir. 2001) (citing Cleveland, 626 U.S. at 805, 119 S.Ct. 1597). Plaintiff sets forth no sufficient explanation in her Opposition to change this result. In fact, instead of pointing to evidence of an explanation as to how her sworn testimony that she was completely unable to work in her SSDI application can possibly be consistent with her current claim that she was able to perform her job, Plaintiff casts blame at everyone else.

First, Plaintiff blames her own lawyer for her inconsistency, stating: "When Pena submitted her SSDI application, her attorney advised her to use March 8, 2013 – her last day of work – as the date of the onset of her disability as opposed to September 20, 2013, the date of her application." (*Plaintiff's Opposition*, p. 5). Indeed, Plaintiff similarly tried to justify her use of the March 8, 2013 date on her SSDI application by blaming it on her lawyer in her deposition:

> Q: What I'm asking is on the one hand you agreed that you applied for Social Security Disability benefits, and in that you said that you were completely unable to work as of March 8, 2013, correct?
>
> A. In September.
>
> Q. In September you applied but you said that as of March 8th?
>
> A. No. When you fill out the application, they ask you when was your last day of work.
>
> Q. That's not what the application says. The application says, "I became unable to work because" --

THE WITNESS: Which application?

MR. McNAMARA: Exhibit M.

A. I applied with the help of a lawyer. It was with a lawyer that I applied for Social Security.

Q. But in any event, you are saying on the one hand that you are completely unable to work, correct?

A. Yes.

(Honeywell's Statement of Undisputed Facts ("UMF") ¶ 97). By making these statements, Plaintiff seemingly indicates that, if not for her attorney's advice, she would have instead testified under oath that September 20, 2013 was the onset of her alleged total disability. If the Court accepts Plaintiff's implication as true, it must also conclude that she committed perjury in her SSDI application and in her deposition by swearing under oath that her complete inability to work started on March 8, 2013.[2] Without concurrently admitting to perjury, Plaintiff's attorney's advice does not change the fact that she testified, under oath, that she was completely unable to perform work as of March 8, 2013.

Plaintiff next turns the aim of her blame game toward Defendant's counsel. Specifically, in attempting to fend off her SSDI testimony in her Opposition, Plaintiff argues: "Honeywell's counsel is . . . guilty of failing to ask the right questions." (*Pena Opposition,* p. 36). However, Defendant's counsel specifically and directly asked Plaintiff: "[C]an you explain why on the one hand you applied for disability benefits and said that you were unable to work at all as of March

---

[2] Specifically, Plaintiff's application states that: "I KNOW THAT ANYONE WHO MAKES OR CAUSES TO BE MADE A FALSE STATEMENT OR REPRESENTATION OF MATERIAL FACT IN AN APPLICATION OR FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW BY FINE, IMPRISONMENT OR BOTH. I AFFIRM THAT ALL INFORMATION I HAVE GIVEN IN CONNECTION WITH THIS CLAIM IS TRUE." (UMF ¶¶ 90, 91). Her application summary further reminds her, "You declared under penalty of perjury that you examined all the information on this form and it is true and correct to the best of your knowledge. You were told that you could be liable under law for providing false information." (UMF ¶¶ 90, 91).

8, 2013 and that was found to be accurate, and on the other hand you then assert a claim against Honeywell, which includes an assertion that if you had been given an accommodation, you could have done your job? Can you explain that to me?" (UMF ¶¶ 97).[3] Moreover, even if Plaintiff were not asked so directly to explain to inconsistency, Defendant's counsel is under no obligation to ask Plaintiff to explain inconsistencies that are dispositive of her claim.

In any event, Plaintiff bears the burden to prove by competent *evidence* that her past statement is consistent with her current claim and, thus, Plaintiff's stone throwing gets her nowhere in response to a summary judgment motion. Mesnick v. Gen. Elec. Co., 950 F.2d 816 (1st Cir. 1991) ("On issues where nonmovant bears ultimate burden of proof, he must present definite, competent evidence to rebut the motion."). Specifically, "to defeat [a defendant's] motion for summary judgment, [a plaintiff] must explain why the representations of total disability [s]he has made in the past are consistent with his current claim that he could perform the essential functions of [her position] with reasonable accommodation." Sullivan v. Raytheon Co., 262 F.3d 41, 47 (1st Cir. 2001) (citing Cleveland, 626 U.S. at 805, 119 S.Ct. 1597). Plaintiff stated in her SSDI application, "I became unable to work because of my disabling condition on March 8, 2013. I am still disabled." (UMF ¶¶ 90, 91). She confirmed this statement in her deposition by underscoring the fact that she was completely unable to work in response to Defendant's counsel's questions as to how this statement in her SSDI application could be reconciled with her current claim that she is was able to perform the essential functions of her position. (UMF ¶¶ 94-95).

