**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| MAYRA F. PENA,<br>    PLAINTIFF | :<br>:<br>:<br>: |
| v. | :    C.A. NO. 15-CV-00179-WES-LDA |
| | :<br>: |
| HONEYWELL INTERNATIONAL INC.,<br>    DEFENDANT. | :<br>:<br>: |

**PLAINTIFF MAYRA PENA'S MEMORANDUM OF LAW IN OPPOSITION TO MAGISTRATE JUDGE LINCOLN D. ALMOND'S SEPTEMBER 22, 2017 REPORT AND RECOMMENDATION ON DEFENDANT HONEYWELL INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 42)**

Mayra Pena, the plaintiff in the above-entitled matter, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and L.R. cv 72(d) of the Local Rules of the United States District Court for the District of Rhode Island, by and through her attorney, hereby submits the within Memorandum of Law in Opposition to Magistrate Judge Lincoln D. Almond's September 22, 2017 Report and Recommendation on Defendant Honeywell International, Inc.'s Motion for Summary Judgment (the "R & R") (Doc. No. 42).

For the reasons set forth herein, the Court should not adopt the R & R, and it should deny Defendant's Motion for Summary Judgment (Doc. No. 27).

**INTRODUCTION**

Pena's state and federal claims in this matter encompass three (3) separate categories: (1) discriminatory discharge on the basis of a disability; (2) failure to provide a reasonable accommodation of a disability; and (3) retaliation.

The R & R recommends summary judgment on all of Pena's claims on the grounds that no reasonable jury could find for her on any of her claims. However, there are two principal issues in

this case that can only be resolved by a jury that make summary judgment inappropriate: (1) The reason(s) why Honeywell did not accommodate Pena's need for a reasonable accommodation; and (2) the reasons why Honeywell fired Pena.

Honeywell claims it did not accommodate Pena's request for an accommodation because she failed to produce at its request medical records to support her need for the accommodation. Pena claims that her request for an accommodation was based on her psychiatrist's medical opinion emanating from her self-reports to him about how the change in her work environment exacerbated her pre-existing anxiety. As such, Pena further claims that no medical records existed — other than the three (3) doctor's notes which she produced to Honeywell — that would satisfy her employer's request for Pena to corroborate her psychiatrist's medical opinion. Furthermore, Honeywell claims it fired Pena because she abandoned her job. Pena disagrees and claims that Honeywell's decision to fire her was motivated, in part, because she is disabled and because she complained about disability discrimination regarding her diabetes.

Here, because the employer's motive for insisting that Pena produce medical records it knew she could not produce and its motive for terminating her are in dispute, these issues must be decided by the jury and not by the Court. Respectfully, Magistrate Judge Almond is incorrect when he writes that no jury could find for Pena on any of her claims. Indeed, the R & R faithfully and uncritically adopts Honeywell's version of the events in question and Honeywell's reasoning for its actions as if this employer's explanations are the only conceivable ones. The R & R does not consider another scenario where a jury could cast doubt on Honeywell's true motive for requiring Pena to produce medical records and its motive for firing her. Indeed, a jury could come to the conclusion that Honeywell's actions were guided by the fact that it recognized it had an opportunity to finally rid itself of a chronically disabled employee who needed FMLA leave every winter, who needed an accommodation in the form of job re-assignment to a different department, and who complained

about discrimination in the workplace. Here, once Honeywell became aware Pena could not work in the Moulding Room because of a medical condition, it presented her with a take-it-or-leave option — work in the Moulding Room or be fired. Then, when Honeywell became aware that Pena had no medical records to satisfy its requests, it knew it had a so-called "legal reason" to fire Pena by creating an impossible condition for her to return to work. This is not a "pie-in-the-sky" conspiracy theory, but rather a sad reality of the workplace. Indeed, when some employers eventually grow tired of the burdens imposed by disabled employees like Pena, they sometimes find ways to get rid of them while also trying to mask their unlawful conduct. Not only is this theory entirely plausible, but it is supported by substantial evidence-on-the-record as explained below.

The R & R also recommends dismissal of Pena's failure to accommodate claims on the grounds that Pena should be judicially estopped from claiming to be disabled as of March 8, 2013. However, the law merely requires that Pena provide a sufficient explanation for why she gave inconsistent statements in two different forums regarding the date of the onset of her disability. Pena has provided sufficient explanations for which a jury could find that she is a qualified disabled person within the meaning of the law and, therefore, the Court should also not adopt this portion of the R & R.