Plaintiff simply has not explained why the representations of total disability she made in her SSDI Application and deposition are consistent with her current claim that she could perform

---

[3] Plaintiff replied that she applied for SSDI with the help of a lawyer and, "I went to see them, but they asked me, Do you want to go back to work, and I said, I don't want to see these people ever anymore." (UMF ¶¶ 97).

with reasonable accommodation.  See Sullivan, 262 F.3d at 47.  Plaintiff attempts to save her claim by belatedly submitting an affidavit that not only conflicts with her deposition testimony that she was ***completely unable*** to work as of March 8, 2013, (UMF ¶¶ 89-95), but was also ***executed the day after the deadline for submitting her Opposition***.  In this affidavit, Plaintiff states in conclusory fashion: "When I stated on my SSDI application that I was unable to work as of March 8, 2013, I meant that I was totally disabled only for the purposes of receiving SSDI benefits.  The SSDI application did not ask if I needed any accommodations of a disability in order to work and no one at any of the hearings asked.  Had I been asked, I would have responded, 'Yes.'" (*Plaintiff's March 29 Addendum, Attachment No. 1,¶ 24*).  However, the Supreme Court has already addressed Plaintiff's hindsight-driven strategy in this very context.  In the very case that the Supreme Court analyzed the effect of statements in an SSDI application on an ADA claim, the Court stated: "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity."  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806, 119 S. Ct. 1597, 1603, 143 L. Ed. 2d 966 (1999).  This is not a novel concept.  It is well-settled that "[a]bsent a satisfactory explanation, a 'party opposing summary judgment cannot create a genuine issue of material fact by the simple expedient of filing an affidavit that contradicts clear answers to unambiguous questions in an earlier deposition.'"  Fin. Res. Network, Inc. v. Brown & Brown, Inc., 867 F. Supp. 2d 153, 171-72 (D. Mass. 2012) (quoting Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 26 (1st Cir. 2002)); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4 (1st Cir. 1994) (stating "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict

and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed"); see also Russell v. Acme–Evans Co., 51 F.3d 64, 67–68 (7th Cir. 1995) (stating that a subsequent affidavit should be disregarded when it is in conflict with previous deposition testimony unless the party can explain the discrepancy); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1297 (7th Cir. 1993) (concluding that without a satisfactory explanation, a subsequent self-serving affidavit which contradicts deposition testimony cannot create a genuine issue of material fact); Trans–Orient Marine Corp. v. Star Trading and Marine, Inc., 925 F.2d 566, 572 (2d Cir. 1991) (stating that a party cannot create a genuine issue of material fact by submitting an affidavit contradicting his own sworn testimony). Plaintiff offers no explanation as to why, in her affidavit—executed more than three-and-a-half years after her SSDI Application, more than four months after her deposition, and a day after her Opposition was due—she changed her testimony.[4] See Colantuoni, 44 F.3d at 4. Accordingly, Plaintiff's affidavit does not save her claim.

Grasping at yet another straw to save her claim, Plaintiff asks this Court to consider certain factors set forth in "EEOC Enforcement Guidance." (*Plaintiff's Opposition*, p. 40). The Enforcement Guidance, effective February 1997, set forth factors for field officers to consider in assessing whether an application for disability benefits should bar an ADA claim. EEOC Notice No. 915.002 (2-12-97). However, the Commission's guidance—issued ***before*** the United States Supreme Court set forth the current framework for assessing these claims—no longer has any

---

[4]    In fact, the only explanation Plaintiff provides for her deposition testimony in her Opposition is that "Honeywell's counsel's deposition questions were confusing, particularly to Pena, who does not speak English, lacks a formal education, and does not understand that each statute defines disability differently." (*Plaintiff's Opposition*, p. 40). However, there is no support for Plaintiff's preposterous suggestion that the language barrier can create a dispute of material fact—particularly when communicating through an interpreter at a deposition. Perhaps even more absurd is Plaintiff's suggestion that she did not understand that each statute defines disability differently. (*Plaintiff's Opposition*, p. 40). Plaintiff's lack of knowledge that she would have to testify in a certain way to preserve her ADA claim does not absolve her of her presumably truthful testimony made under oath at her deposition.

bearing whatsoever on the interplay between an SSDI application and an ADA claim.