## LEGAL STANDARD

Rule 72(b)(3) of the Federal Rules of Civil Procedure provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

A motion for summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue

is "genuine" if the evidence is such that a rational factfinder could find for either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the applicable law." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). The moving party carries the burden of demonstrating that no genuine issue of material fact exists. Id.

In considering whether a genuine triable issue exists, the Court views the record and draws all reasonable inferences in the light most favorable to the nonmoving party. Cont'l Cas. Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991). The party seeking summary judgment must show that there is "'an absence of evidence to support the nonmoving party's case.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Summary judgment will be denied if "there is enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1985)).

Moreover, in cases like the one at hand, which involve questions of motive and intent, the movant's burden is particularly rigorous. Unsettled issues regarding motive and intent will often preclude summary judgment. See Medina v. Adecco, 2008 WL 2428207 at * 1 (D.P.R. July 12, 2008); see Lipsett v. Univ. of P.R., 864 F.2d 881, 895 (1st Cir. 1988). Moreover, the court should deny summary judgment when the non-moving party can point to specific facts detailed in affidavits and depositions — that is, names, dates, incidents, and supporting testimony giving rise to an inference of discriminatory animus. Id. Finally, if the affirmative evidence presented by the non-moving party raises a question of credibility as to the testimony provided by the moving party, summary judgment is inappropriate, and that credibility issue must be presented to the factfinders at trial. Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co., 149 F.2d 359, 363 (5th Cir. 1945) ("The success of an attempt to impeach a witness is always a jury question, as is the credibility of the witnesses where they contradict one another, or themselves.").

**ARGUMENT**

For the reasons stated herein, triable issues of fact exist on all of Pena's claims and, therefore, the Court should not adopt the R & R, and it should deny Honeywell's Motion for Summary Judgment. First, a jury could find that Honeywell's decision to terminate Pena was motivated, in part, because she is disabled. Second, a jury could find that Pena can provide a sufficient explanation for why she claimed in her SSDI application that she was "unable to work because of a disabling condition as of March 8, 2013." Third, a jury could find that Honeywell's decision to terminate Pena was motivated, in part, because she engaged in protected conduct. Fourth, a jury could find that Honeywell's proffered reason for terminating Pena is pretext.

**I.  A JURY COULD FIND THAT HONEYWELL'S DECISION TO TERMINATE PENA WAS MOTIVATED, IN PART, BECAUSE SHE IS DISABLED.**

To succeed on a claim for discriminatory discharge on the basis of a disability, Pena must prove that Honeywell terminated her employment because of a disability. R.I. Gen. Laws § 28-5-7(1)(ii); R.I. Gen. Laws § 42-87-1; R.I. Gen. Laws § 42-112-1.12. Specifically, Pena must prove that: (1) she was "disabled" within the meaning of the law; (2) she was a "qualified individual," meaning she could perform the essential functions of her job with or without a reasonable accommodation; and (3) Honeywell discharged her in whole, or in part, because of her disability. See Katz v. City Metal Co., Inc., 87 F.3d 26, 30 (1st Cir. 1996).

Here, based on the evidence-on-the-record, a reasonable jury could find that Honeywell terminated Pena's employment because of a disability and, therefore, summary judgment is inappropriate on Pena's discriminatory discharge claim.[1]

---

[1] Rather than re-assert her entire argument regarding the discriminatory discharge claim from her Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc No. 33), Pena will focus her argument on the third prong of the discriminatory discharge claim, which is whether Honeywell discharged her in whole, or in part, because of her disability.

A.  **A REASONABLE JURY COULD FIND THAT HONEYWELL DISCHARGED PENA IN WHOLE, OR IN PART, BECAUSE OF HER DISABILITY.**

In cases like the one at hand, which involve questions of motive and intent, the movant's burden is particularly rigorous. Unsettled issues regarding motive and intent will often preclude summary judgment. Adecco, 2008 WL 2428207, at * 1; see Lipsett v. Univ. of P.R., 864 F.2d 881, 895 (1st Cir. 1988). Here, Honeywell knew about Pena's lengthy record of medical problems and mental impairments and, therefore, Honeywell had ample motive to rid itself of a burdensome, disabled employee — at least a reasonable jury could conclude so.