Specifically, two years after the Commission issued the aforementioned guidance, the United

States Supreme Court issued its opinion in <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, in which it

held:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

526 U.S. 795, 807, 119 S. Ct. 1597, 1604, 143 L. Ed. 2d 966 (1999). As shown, the Court quite

clearly set forth the test to determine the effect of an SSDI application on a plaintiff's ADA

claim. None of the factors that Plaintiff analyzes under the EEOC Guidance are consistent with

the straightforward test set forth in <u>Cleveland</u>. Consequently, this Court would err as a matter of

law by resting its decision upon them.

Similarly, Plaintiff relies upon two pre-<u>Cleveland</u> cases to support her argument that

"Pena should not have to choose between being surviving [sic] and using the ADA to assist her

in being a productive member of society." (*Plaintiff's Opposition*, p. 46). Honeywell does not

suggest that Plaintiff was required to choose between SSDI and the ADA. Indeed, as <u>Cleveland</u>

and its progeny establish, a plaintiff need not choose between SSDI and the ADA, ***but***,

importantly, a plaintiff ***must explain*** how her claim in her SSDI application can be reconciled

with her ADA claim. Here, as shown above and in Defendant's Motion for Summary Judgment,

Plaintiff simply has offered no such explanation. Accordingly, under <u>Cleveland</u>, her claims must

fail.

## C. **Plaintiff's Retaliation Claim**

Plaintiff's Retaliation and Whistleblower Claims (Counts IX to XII) must fail because she has identified no evidence of a causal connection between any protected conduct and any adverse employment action. In addition, these claims fail because she does not identify any evidence to suggest that Honeywell's legitimate non-retaliatory reasons for her discharge were pretextual. Each of these reasons are discussed in turn.

### 1. No Causal Connection

In response to Honeywell pointing out in its Motion for Summary Judgment that Plaintiff had not alleged any protected conduct, Plaintiff invented some protected conduct—a report to Human Resources concerning her diabetes.[5] (Plaintiff's Opposition, p. 47). However, Plaintiff's diabetes has nothing to do with this case. As a result, Plaintiff unsurprisingly cannot present any evidence of a causal connection between her protected conduct and any adverse employment action.

In Plaintiff's Opposition, she states that the protected conduct that she engaged in was a complaint on February 21, 2013 regarding her need for breaks due to her diabetes. (Plaintiff's Opposition, p. 47). She defines the adverse employment action for her claim as her termination, which occurred nearly **four-months later** on June 17, 2013. (Id.) Plaintiff then relies **solely upon** the temporal proximity of **nearly four months** between her alleged report and termination to support the causal connection necessary for her retaliation claim.

---

[5]     Up until her Opposition, Plaintiff gave absolutely no explanation as to what she claimed her protected conduct to be. Specifically, Plaintiff claimed—in a conclusory nature and without any evidentiary support—that she "engaged in protected conduct by reporting unlawful conduct to the H.R. Department." (Complaint ¶¶ 59, 61, 63, 67). Honeywell noted in its Motion for Summary Judgment that Plaintiff had presented no evidence of any protected conduct. (*Honeywell's Motion for Summary Judgment*, p. 24). Apparently realizing that Honeywell was correct in that assertion, Plaintiff executed an affidavit the day after her Opposition was due in which she stated, for the first time, that her protected conduct was a report concerning her diabetes.

"[T]he Supreme Court has stated that '[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be **very close**.'" Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)) (emphasis added). Consequently, "**[t]hree and four month periods** have been held insufficient to establish a causal connection based on temporal proximity." Id. (emphasis added); see Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 85–86 (1st Cir. 2005) (finding **two-month** temporal proximity between filing of discrimination complaint and plaintiff's termination insufficient to establish a causal connection for ADEA-based retaliation claim); Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 338 (1st Cir. 2005) (holding **four month** interval between commencement of leave and termination "raises no inference of retaliatory motive"); Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918-919 (7th Cir. 2000) (**three months** too long to support an inference of retaliation); Castro–Medina v. P & G Commer. Co., 565 F.Supp.2d 343, 382 (D.P.R. 2008) (plaintiff unable to establish *prima facie* case that termination constituted retaliation where **almost four months** had elapsed between filing of complaint and termination); see also King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997) (five-month lapse between complaint and disciplinary action found to be too long to establish retaliation claim where plaintiff failed to point to any other evidence demonstrating that action was retaliatory). Here, Plaintiff's nearly four-month break between her reported conduct is insufficient to establish a causal connection between that report and her termination.