1.  **Honeywell knew about Pena's past FMLA medical leaves for seasonal depression.**

Pena had taken FMLA medical leave routinely throughout her employment with Honeywell because of seasonal depression, which would usually commence in the Fall. (Doc. No 27-1 at 4, n. 3); (Pena Depo. at 26:5-27:4; 28:4-8). Pena claims her employer was aware of why she needed to take FMLA medical leave. (Pena Aff.). Pena's most recent FMLA medical leave for seasonal depression prior to her termination was from November 29, 2012 to January 14, 2013 (Pena Depo. at 27:17-28:8). On March 8, 2013, less than two months later, Honeywell refused to accommodate Pena's request for a reasonable accommodation and sent her home from work (Pena Dep. at 52:5-10; Ryan Dep. at 80:8-12; Gouveia Dep. at 64:8-11, 17-20).

2.  **Honeywell knew that Pena suffered from psychological disorders — anxiety and depression.**

Dr. Geer's three letters informed Honeywell prior to Pena's termination that Pena suffered from anxiety and Major Depressive Disorder. (Exs. A-C). Also, after Honeywell received the First Doctor Letter, Honeywell's managers Gouveia, Connor, and Dyer, all had actual knowledge that Pena suffered from anxiety. (Gouveia Dep. at 67:5-6; Jennison Dep. at 24:2-10; Ex. A-C).

3. **Honeywell knew that Pena had been receiving counseling and medication from a mental health provider since 2010.**

The Letterhead from Dr. Greer's employer, *The Providence Center,* includes language in the left hand margin listing the services it provides: "Mental health and substance abuse care and treatment services to adults, children, adolescents, and families" (emphasis added) and managers from Honeywell read the entire contents of this letter on March 8, 2013 prior to terminating Pena (Jennison Dep. at 24:2-10; Ryan Dep. at 71:25-72:7, 74:9-16; Gouveia Dep. at 55:6-16; Ex. A).

4. **Gouveia made discriminatory remarks to Pena about her health advising her to apply for SSDI by stating: "Why don't you apply for SSDI if you have so many problems?" or words to that effect.**

Pena testified at her deposition:

Q. Okay. Do you remember some time at the end of February going to Jose Gouveia and telling him that you had a problem because Myra Fermin kept sending you to the molding department?
A. Yes. I went to see him because I was being denied my breaks as well.
Q. Right. We've already talked about that. What I'm asking you about now is did you go to him to tell him that you had a problem because Myra Fermin was asking you to work in the molding department?
A. **I did explain that to him also, and he told me if I had so many health problems, why didn't I apply for Social Security.**
Q. Isn't it true that what he actually said to you later was that when you were out on leave that you should apply for Temporary Disability Insurance or short-term disability benefits?
A. **Not temporary. He said if I had so many problems with panic, depression, diabetes, why didn't I apply for Social Security, and I told him I wouldn't because Social Security would not give me what I'm making working for the company.**

(Pena Dep. at 42:24-43:20).

A reasonable jury could find that the temporal proximity between the discriminatory remarks Gouveia made to Pena in late February 2013 and the adverse employment actions Pena suffered in March 8, 2013 (when she was sent home) and June 2013 (when she was terminated) constitutes sufficient evidence, together with other evidence, that Honeywell's decision to fire Pena was motivated, in part, because of a disability.

5. **<u>Gouveia claims he told Pena to apply for TDI</u>**.

There is a genuine dispute over whether Gouveia advised Pena to apply for SSDI benefits as Pena claims or TDI benefits[2] as Gouveia claims (Gouveia Dep. at 69:4-70:23). Nonetheless, even giving Gouveia the benefit of the doubt that he advised Pena to file for TDI as opposed to SSDI and that it got lost in translation, Gouveia's suggestion to Pena that she apply for some form of disability insurance leads to a very strong inference that Gouveia must have believed that Pena was unable to work due to a disability or a medical issue. The evidence also supports Pena's theory that she was a burden to Honeywell because she is disabled and that the company was looking for a way to get rid of her.

6. **<u>Dr. Jennison only received and reviewed one of Dr. Greer's three letters and she never received or reviewed Pena's completed Request for Reasonable Accommodation Form</u>**.

Dr. Jennison claims part of her job duties at Honeywell is to provide an "advisory opinion" on accommodation requests (Jennison Dep. at 47:25-48:3). Yet Dr. Jennison only read one of the three doctor's letters Dr. Greer provided, and she did not read Pena's completed Request for Reasonable Accommodation Form. (Jennison Dep. at 44:21-45:1). In fact, Dr. Jennison does not recall even speaking with anyone at Honeywell about Pena's need for an accommodation. (Jennison Dep. at 47:2-24). Thus, a reasonable jury could conclude that Gouveia or someone else at Honeywell purposefully kept Dr. Jennison out of the loop in order to force Pena's termination.