This is particularly true in the instant case where there is not a shred of evidence to suggest that Honeywell terminated Plaintiff's employment because of her February 21, 2013 report. Indeed, Plaintiff presents no evidence to suggest that there was any connection between her February 21, 2013 complaint and her termination.[6] Accordingly, Plaintiff's retaliation claim fails because she has provided absolutely no evidence of a causal connection between her protected conduct and any adverse employment action.[7]

## 2. No Pretext

Plaintiff muddles a bunch of inapplicable and non-binding cases together to present a peculiar argument that she need not follow the McDonnell-Douglas burden-shifting framework that federal courts have been applying for forty-four years. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); (*Plaintiff's Opposition*, p. 46). Specifically, Plaintiff attempts to avoid the McDonnell-Douglas framework in order to avoid the need to show evidence of pretext in response to Honeywell's evidence of its legitimate non-discriminatory and non-retaliatory reasons for Plaintiff's termination.

First, Plaintiff cites to three Massachusetts cases which state that, under the state's G.L. c. 151B, a plaintiff need not follow the McDonnell-Douglas framework to state a claim. Plaintiff's

---

[6]    The only two statements in Plaintiff's Affidavit concerning her diabetes are as follows: (1) "Because of my diabetes, I need to eat at very specific intervals during the day and, therefore, I needed to take breaks at 9:00 AM and 12:00 PM;" and (2) "On February 21, 2013, I complained to Jose Gouveia that my supervisor was not allowing me to take breaks at 9:00 AM and 12: 00 PM so I could eat, which I told him was necessary because of my diabetes." (Affidavit of Mayra Pena attached to Plaintiff's Addendum to Opposition).

[7]    To the extent that Plaintiff discusses her assignment to the molding department in her Opposition, this assignment is not relevant to her retaliation claim. The only adverse employment action Plaintiff identifies in her Opposition is Plaintiff's termination. Indeed, Plaintiff could not claim that her assignment to the molding department was an adverse employment action. Instead, working in the molding department was a part of Plaintiff's job and an employer requiring an employee to do his or her job cannot, as a matter of law, constitute an adverse employment action. Morales-Vallellanes v. Potter, 605 F.3d 27, 38 (1st Cir. 2010) (vacating verdict and concluding that plaintiff failed as a matter of law to provide evidence of an adverse employment action under Title VII's retaliation provision where employer required plaintiff to complete window duties, rather than his typical and preferred distribution duties, because window duties fell within his job description and on rare occasions he had performed window duties in the normal course of his employment).

claims in the instant matter are based upon the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101 et seq, and four Rhode Island state antidiscrimination statutes.[8]  In making her argument that she should not have to follow the McDonnell-Douglas framework to support a claim, Plaintiff does not cite to a single case applying any of the statutes applicable to this case. Indeed, there are no such cases.  Plaintiff's argument that she should not have to follow the McDonnell-Douglas framework (and, therefore, not have to prove pretext) is nothing more than an invitation for this Court to go rogue and render a decision that flies in the face of nearly a half century of precedent.

Plaintiff's citation to inapplicable case law to avoid the pretext requirement does not stop with Massachusetts.  She next turns her attention to Second and Eleventh Circuit cases to argue that a plaintiff has to prove only discriminatory motive by the employer, but does not have to prove that its proffered legitimate non-retaliatory reason is pretextual.  Of course, Plaintiff does not cite to a single First Circuit case in support of this claim because this notion is directly contrary to First Circuit case law.  Indeed, the First Circuit has been clear:  When an employer proffers a legitimate, non-retaliatory reason, "[t]he plaintiff must present sufficient evidence to show **both** that 'the employer's articulated reason for laying off the plaintiff is a **pretext**' and that 'the true reason is **discriminatory**.'" Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999) (quoting Udo v. Tomes, 54 F.3d 9, 13 (1st Cir. 1995)) (emphasis added); Jones v. Walgreen Co., 679 F.3d 9, 21 (1st Cir. 2012) (A plaintiff must prove "that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." (quoting Collazo v. Bristol–Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st

---

[8]      Plaintiff brings her state claims under the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws §§ 42-112-1 et seq., the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws §§ 28-5-1 et seq., the Rhode Island Civil Rights of People with Disabilities Act ("RIPDA"),  R.I. Gen. Laws §§ 42-87-1 et seq., and the Rhode Island Whistleblower's Protection Act ("RIWPA"), R.I. Gen. Laws §§ 28-50-1 et seq.

Cir.2010))). "For expository convenience, [the First Circuit] has sometimes labeled these two findings 'pretext' and 'plus' and has referred to the First Circuit rule as a "pretext-plus" standard." Id. Thus, under well-settled First Circuit precedent, a plaintiff must prove both the "pretext" (i.e., that the proffered reason is untrue) and the "plus" (i.e., that the real reason is discriminatory). Accordingly, Plaintiff's citation to Second and Eleventh Circuit case law is unavailing.