7. **<u>Honeywell did not consult with a psychiatrist and only relied on the opinion of its own in-house doctor who specializes in occupational medicine</u>.**

During Dr. Jennison's entire thirty (30) year medical career, she had never practiced medicine in an area other than occupational medicine. (Jennison Dep. at 14:2-4). Indeed, Dr. Jennison's only exposure to treating patients with psychological disorders occurred in medical school

---

[2] Presumably, when Gouveia used the term TDI, he meant Rhode Temporary Disability Insurance, a state-funded temporary disability insurance programs that Rhode Island employees can utilize through their employers.

in 1987 during a mandatory six (6) week rotation. (Jennison Dep. at 18:12-19:20). As the Associate Director of Health Services at Honeywell, Dr. Jennison's job duties primarily encompassed setting forth the company's policy for manufacturing facilities to follow to maintain workplace safety with regard to, for example, chemicals. (Jennison Dep. at 14:4-15:22).  Thus, a reasonable jury could conclude that Gouveia, Dr. Jennison or someone else at Honeywell purposefully did not consult with a trained psychiatrist in order to stonewall Pena's efforts to remain employed and force her termination.

8. **On March 7, 2013, Gouveia told Pena that she had to work in the Molding Room and that there was no other work for her to do. (Ryan Dep. at 80:8-12; Gouveia Dep. 64:8-11, 17-20).**

This is untrue. Kevin Dyer testified that Honeywell needed all Associate Assemblers to be cross-trained so they would be able to work in the Molding Room on an as needed basis to account for unexpected exigencies (such as a worker being out, vacations, or an unexpected large order), rather than on a consistent basis. (Dyer Dep. at 41:3-20).  Since this was to be a temporary assignment, another employee simply could have been rotated into the Molding Room and Pena could have remained in HEPA. (Dyer Dep. at 58:5-16).  Thus, a reasonable jury could conclude that Gouveia lied to Pena so she would remain out of work indefinitely, so he could eventually have a reason to terminate her.

II. **A JURY COULD FIND THAT PENA CAN PROVIDE A SUFFICIENT EXPLANATION FOR WHY SHE CLAIMED IN HER SSDI APPLICATION THAT SHE WAS "UNABLE TO WORK BECAUSE OF A DISABLING CONDITION AS OF MARCH 8, 2013."**

In Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795 (1999), the United States Supreme Court determined that the application for and receipt of SSDI benefits does not judicially estop an ADA claimant from proving the essential element that she can perform the essential functions of her job with a reasonable accommodation. Id. at 799.  Rather, when a court is faced with an ADA

claimant's prior sworn statement asserting total disability for the purpose of SSDI benefits, it should require an explanation from the claimant of the inconsistency. Id. at 807.  An ADA plaintiff "may not simply ignore seeming contradictions between statements made in an application for SSDI benefits and elements of an ADA claim . . . [,][r]ather, [she] must explain such seeming contradictions." DeCaro v. Hasbro, Inc., 580 F.3d 55, 62 (1st Cir. 2009).  Indeed, such statements "may or may not be inimical to an employment discrimination claim.  Everything depends on interpretation: how the jurors view the statements and the receipt of benefits in the context of the overall explanation." Id.

The R & R concludes that "no reasonable juror could reconcile [Pena's] position in this ADA litigation with her position in the SSDI process." (R & R at 13).  The R & R appears to focus on the date that Pena provided on her SSDI application for the onset of her disability (March 8, 2013) and her deposition testimony, during which time Honeywell's counsel attempted to dupe Pena into testifying that she was too disabled to work on March 8, 2013, when this was not true and Honeywell knew it.  Indeed, Honeywell knew that Pena was trying to come back to work for three (3) months; it knew she had produced three (3) doctor's notes; and it knew she even hired an attorney in an attempt to get back to work.  If Pena was truly unable to work as of March 8, 2013, why would she have undertaken such efforts?  Furthermore, if Pena was truly unable to work as of March 8, 2013, why did she wait until September 20, 2013 to file for SSDI benefits?