Here, as Plaintiff's attempt to avoid the pretext inquiry demonstrates, she has no evidence that Honeywell's reason for terminating Plaintiff was pretextual. Honeywell terminated Plaintiff's employment for a legitimate, non-retaliatory reason: She failed to show up to work for nearly three months. Indeed, prior to her termination, Honeywell had been very generous with leave time for Plaintiff. Despite the fact that she had previously been granted leaves totaling 23 weeks between October 14, 2011 and January 14, 2013, and had no available FMLA time in March 2013, Honeywell did not terminate her employment for job abandonment until she had been absent for over three months, and the company had not heard from her or her lawyer for over one month. If Honeywell were motivated by discriminatory animus, it would be nonsensical for it to keep her as an employee past March 8, 2013, and work with her for three months to attempt to maintain her as an employee. Honeywell's legitimate, nondiscriminatory reasons for terminating Plaintiff were not pretextual.

Plaintiff has offered no evidence to suggest that such reasons were pretextual. The only evidence Plaintiff cites to in her Opposition has nothing to do with discriminatory animus or with her protected conduct. In support of her pretext argument, Plaintiff claims that (i) "Honeywell's contention that the only work available for Pena to do at the Cranston facility was in the Molding Room is inconsistent with Dyer's testimony that workers were only assigned there on an 'as

15

needed' basis," and (ii) "This statement is also inconsistent with Pena's actual work assignments over a two week period – from February 21, 2013 to March 7, 2013 – when she was only assigned to work in the Molding Room twice and for only a short period of time." (*Plaintiff's Opposition*, p. 51).   However, Plaintiff takes Kevin Dyer's ("Mr. Dyer") testimony out of context. Mr. Dyer's testimony states:  "We need to move people with business needs. You know, you might get an order that comes in for 50,000 of this and you need to move everybody there tomorrow." Dyer Dep. 41:11-14. Mr. Dyer's testimony is entirely consistent with Honeywell's legitimate, non-discriminatory statement that the only work for Plaintiff to perform on a particular day was in the molding department.  Similarly, it is entirely consistent with Plaintiff having fewer work assignments in the molding department at other times.  In fact, Mr. Dyer's testimony fully supports both of these statements:  Honeywell moved Plaintiff to where she was needed based upon business demands, and she understandably was needed in different departments at different times.  Thus, Plaintiff questioning Mr. Dyer's testimony does not suggest an inkling of pretext.

In addition, Plaintiff argues that pretext can be shown by Dr. Jennison's testimony that Honeywell's Human Resources department had final authority to grant or deny Plaintiff's accommodation, compared to Jose Gouveia's ("Mr. Gouveia") alleged testimony that Honeywell's legal and medical teams had final decision-making authority.  First, Mr. Gouveia's alleged statement that Honeywell's legal and medical teams had decision-making authority is not part of the summary judgment record, and, therefore, this argument is unsupported by any evidence.[9]  Further, Plaintiff identifies only her termination of employment as an adverse employment action and, as discussed above, her assignment to the molding department was part

_____

[9]     Plaintiff cites to page 84 of Mr. Gouveia's deposition to support this argument.  However, Plaintiff did not attach this portion of Mr. Gouveia's deposition to her Opposition and Honeywell did not cite to this portion at all.

of her job duties and could not be an adverse employment action. Thus, the ultimate decision-maker with respect to Plaintiff's request for an accommodation has nothing to do with whether or not Honeywell's termination of her employment was pretextual.[10]

### D. **Plaintiff's Disability Discrimination Claims**

Even if Plaintiff's SSDI application was not dispositive of her claims based upon failure to provide a reasonable accommodation and discriminatory discharge (Counts I to VIII) as discussed in Section II(B), her claims nevertheless fail because (i) Plaintiff's refusal to work in the molding department was not a reasonable accommodation; (ii) Plaintiff does not show Honeywell's articulated legitimate nondiscriminatory reasons to be a pretext for discrimination; (iii) Plaintiff cannot show that she was discharged because of her disability.

1. Plaintiff's Refusal to Work in the Molding Department Was Not a Reasonable Accommodation

Plaintiff has not identified or suggested any accommodation aside from refusing to work in the molding department. The ability to perform the work in all production areas of the facility, and to rotate among them, is an essential function of Plaintiff's position. (UMF ¶ 18). It is well settled that "an employer's obligation to make reasonable accommodations does not require the employer to rewrite the essential elements of a job description or to reallocate those functions to other workers." Rios-Jimenez v. Principi, 520 F.3d 31, 42 n.9 (1st Cir. 2008).