Nonetheless, despite Honeywell's attempt to manipulate an uneducated woman who does not speak English and had never been deposed before, Pena testified that she became disabled when Honeywell denied her accommodation, which did not happen on March 8, 2013, but rather, four of five months later:

> **Q. At what point did you become unable to work at all?**
> A. The same moment that they denied me my job without accommodating me, without any need to do that.

> **Q. Was that on March 8, 2013?**
> A. For about four or five months during the time that the lawyer was in constant communication with them, and they were declining.

(Pena Depo. at 82:1-9).

If given the opportunity, Pena will explain at trial that she was able to work had Honeywell granted her request for an accommodation by simply allowing her to continue to work in her normal work setting (Pena Aff.). At trial, Pena will explain that after she was fired on June 17, 2013, she did not apply for SSDI benefits until September 20, 2013, only <u>after</u> she had exhausted every possible effort of getting the needed accommodation (<u>Id</u>.). At trial, Pena will explain that Jose Gouveia and her psychiatrist James Greer, M.D. both advised her to file for SSDI benefits (<u>Id</u>.). Pena will also explain that she filed for SSDI benefits because she could no longer work due to depression, which became exacerbated when Honeywell fired her, and she needed a source of income to pay her bills (<u>Id</u>.). At trial, Pena will explain that she did not understand the difference between being disabled for the purposes of SSDI and the ADA and that no one explained it to her (<u>Id</u>.). Finally, Pena will explain that her SSDI lawyer advised her to use March 8, 2013, her last day of work, as the date of the onset of her disability (<u>Id</u>.). Furthermore, the jury will be permitted to infer that using the earlier date of March 8, 2013 as the date of the onset of the disability as opposed to September 20, 2013 would have enabled Pena to maximize the benefits she would receive.

Here, Pena has given a sufficient explanation for why she provided inconsistent statements in her SSDI application and her ADA litigation. Furthermore, when given the choice between having to accept one of two contradictory statements, it is curious that Honeywell conveniently accepts the statements Pena made in her SSDI application as the ones that are truthful and accurate. Why doesn't Honeywell take the position that Pena lied on her SSDI application, but that she is telling the truth in her ADA litigation? Why is the statement in Forum "A" truthful, but the statement in Forum "B" is untruthful? Certainly, Honeywell should be allowed to use Pena's

contradictory statements to impeach her at trial, but dismissing her case because of this innocent discrepancy would amount to a miscarriage of justice.

> A. **THE COURT SHOULD CONSIDER THE FACTORS SET FORTH IN EEOC ENFORCEMENT GUIDANCE ON THE EFFECT OF REPRESENTATIONS MADE IN APPLICATIONS FOR BENEFITS ON THE DETERMINATION OF WHETHER A PERSON IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY" UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990 (ADA).**

The EEOC has published enforcement guidelines for dealing with issue of claimants who make statements on their SSDI applications that are allegedly inconsistent with statements about their disabilities in other claims, such ADA claims and workers' compensation claims entitled: "EEOC Enforcement Guidance on the Effect of Representations Made in Applications for Benefits on the Determination of Whether a Person Is a "Qualified Individual with a Disability" Under the Americans with Disabilities Act of 1990" (ADA), EEOC NOTICE Number 915.002 (2-12-97), at https://www.eeoc.gov/policy/docs/qidreps.html (last visited March 28, 2017) (the "EEOC Enforcement Guidance").

The EEOC Enforcement Guidance provides:

> This Enforcement Guidance explains why representations about the ability to work made in the course of applying for social security, workers' compensation, disability insurance, and other disability benefits do not bar the filing of an ADA charge. It provides instructions to EEOC investigators for assessing what weight, if any, to give to such representations in determining whether a charging party (CP) is a "qualified individual with a disability" for purposes of the ADA.
>
> A "qualified individual with a disability" is "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and who, with or without reasonable accommodation, can perform the essential functions of such position." Because of the fundamental differences in the definitions used in the ADA and the terms used in disability benefits programs, an individual can meet the eligibility requirements for receipt of disability benefits and still be a "qualified individual with a disability" for ADA purposes. Thus, a person's representations that s/he is "totally disabled" or "unable to work" for purposes of disability benefits are never an absolute bar to an ADA claim.

### Americans with Disabilities Act

The definition of the term "qualified individual with a disability" reflects the ADA's broad remedial purpose to prohibit discrimination against individuals with disabilities who want to work and are qualified to work. Accordingly, the definition:

- requires an individualized assessment of a particular individual's capabilities;
- focuses on the essential functions of a particular position;
- looks at particular positions, not work in general; and
- considers whether a person can work with reasonable accommodation.