---

[10] Moreover, Plaintiff once again takes witness testimony out of context—there is no inconsistency at all. Dr. Jennison testified that she serves as a consultant and plays an advisory role in decision-making regarding the request for a reasonable accommodation. (Jennison Dep. 29:10-21). This is not inconsistent with Mr. Gouveia's alleged testimony that he escalated requests for accommodation to the legal and medical teams. Similarly, Plaintiff takes issue with Dr. Jennison stating that her role was only to provide a medical opinion, but reviewing only some of the information available including the first note from Dr. Greer. However, as discussed in great detail in Honeywell's Motion for Summary Judgment, Dr. Jennison identified that Honeywell needed to know how Plaintiff's anxiety symptoms would allow her to work in many areas of the plant, but not in the molding department. (UMF ¶ 51-55). Given that Honeywell never received an answer to this question, it was not necessary for Dr. Jennison to review each and every doctor's note or additional document to reiterate the same thing that she concluded the first time.

Plaintiff attempts to create an issue of fact as to whether the molding department was an essential function of Plaintiff's job when no issue exists at all. In recognition that courts do not purport to be super-personnel departments, courts "generally give substantial weight to the employer's view of job requirements." Mulloy v. Acushnet Co., 460 F.3d 141, 147 (1st Cir. 2006) (quoting Ward v. Mass. Health Research Inst., Inc., 209 F.3d 29, 34 (1st Cir. 2000)). Here, Honeywell personnel consistently identified that working in the molding department was part of Plaintiff's job duties and an essential function of her job. (Ryan Dep. 99:25-100:12; Dyer Dep. 41:3-24).

Plaintiff attempts to create an issue of fact by stating that "Honeywell's claim that working in the Molding Room is an essential function of Pena's job should be viewed with skepticism . . . [because] Honeywell did not come up with this creative argument until a year after it terminated Pena and only after she filed a Charge of Discrimination in RICHR accusing Honeywell of disability discrimination and only because it was in desperate need of a defense." (*Plaintiff's Opposition*, p. 20). This could not be further from the truth. Instead, Honeywell repeated that working in the molding department was part of Plaintiff's typical job duties over and over throughout its attempts to engage in the interactive process. For example, in Dr. Jennison's April 2, 2013 letter to Plaintiff, she states, "Ms. Pena routinely works in several areas of the facility, including the moulding room, so the moulding room would, in fact, be considered part of her typical duties." (Exhibit G to Pena Dep.; see also Exhibit C to Rolfs Aff. ("Ms. Pena works as an assembly associate and is required to work in various areas, including the molding area.")). Accordingly, this is not a "newly minted" defense, but rather, the same legitimate non-discriminatory reason that Honeywell has been reiterating all along. Honeywell's judgment as to what constituted the essential functions of her job is entitled to deference.

In addition, the amount of time Plaintiff spent working in the molding department suggests that working in the molding department was an essential function of her job. Plaintiff testified that she was assigned to work in the molding department two to three times per week for four hours at a time, which represents eight (8) to twelve (12) hours per week, or 20% to 30% of her forty (40) hour work week. (UMF ¶ 29). This significant amount of her workweek shows that working in the molding room was an essential function of her job. Mulloy v. Acushnet Co., 460 F.3d 141, 153 (1st Cir. 2006) ("Even if Mulloy had not stipulated to the essential nature of this function, a job function requiring 10% of Mulloy's time is not insignificant when considered in relation to the five remaining essential functions of his job, each of which requires only 10% to 25% of his time.").

The consequences of not requiring Plaintiff to perform her duties in the molding room also supports Honeywell's recognition that this was an essential function of her job. It was Honeywell's business practice to move associate assemblers to departments where customer demand was greatest and, as a result, an employees' inability to work in any particular area would burden the production process. (UMF ¶ 15). In addition, Plaintiff does not dispute that it was particularly important for employees to cycle into the molding department because the molding department runs twenty-four hours per day and does not shut down for employee lunch and other breaks. (UMF ¶ 16). Accordingly, there are several factors to bolster Honeywell's judgment that working in the molding department was an essential function of Plaintiff's job.