The ADA definition of "qualified individual with a disability" differs from the definitions used in the Social Security Act, state workers' compensation laws, disability insurance plans, and other disability benefits programs designed for different purposes.

### Social Security Act

Disability programs established under the Social Security Act are designed to provide income to individuals with disabilities who generally are unable to work. Unlike the ADA definition of "qualified individual with a disability," the Social Security Administration (SSA) definition of "disability":

- permits general presumptions about an individual's ability to work;
- considers all tasks as jobs are customarily performed without focusing on the essential functions of a particular position;
- looks generally at whether an individual can do work which exists in the national economy rather than whether s/he can perform the essential functions of a particular position; and
- does not consider whether a person can work with reasonable accommodation.

EEOC Enforcement Guidance provides the below factors for investigators to consider when assessing the effect of representations made in connection with an application for SSDI benefits on the determination of whether a claimant is a "qualified individual with disability" investigators should consider the following factors. Several of these factors weigh in Pena's favor of Pena's argument that she is a "qualified disabled person:"

- **the definitions of terms such as "disability," "permanent disability," "total disability," "inability to work," etc., under the relevant statute or contract pursuant to which CP applied for disability benefits (e.g., do they look at specific positions or general kinds of work? do these terms take into account reasonable accommodation?);**

See discussion in Section III, Part A supra.

- **whether CP asked for and was denied reasonable accommodation;**

On March 8, 2013, Pena requested an accommodation and was denied. (Pena Aff.).

- **whether the representations are in CP's own words;**

Pena's SSDI lawyer advised her to use March 8, 2013, her last day of work, as the date of the onset of her disability. (Pena Aff.).

- **whether CP was working during the period of time referred to as a period of total disability;**

Pena was not working during this time.

- **whether the employer suggested that CP apply for benefits;**

Gouveia advised Pena to file for SSDI benefits. (Pena Aff.).

- **when the employer learned of the representations;**

The employer learned that Pena filed for SSDI during the discovery phase of this case.
- **other relevant factors, such as advances in technology or changes in the employer's operations that may have occurred since representations were made that may make it possible for CP to perform the essential functions of the position, with or without reasonable accommodation.**
- **when the representations were made, the period of time to which they refer, and whether CP's physical or mental condition has changed since the representations were made;**
- **the specific content of the representations, who made them, and the purpose for which they were made;**
- **whether the representations about CP's inability to work are qualified in any way (e.g., "I am able to work with certain restrictions");**

Here, the R & R makes no reference whatsoever to the EEOC Enforcement Guidelines

leading to a reasonable inference that the Magistrate Judge did not consider them.

B. **PENA SHOULD NOT HAVE TO CHOOSE BETWEEN APPLYING FOR DISABILITY BENEFITS AND VINDICATING HER RIGHTS UNDER THE ADA.**

As discussed above, Congress created one statutory framework to provide for the needs of

disabled people who cannot support themselves financially (the SSA) and another one to provide for

disabled people who are able to work with an accommodation (the ADA). Honeywell is attempting to put Pena "in the untenable position of choosing between [her] right to seek disability benefits and [her] right to seek redress for a[]…violation of the ADA." Smith v. Dovenmuehle Motrtg. Co., 859 F.Supp. 1138, 1142 (N.D. Ill. 1994). Indeed, when Pena chose to apply for SSDI benefits, while later setting forth an ADA claim, she was exercising two independent rights.

Furthermore, both the ADA and SSA permit people to work, which suggests that neither statute defines disability as being totally and completely unable to work. See Mohamed v. Marriott, 1996 WL 631687 at *6 (S.D.N.Y. Oct. 30, 1996) (since the SSA permits individuals to work and receive benefits at the same time, "the classes of individuals entitled to protection under the [Social Security Act and the ADA] are not mutually exclusive").

Thus, because both statutes permit claimants to work, Pena should not have to choose between being surviving and using the ADA to assist her in being a productive member of society.

### III. A JURY COULD FIND THAT HONEYWELL'S DECISION TO TERMINATE PENA WAS MOTIVATED, IN PART, BECAUSE SHE ENGAGED IN PROTECTED CONDUCT.