Notably, Plaintiff misleadingly suggests that summary judgment is somehow unsuitable when an employee's essential functions are at issue. However, courts repeatedly and consistently grant summary judgment in such circumstances and the First Circuit has repeatedly and consistently affirmed such decisions. See, e.g., Rios-Jimenez, 520 F.3d at 42 (concluding

summary judgment was appropriate because communication and attendance were essential functions of plaintiff's job); Mulloy, 460 F.3d at 151 (concluding that physical presence as opposed to working remotely was an essential function of plaintiff's job based, in part, upon the employer's judgment as to the essential functions of the job); Horn v. S. Union Gas Co., No. 07-142S, 2009 WL 462697, at *7 (D.R.I. Feb. 20, 2009) (concluding that plaintiff failed to meet her *prima facie* case of discrimination where her proposed accommodation to move her from the leak survey department to an assistant to legal counsel would rewrite her job description and was not a reasonable accommodation). Here, the issue is clear-cut. In 2012, Honeywell made a decision that all its employees who worked on the floor at the Cranston facility needed to be able to work in all areas of the facility, and to rotate among those areas as needed. Plaintiff and the other employees were all trained to be able to perform those various functions. Honeywell required this cross-training because it allowed Honeywell to run an efficient operation by shifting employees to different departments based on customer demands. The ability to perform the work in all production areas of the facility, and to rotate among them, is an essential function of Plaintiff's position. (UMF ¶ 18). Aside from questioning Honeywell's evidence, Plaintiff has presented no evidence to suggest that working in the molding department was not an essential function of her job. Indeed, she did not identify **a single associate assembler** that was not required to work in the molding department—nor could she, because it was required of all associate assemblers.[11]

As the foregoing makes unmistakably clear, there is no issue of material fact as to whether working in the molding department was an essential function of Plaintiff's job. Given that her refusal to work in the molding department was the only accommodation Plaintiff

---

[11]    Plaintiff does not dispute that no other employee other than Plaintiff has refused to work in the molding department. (UMF ¶ 12).

suggested, she failed to present a reasonable accommodation and, thus, summary judgment is appropriate. Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001) (granting summary judgment in recognition of the principle that the burden is on the Plaintiff "of proposing an accommodation that would enable [her] to perform his job effectively and is, at least on the face of things, reasonable.").

> 2. Plaintiff Provides No Evidence That Honeywell's Articulated Legitimate Non-Discriminatory Reasons for Her Termination Were a Pretext for Discrimination

Plaintiff's **sole argument** that Honeywell's legitimate non-discriminatory reason[12] for her termination was pretext is as follows: "If Honeywell truly believed that working in the Molding Room was an essential function of the Associate Assembler position, then the time to raise this issue should have been when Pena first made her reasonable accommodation request on March 7, 2013 or during the interactive process." (*Plaintiff's Opposition p. 24*). Plaintiff further notes that "[i]f Honeywell truly believed from the onset that working in the Molding Room was an essential function of the Associate Assembler position, then once Pena refused to work there—irrespective of whether or not it was for medical reasons—Honeywell had the right to terminate her employment on the grounds that she could not perform the essential functions of her job." (*Plaintiff's Opposition p. 25*). Plaintiff claims Honeywell's "newly minted" argument suggests that it is pretextual.

As detailed above in Section II(D)(1), Honeywell repeated that working in the molding department was part of Plaintiff's typical job duties over and over throughout its attempts to engage in the interactive process. Thus, Plaintiff's argument simply has no merit. Further,

---

[12] As outlined in detail in Honeywell's Motion for Summary Judgment, Honeywell had a legitimate and lawful reason for terminating Plaintiff's employment: Plaintiff refused to perform an essential function of her job, left the workplace, and never returned. Honeywell nevertheless sought to work with her to maintain her as an employee and accommodate any condition that Plaintiff may have had. Plaintiff was not terminated until she had been out on leave for over three months—a leave which had never been approved—and neither she nor her attorney had been in touch with Honeywell for over one month. Her abandonment of her job was sufficient to support the decision to terminate her employment.

Plaintiff is absolutely correct that Honeywell had the right to terminate her the moment she refused to work in the molding department. Honeywell nevertheless sought to work with her to maintain her as an employee and accommodate any condition that Plaintiff may have had. Honeywell going above and beyond for its employees does not establish pretext.

### 3. Plaintiff Has Offered No Evidence That She Was Discharged Because of Her Disability

In a discrimination case, the employee has the burden of proving that she was discharged because of her disability. See Barber v. Verizon New England Inc., No. 05-390-ML, 2006 WL 3524465, at *3 (D.R.I. Dec. 6, 2006); Ward v. Massachusetts Health Research Inst., Inc., 209 F.3d 29, 33 (1st Cir. 2000). Plaintiff sets forth a number of reasons that she believes show Honeywell discharged her because of her disability—each of which is either unsupported by evidence or not relevant to her instant claim.