The R & R recommends dismissing Pena retaliation claims on the grounds that "no reasonable jury could conclude that [Pena's] June 17, 2013 termination was causally related to her February 21, 2013 conversation with Mr. Gouveia about her break schedule." (R & R at 13). Here, a jury could find that Pena's February 21, 2013 complaint set off a chain of events that ultimately led to her termination on June 17, 2013. Indeed, Pena was sent home on March 8, 2013, only two weeks after she complained about unlawful conduct. A jury could find that but for Pena's complaint about unlawful conduct, Honeywell would not have taken such a hard line with her about working in the Moulding Room. A jury could consider Gouveia's discriminatory remarks to Pena — "if you have so many problems, why don't you go out on SSDI"— as evidence that Gouveia was frustrated with Pena because she complained about unlawful conduct regarding her diabetes. In any event,

Honeywell's motive behind why it sent Pena home on March 8, 2013 and why it fired her are issues of fact for the jury to decide.

**IV.    A JURY COULD FIND THAT HONEYWELL'S PROFFERED REASON FOR TERMINATING PENA IS PRETEXT.**

One way a plaintiff may demonstrate pretext is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and" . . . "infer that the employer did not act for the asserted non-discriminatory reasons." Hodgens v. General Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998). In assessing discriminatory motive, a court may also consider other factors, including, inter alia, the historical background of the decision, the specific sequence of events leading up to the challenged decision, departures from the normal procedural sequence and any contemporary statements by members of the decisionmaking body. Id. at 168-69; see also Straughn v. Delta Airlines, Inc., 250 F.3d 23, 35 (1st Cir. 2001) ("[t]he burden of persuasion on pretext may be met, inter alia, by showing 'that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker.'" (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000)). Moreover, "doubts about the fairness" of an employer's decision, while not necessarily dispositive, may be probative of whether the employer's reasons are pretexts for discrimination. General Dynamics Corp., 144 F.3d at 169 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981)). Finally, "[t]he reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as pretext." Rossy v. Roche Prods., Inc., 880 F.2d 621, 625 n. 4 (1st Cir. 1989).

To the extent this Court requires Pena to provide sufficient evidence of pretext in order to survive summary judgment, there is more than adequate evidence for a reasonable jury to conclude

that Honeywell's proffered reason for terminating Pena is pretext for discrimination. Indeed, Honeywell's contention that the only work available for Pena to do at the Cranston facility was in the Molding Room is inconsistent with Dyer's testimony that workers were only assigned there on an "as needed" basis. (Dyer Depos. at 41:3-20). This statement is also inconsistent with Pena's actual work assignments over a two week period — from February 21, 2013 to March 7, 2013 — when she was only assigned to work in the Molding Room twice and for only a short period of time. (Pena Dep. 27:9-11; 40:9-22). Finally, Honeywell has made inconsistent statements about whom at Honeywell had the final decision-making authority to grant or deny Pena's accommodation. Gouveia claims that Honeywell's legal and medical teams had the final say, while Dr. Jennison testified that Honeywell's H.R. people did. (Gouveia Dep. at 84:9-11; Jennison Dep. at 29:12-16). Finally, Dr. Jennison claims that her role in this matter was only to provide a medical opinion, yet she only viewed a small fraction of the information available, the First Doctor's Note and nothing more. (Jennison Dep. at 37:6-21, 44:21-45:1, 47:2-24, 47:25-48:3).

## CONCLUSION

For the reasons stated above, Plaintiff Mayra Pena respectfully requests that the Court not adopt the R & R and that it deny Defendant Honeywell, Inc.'s Motion for Summary Judgment (Doc. No. 27).

    MAYRA PENA
    By Her Attorney,
    /s/Mark P. Gagliardi
    Mark P. Gagliardi (#6819)
    mark@markgagliardilaw.net

    LAW OFFICE OF MARK P. GAGLIARDI
    120 Wayland Avenue, Suite 7
    Providence, RI 02906
    (401) 277-2030
    (401) 277-2021 (fax)

Dated: October 6, 2017

## CERTIFICATE OF SERVICE

  I hereby certify that on this **6**th day of October 20**17**, I caused the foregoing document to be electronically filed with the Court's CM/ECF system. The following counsel-of-record have been served by electronic means.

  Neal J. McNamara
  nmcnamara@nixonpeabody.com

  Aaron F. Nadich
  anadich@nixonpeabody.com

  Nixon Peabody, LLP
  One Citizens Plaza, Suite 500
  Providence, RI 02903-1345

               /s/Mark P. Gagliardi