- Plaintiff states that "Honeywell knew about Pena's past FMLA medical leaves for seasonal depression." (*Plaintiff's Opposition*, p. 26). However, Plaintiff's seasonal depression has nothing to do with this case. She claims in the instant case that her disability was anxiety as a result of working in the molding department. Plaintiff does not present any claim based upon her seasonal depression and, in fact, Honeywell accommodated each of her requested medical leaves for her seasonal depression by allowing her time to take trips to the Dominican Republic. (UMF ¶ 26). Thus, Plaintiff's seasonal depression or Honeywell's knowledge thereof have nothing to do with this claim.

- Plaintiff states that "Honeywell knew that Pena had been receiving counseling and medication from a mental health provider since 2010." (*Plaintiff's Opposition*, p. 26). In support, she relies upon the letterhead from Dr. Greer's

letter, dated March 8, 2013, which lists the services he provides, including "Mental health and substance abuse care and treatment services . . . ." First of all, it is absurd to believe that each and every time an employee submits a doctor's note, an employer is required to assume that their employee receives treatment for all of the conditions that a doctor sets forth in his letterhead. No reasonable juror would so conclude. Further, given that the note is dated March 8, 2013, it is unclear how Plaintiff concludes that Honeywell's knowledge dated back to 2010. Indeed, Plaintiff offers no evidence or explanation of this.

- It is immaterial that "Dr. Jennison only received and reviewed one of Dr. Greer's three letters and she never received or reviewed Pena's completed Request for Reasonable Accommodation Form." (*Plaintiff's Opposition*, p. 28). Upon reviewing Dr. Greer's first note, Dr. Jennison identified that Honeywell needed to know how Plaintiff's anxiety symptoms would allow her to work in many areas of the plant, but not in the molding department. (UMF ¶ 51-55). Given that Honeywell never received an answer to this question, it was not necessary for Dr. Jennison to review each and every doctor's note or additional document to reiterate the same thing that she concluded the first time. The fact that she did not review subsequent documents does not suggest that Honeywell engaged in discrimination.

- Plaintiff claims that "Honeywell did not consult with a psychiatrist and only relied on the opinion of its own in-house doctor who specializes in occupational medicine." (*Plaintiff's Opposition*, p. 28). Plaintiff sets this forward to suggest that "a reasonable jury could conclude that Gouveia, Dr. Jennison or someone else

at Honeywell purposefully did not consult with a trained psychiatrist in order to stonewall Pena's efforts to remain employed and force her termination." (*Plaintiff's Opposition*, p. 28). However, Plaintiff offered **absolutely no** evidence of such a nefarious intent. Therefore, a reasonable jury could not so conclude, because such a conclusion would not be based upon **evidence**.

- Plaintiff claims that "Gouveia emphasized how Pena was pointing her finger in his face and being disrespectful." (*Plaintiff's Opposition*, p. 29). First, the incident involving Plaintiff pointing her finger at Mr. Gouveia occurred in March 2013, but she was not terminated until June 2013. Thus, the temporal proximity between these two events is insufficient to show any causal connection. Moreover, even if Honeywell based its decision to terminate Plaintiff on this insubordination, this would only present an additional reason for Honeywell to terminate Plaintiff. Termination for an employee's insubordination is not discrimination. Therefore, whether this played any role in Honeywell's decision to terminate Plaintiff is irrelevant.

As these points show, Plaintiff has offered no evidence that she was discharged because of her disability. While Plaintiff attempts to create an issue of fact where none exists, all of the points that Plaintiff attempts to make are either unsupported by evidence or simply irrelevant to this claim. Accordingly, Plaintiff failed to carry her burden of proving that she was discharged because of her disability, and summary judgment is appropriate.

## III. CONCLUSION

For each and all of the foregoing reasons and for the reasons stated in Honeywell's Motion for Summary Judgment, Defendant Honeywell International, Inc. respectfully requests that the Court ALLOW its Motion for Partial Summary Judgment in its entirety.

HONEYWELL INTERNATIONAL INC.,

By their Attorneys,

NIXON PEABODY LLP


 /s/ Neal J. McNamara
Neal J. McNamara (#4249)
Aaron F. Nadich (#9571)
One Citizens Plaza, Suite 500
Providence, Rhode Island 02903
(401) 454-1000
(401) 454-1030 (Facsimile)
nmcnamara@nixonpeabody.com

Date: April 11, 2017


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the within document was served on counsel via the Court's Electronic filing system on this 11th day of April, 2017.


   /s/ Neal J. McNamara