# EXCERPTED DEPO. TR.
# MAYRA PENA

# In The Matter Of:

*Pena vs*
*Honeywell International, Inc.*

---

*Mayra F. Pena*
*November 3, 2016*

---



**ALLIED**
COURT REPORTERS, INC.
— *and* —
VIDEO CONFERENCE CENTERS

Phone:    401-946-5500          Toll Free: 888-443-3767
www.alliedcourtreporters.com    info@alliedcourtreporters.com

*Min-U-Script® with Word Index*

Mayra F. Pena - November 3, 2016

9

1      A.    Sandra Sycal.

2   Q.   I understand, Ms. Pena, that you were in the

3        Dominican Republic for the summer?

4      A.    I do go there because I get very severe

5        depression, and my psychiatrist recommended that I

6        should go there because I get better when I go

7        there.

8   Q.   Do you know why you get better when you go to the

9        Dominican Republic?

10      A.    He says that, for example, during the fall, I

11        get the depression more severe because of like

12        winter blues.

13   Q.   So how often do you go to the Dominican Republic?

14      A.    I've been going more.  I went about two

15        months ago, and I am planning on going back

16        because my depression is more severe.

17   Q.   Last year in 2015 how often did you go to the

18        Dominican Republic, and for how long?

19      A.    I don't quite recall how long, but I know

20        that I went about once or twice.

21   Q.   Okay.  What part of the Dominican Republic are you

22        from?

23      A.    Capital city, Santo Domingo.

24   Q.   I've been to Santo Domingo, and I have been to El

25        Pedregal in the mountains.  I don't know if you

Mayra F. Pena - November 3, 2016

10

1       know where that is.

2       A.    No, I don't.  It could be in a place called

3       Seawow (phonetic).

4   Q.  It's very remote up in the mountains.  So when did

5       you come to the United States from the Dominican

6       Republic?

7       A.    1985.

8   Q.  Why did you come?

9       A.    My mother got us all here.

10  Q.  And how old were you in 1985?

11      A.    I was about 24, 25 years old.

12  Q.  Did you come to Rhode Island originally?

13      A.    No.

14  Q.  Where did you go?

15      A.    Puerto Rico.

16  Q.  So you went from the Dominican Republic to Puerto

17      Rico?

18      A.    Yes.

19  Q.  Then when did you leave Puerto Rico and come to

20      the mainland, United States?

21      A.    Around 1987, I believe.

22  Q.  And did you come to Rhode Island then?

23      A.    No, I was in New York.

24  Q.  How long did you stay in New York?

25      A.    I came here in 1989.

Mayra F. Pena - November 3, 2016

14

1        this past letter indicating that they're going to

2        make the benefits retroactive to March of 2013?

3                      THE WITNESS:  That letter?  And

4        whatever they approved -- whatever level of

5        approval I got?

6                      MR. McNAMARA: Yes.  And anything you

7        received before that.  I think Ms. Connor

8        understands what I'm looking for, she will help

9        you with that?

10                     THE WITNESS:  Okay.

11    Q.  Because Social Security Disability, as I

12        understand it, determined that you were totally

13        disabled from work as of March 8, 2013?

14                     THE INTERPRETER: Social Security?

15                     MR. McNAMARA: Social Security

16        Disability, yes.

17    A.    Yes.

18    Q.  As of March 8, 2013, correct?

19    A.    I had applied in September of 2013 based on

20        what the doctor had recommended, but they

21        determined that since I hadn't received anything

22        at all for that year, they would make it

23        retroactive.

24    Q.  But your application for Social Security

25        Disability stated that you were totally disabled

Mayra F. Pena - November 3, 2016

15

1       from work as of March 8, 2013; is that correct?

2       A.   I believe so.

3    Q.   I have that application, and I'll show it to you

4       later, but that's what it says.  Back to Rhode

5       Island.  When did you start to work for Honeywell

6       or North Safety Products?

7       A.   2003 or 2002.  I don't quite recall.

8    Q.   So, at that point -- that's fine.  All I want is

9       your best memory.  So my understanding is that

10      as -- strike that.  Did you first work in

11      Cranston?

12      A.   I don't understand.  What do you mean by

13      Cranston?

14   Q.   Cranston, Rhode Island?

15                    THE WITNESS:  The first time I

16      worked?

17   Q.   Yes.  In 2002 to '3 or '3 that's when you said you

18      worked for either Honeywell or North Safety

19      Products?

20      A.   Yes.

21   Q.   And was that facility you worked in in Cranston,

22      Rhode Island?

23                    THE WITNESS:  North Safety?

24                    MR. McNAMARA: Yes.

25      A.   Yes.

Mayra F. Pena - November 3, 2016

16

1   Q.   Because North Safety was purchased by Honeywell in
2        2008?
3        A.   Yes.
4   Q.   So, throughout your employment, whether it was for
5        North Safety or Honeywell, did you work in that
6        Cranston facility?
7        A.   I worked in an area they called HEPA.
8   Q.   I understand you worked in the HEPA area.  I'm
9        talking about the town that the facility was in.
10       A.   It was the same.
11  Q.   I understand.  I apologize.  The building where
12       you worked from 2002 or '3 until 2013, was that
13       building in Cranston, Rhode Island?
14       A.   Yes, it was in Cranston.
15  Q.   That's what I was looking for.  When you started
16       to work for North Safety Products, what was your
17       job?
18       A.   I was working in assembly, and I was also a
19       machine operator.
20  Q.   Do you remember about how many people worked in
21       that building when you started there?
22       A.   The building was huge.  I remember -- I know
23       about my area.
24  Q.   Okay.  How many people worked in your area when
25       you started?

Mayra F. Pena - November 3, 2016

17

1      A.    Approximately 20.

2    Q.   Who was your supervisor when you started?

3      A.    I don't remember the name, Julia Mercedes.

4    Q.   I'll tell you now, if I ask you a question and you

5         don't remember the answer, but then in an hour or

6         so you remember it, remind me, and you come back

7         and give me the answer if you do.

8      A.    Okay.

9    Q.   Thank you.  So in that first job, what did you do?

10     A.    Assembly.

11   Q.   Assembly of what?

12     A.    It was the filter that they use for breathing

13        masks.

14   Q.   Now, was that the HEPA you referred to before?

15     A.    Yes.

16   Q.   And that also is sometimes called respiratory?

17     A.    That was another area.

18   Q.   That was a different area.  Okay.  So there were

19        20 people who worked in HEPA when you started?

20     A.    More or less.

21   Q.   And can you explain to me what the work area was

22        like, were there machines, were you assembling

23        different pieces of equipment, whatever you can

24        remember I would appreciate.

25     A.    There were about six assemblers and the parts

20

```
 1   Q.   And we know there was another area called molding,
 2        correct?
 3        A.   Yes.
 4   Q.   And it's my understanding that there were four
 5        areas all together.  Can you remember what the
 6        fourth area was called?
 7        A.   I don't remember the name of that fourth
 8        area, but I do remember there was another area
 9        where they did some assembly as well.
10   Q.   Okay.  Were these four areas all in a very large
11        room, or were they in separate rooms?
12        A.   Separate.
13   Q.   They were separate.  When you were working in
14        HEPA, did you ever need to wear earplugs?
15        A.   Yes.
16   Q.   Why was that?
17        A.   Because of the equipment, the machines.
18   Q.   So the machines were loud?
19        A.   They weren't really that loud, but it was
20        mandatory to have those earplugs.
21   Q.   So the company required you to wear those earplugs
22        for your own safety?
23        A.   In all the areas.
24   Q.   In all the areas.  Okay.
25
```

Mayra F. Pena - November 3, 2016

22

1      A.    This is where I mentioned earlier the

2      gentlemen used to work.

3   Q.   Okay.  And also in HEPA?

4      A.    Yes, in HEPA.

5   Q.   Finally, the fourth photograph?

6      A.    It's also HEPA where we used to place the

7      parts, and then they would come down to this

8      machine.

9   Q.   So, all four photos in Exhibit A are photos of

10     portions of the HEPA area that you worked in?

11     A.    I believe so.

12                    EXHIBIT B (DEFENDANT'S EXHIBIT B

13                    MARKED FOR IDENTIFICATION)

14  Q.   So, Ms. Pena, Exhibit B is another grouping of

15     four photographs, and I'd like you to tell me if

16     you recognize what portion of the Honeywell

17     facility these photographs are of.

18     A.    Truthfully, I couldn't tell you.  It could

19     very well be molding, but I went there to work on

20     some occasions, but I'm not sure.

21  Q.   I've been told that these four pictures are of the

22     molding area?

23     A.    I worked in molding only for the safety hats,

24     and also there was some plastic that would drive

25     me crazy.

Mayra F. Pena - November 3, 2016

24

1  Q.   So does that mean that -- well, strike that.  Were
2       you ever told why the company trained you to work
3       in molding?
4       A.   I told them that it was harmful for me to
5       work in that area, and they said that it was
6       mandatory training for everybody.
7  Q.   Okay.  I understand that.  But that's not the
8       question I asked you.  Did the company explain to
9       you why they were training you and other employees
10      to work in molding?
11      A.   They told me that it was only two weeks, and
12      it would involve more people, but it was mandatory
13      to have the people take that training.
14 Q.   I understand it was mandatory, but that's still
15      not the question I asked you.  The question is I
16      understand that you were told it was mandatory.
17      What I would like to know is when you were given
18      the training, did the company explain to you why,
19      after these years where you worked in HEPA, they
20      now wanted to train you and other employees to
21      work in molding?
22      A.   No one explained to me why.
23 Q.   Did anyone explain to you that the company wanted
24      to be able to move people around from one section
25      to another in case people were on vacation or

26

1      A.   No.

2  Q.   But you say you were on a medical leave, correct?

3      A.   Almost every year because in the fall I have

4      to leave on medical leave.

5  Q.   Okay.  So I have a listing here of dates that you

6      were on medical leave in late 2011 through 2012.

7      I'm going to read you the dates and see if you can

8      remember them, and if you can tell me what the

9      reason for the leave was each time, okay?  So the

10     first leave I have is from October 14th, 2011 to

11     November 21st, 2011.  Do you remember that leave?

12     A.   No, I don't remember.

13 Q.   The next leave I have that you were on was from

14     December 16th, 2011 to February 13, 2012.

15              THE INTERPRETER: 2012?

16              MR. McNAMARA: Yes.

17     A.   That was because of depression.

18 Q.   I speak Spanish a little bit.  I followed you, you

19     didn't get the years right.  Let's start over.

20     The second medical leave is from December 16, 2011

21     to February 13, 2012?

22     A.   I'm not quite sure, but it was almost always

23     because of depression.

24 Q.   There's two more I want to ask you about.  There

25     was a leave from June 22nd of 2012 to August 6,

32

1          meant?

2          A.    They didn't take me anywhere and it wasn't

3          explained anything when that happened.

4     Q.   Okay.   Did you receive this -- strike that.   Do

5          you remember a person who worked in human

6          resources called Amy Green?

7          A.    No.

8     Q.   Do you remember who gave you this final warning?

9          A.    I don't remember, and I don't remember any

10         such incident, because I never refused to go to

11         any area that I was assigned to work.

12    Q.   All right.   Now in your complaint which your

13         attorneys filed in court for you, Ms. Pena, you

14         claim discrimination based on disabilities?

15         A.    Yes.

16    Q.   Which disabilities do you claim you were

17         discriminated because of?

18         A.    Because I get anxiety and panic attacks.   I

19         have been sick since I was 8 years old, and they

20         took me to molding, and I explained to them how

21         that affected me.   There were some roll bolts

22         (sic) that would startle me, and I would get very

23         nervous because of that.   They requested a letter

24         from the psychiatrist, which I took that letter to

25         them.   They did not accept that letter.   They

Mayra F. Pena - November 3, 2016

41

1      did not want to go; do you remember that?

2      A.    No.

3   Q.   When is the first time you remember -- well,

4        strike that.  Starting January 14th you've

5        testified that two to three times a week you would

6        be sent to molding for about four hours?

7      A.    Uh-huh.

8   Q.   When was the first time -- well, strike that.  At

9        some point did you tell Myra Fermin that you did

10       not want to go to molding?

11     A.    Never.  Can I say something?

12                MR. McNAMARA: Yes.

13     A.    When they purchased that area, because those

14       equipment for molding was purchased later, I was

15       working at Honeywell through a temp agency, and

16       every time I would go around that area -- first I

17       was working as a temp, but they had promised to

18       make me a permanent employee.  But every time I

19       would go around there, the smell and the noise, I

20       was affected by it.

21           They train people who have been with the temp

22       agency for only a couple of months, and they give

23       them permanent employment in that area.  But I

24       wasn't -- I had been there for about four, four

25       and a half years, I wasn't given permanent

Mayra F. Pena - November 3, 2016

42

1         employment until after the four years.

2    Q.   Okay.  But you weren't asked to go to molding

3         until 2012, right?

4    A.   Yes, until 2012.

5    Q.   Right.  So at some point in 2013 did you tell any

6         supervisor that either you didn't want to work in

7         molding or that you couldn't work in molding

8         because of a medical condition?

9    A.   Of course, and that's when they requested the

10        letter from the psychiatrist.

11   Q.   Okay.  So, when a minute ago I asked you if you

12        ever told Myra Fermin that you did not want to

13        work in molding and you said never, now you've

14        told me that at some point they told you you

15        needed to bring a psychiatrist's letter so you

16        wouldn't have to work in molding.

17   A.   When they started sending me more frequently,

18        I told them that I was depressed, and I was

19        getting panicked because of the equipment, and

20        they said I should bring a letter from my doctor.

21   Q.   Okay.  Do you remember when that was?

22   A.   I believe it was towards the end of February

23        that I took the first letter.

24   Q.   Okay.  Do you remember some time at the end of

25        February going to Jose Gouveia and telling him

Mayra F. Pena - November 3, 2016

43

1      that you had a problem because Myra Fermin kept

2      sending you to the molding department?

3      A.    Yes.  I went to see him because I was being

4      denied my breaks as well.

5  Q.   Right.  We've already talked about that.  What I'm

6      asking you about now is did you go to him to tell

7      him that you had a problem because Myra Fermin was

8      asking you to work in the molding department?

9      A.    I did explain that to him also, and he told

10     me if I had so many health problems, why didn't I

11     apply for Social Security.

12 Q.   Isn't it true that what he actually said to you

13     later was that when you were out on leave that you

14     should apply for Temporary Disability Insurance or

15     short-term disability benefits?

16     A.    Not temporary.  He said if I had so many

17     problems with panic, depression, diabetes, why

18     didn't I apply for Social Security, and I told him

19     I wouldn't because Social Security would not give

20     me what I'm making working for the company.

21 Q.   Okay.  Did you ever tell Jose Gouveia that you

22     just did not like working in molding?

23     A.    Not that I didn't like working there, but it

24     was harmful to me emotionally.

25 Q.   When you had this conversation with Mr. Gouveia

Mayra F. Pena - November 3, 2016

49

1              EXHIBIT D (DEFENDANT'S EXHIBIT D

2              MARKED FOR IDENTIFICATION)

3    Q.    Ms. Pena, Exhibit D is a note from Dr. Greer to

4          Honeywell dated March 4th.  Is this the note from

5          Dr. Greer that you gave to Honeywell about your

6          not being able to work in molding?

7          A.    I believe that was the first letter, yes.

8    Q.    Right.  This is dated March 4th.  When did you

9          give this letter to Honeywell?

10         A.    I believe it was the next day, because I

11         was -- after this letter I was given another one.

12   Q.    Well, the next letter from your doctor that I have

13         after this one is dated April 2nd, but in any

14         event --

15         A.    He sent two letters prior to me leaving.  I

16         do have them at home.

17                    MR. McNAMARA: If there's another

18         letter --

19                    MS. CONNOR: I can look into that.

20                    MR. McNAMARA: The only one I have

21         is this one.

22                    MS. CONNOR: We only have these two

23         as well.

24                    THE WITNESS:  And the second letter

25         he explained that I get panicky, and I get

Mayra F. Pena - November 3, 2016

51

1              MR. McNAMARA: We're going to get to

2        that.  Yes.

3   Q.   If it turns out there are other letters that you

4        know of that I don't show you today, please let me

5        know; okay?

6        A.   Yes, I would let you know.

7   Q.   Thank you.  As I told you before, we always need a

8        verbal answer.  Your translator can't make the

9        assumption of what you're saying.  On the day

10       that -- on March 7th, the day before you were told

11       to go home, you had a conversation with Kevin Dyer

12       and Jose Gouveia; is that right?

13       A.   That's when they requested the second letter,

14       I believe.  I don't know.

15  Q.   And then the following day, on March 8th, did you

16       have another meeting with Jose Gouveia and Kevin

17       Dyer, along with Connor Ryan?

18       A.   Yes.

19  Q.   Okay.  And what happened in that conversation?

20       A.   That was the day that I took the second

21       letter.  I was working at the machine, and they

22       took somebody to replace me on the machine, and

23       Kevin asked me to come and join them in human

24       resources.

25  Q.   What machine were you working at?

Mayra F. Pena - November 3, 2016

52

1          A.    Potting 2.

2     Q.   So they brought you from the machine in potting 2.

3          What happened in the conversation you had with

4          them?

5          A.    At first I told them I need an interpreter

6          when I saw all of them there.  And Connor said,

7          You speak English.  And Gouveia, the one that

8          spoke some Spanish, told me that letter would not

9          be accepted.  At 11:00 you have to go to molding

10         to work.

11    Q.   You testified that when you spoke to Gouveia, you

12         could understand his Spanish and he could

13         understand you, correct?

14         A.    Whenever there was a problem, and there were

15         more bosses, I would request an interpreter.  And

16         I always had the same interpreter, whose name was

17         Luis Rodrigues.

18    Q.   So they told you then you needed to go to molding,

19         and that letter was not going to be sufficient,

20         correct?

21         A.    They said they would not accept it.

22    Q.   So what happened then?

23         A.    I started crying, and I told them I get very

24         nervous, and I told them that I was going to go

25         home.  I could not drive.  So I had to call my

—

53

1     daughter to come with the other daughter to take

2     the car.  Then I went to see the psychiatrist.  He

3     increased the dosage, and he says to seek help

4     because there was nothing else he could do.  Then

5     that's when my daughter called Legal Services.

6  Q.   Okay.  So how long after March 8th did your

7     daughter call Legal Services?

8     A.   I don't recall exactly, but that was very

9     quick, within a week I was consulting with a

10    lawyer, because I wanted to get back to my regular

11    job.

12  Q.  Now a few days after you went home, did you call

13    Kevin Dyer?

14              THE WITNESS:  I?

15              MR. McNAMARA: Either you or perhaps

16    somebody calling on your behalf, one of your

17    children.

18    A.   The person who called there was the lawyer

19    and spoke to Gouveia.  No, I don't speak English,

20    so I couldn't call.

21  Q.  Well, let me see if I can refresh your memory.

22    Kevin Dyer says that a few days after you left,

23    somebody, either you or somebody calling on your

24    behalf, called and left him a message, so then he

25    called you?

Mayra F. Pena - November 3, 2016

58

1   Q.   So, Exhibit G is a letter to Dr. Greer from a Dr.

2        Jennison who is a doctor who works for Honeywell.

3        Did Dr. Greer tell you he had gotten a letter from

4        a Honeywell doctor which set out the information

5        Honeywell was looking for?

6        A.   No, it was between the lawyer and him.

7   Q.   So you were not aware that Dr. Greer got a letter

8        from the Honeywell doctor setting forth the

9        information that was needed?

10       A.   No.   The lawyer explained to me that they

11       were communicating directly with Honeywell.

12  Q.   I understand that.   But what I want to know is did

13       you know that the Honeywell doctor had asked Dr.

14       Greer -- had specified for Dr. Greer the

15       information Honeywell was looking for?

16       A.   No.   Whenever I had my appointment with him,

17       he would tell me whatever they requested, he would

18       send it to them.

19  Q.   But he didn't tell you that he had been in touch

20       with the doctor from Honeywell?

21       A.   No.

22  Q.   Does Dr. Greer speak Spanish?

23       A.   Perfectly.

24  Q.   Okay.   So there was no communication problem that

25       you had with him?

55

1   Q.   Okay.  Now the same day that Mr. Dyer says he

2        called you, Mr. Gouveia also received a voice mail

3        message, he says, from not you, but perhaps your

4        daughter, and he says that he called the number

5        and spoke with you, and that you told him that you

6        went to your doctor and that your doctor said he

7        was going to call Honeywell, and he told you they

8        hadn't received any information from the doctor.

9        Does that refresh your memory?

10  A.   Let me tell you one thing.  When I went to

11       Legal Services, my lawyer instructed me to not to

12       have any more communication with anyone.  Any

13       correspondence that I got I would forward them to

14       my lawyer.

15  Q.   Okay.  So your lawyer told you not to talk to

16       anybody at Honeywell?

17  A.   That she would be the one keeping contact

18       with them, not me.

19              EXHIBIT E (DEFENDANT'S EXHIBIT E

20              MARKED FOR IDENTIFICATION)

21  Q.   So, Ms. Pena, Exhibit E is another note from Dr.

22       Greer to Honeywell.  This is a letter where he

23       refers to a reasonable accommodation request form

24       that the company had given you.  Do you remember

25       filling out a reasonable accommodation request

75

1      letter -- as I told you a minute ago, Honeywell's
2      attorney wrote to your attorney on May 22nd.  When
3      they didn't hear back from your lawyer for almost
4      a month, and they didn't hear back from your
5      doctor, either, and you hadn't contacted them,
6      they assumed that you just didn't want to work
7      there anymore.  So this is the letter in which
8      Mr. Gouveia says that your employment is
9      terminated.
10                  THE WITNESS:  Yes, I do have that
11     letter.  That's the termination letter.
12                  MR. McNAMARA: Yes, it is.
13     A.   When I got the letter, the lawyer had
14     referred me to another lawyer because she had
15     already thrown in the towel, she said.  She did
16     everything that she could, she told me.
17  Q.   Okay.  Who did she refer you to?
18     A.   She didn't refer me to any specific lawyer.
19     She was going to take me to the discrimination --
20     or I could -- the discrimination board, or I could
21     personally look for another lawyer, and then I
22     decided to look for a lawyer.
23  Q.   Okay.  And which lawyer did you go to?
24     A.   With them.  I don't even remember the name.
25  Q.   I do.  Do you remember when you first went to

Mayra F. Pena - November 3, 2016

78

1        been unable to perform any work?

2        A.   Yes.

3   Q.   Do you understand that when you make a claim of

4        disability discrimination, you are alleging that

5        if you had received an accommodation, you could

6        have performed your job?

7                    MS. CONNOR:  Objection.  Legal

8        conclusion.

9        A.   I was doing quite well, and they were the

10       ones that harmed me.

11  Q.   But you're saying they harmed you as of the first

12       day you went out?

13       A.   They ended up hurting me by not accommodating

14       me, and I felt useless after.

15  Q.   But that took place after March 8th, correct?

16       A.   Yes.

17  Q.   Okay.  In the decision the -- do you need to take

18       a few minutes?

19       A.   No.

20  Q.   On the third page of the decision, at the bottom

21       next to Number 3 it says, "The claimant has the

22       following severe impairment:  Somatoform

23       disorder."  You may not know the answer to this,

24       but do you know what a somatoform disorder is?

25                    MS. CONNOR:  Objection.  Legal

Mayra F. Pena - November 3, 2016

80

1          to see these people ever anymore.

2     Q.   Who said that?

3          A.    My daughter.  I told my daughter to tell the

4          lawyer that.

5     Q.   I understand that.  But that's not what I'm

6          asking.  What I'm asking is on the one hand you

7          agreed that you applied for Social Security

8          Disability benefits, and in that you said that you

9          were completely unable to work as of March 8,

10         2013, correct?

11         A.    In September.

12    Q.   In September you applied but you said that as of

13         March 8th?

14         A.    No.  When you fill out the application, they

15         ask you when was your last day of work.

16    Q.   That's not what the application says.  The

17         application says, "I became unable to work

18         because" --

19                        THE WITNESS: Which application?

20                        MR. McNAMARA: Exhibit M.

21         A.    I applied with the help of a lawyer.  It was

22         with a lawyer that I applied for Social Security.

23    Q.   But in any event, you are saying on the one hand

24         that you are completely unable to work, correct?

25         A.    Yes.

Mayra F. Pena - November 3, 2016

83

1    A.    They messed up my life.  My life is all

2    messed up.

3  Q.  But I'm looking to see if you can give me even an

4    approximate date when you were no longer able to

5    work at all.

6    A.    When I was kicked out of that place, I had to

7    go see the psychiatrist, and that's when I started

8    having panic attacks, and he started giving me new

9    medication and increasing the dose.  He said to me

10   you can no longer work because you are sleeping

11   during the day.

12  Q.  And when you say you were kicked out, are you

13   referring to March 8th when you were sent home?

14   A.    From that point on, that's when I started

15   getting worse.  Every time the lawyer would tell

16   me that she would send letters, and then they

17   would decline, it got worse.

18  Q.  Were there any other stressors in your life at

19   that point, Ms. Pena, that would affect your

20   mental health?

21   A.    Not that I can recall.

22  Q.  You said you have four children?

23   A.    Yes.

24  Q.  Two daughters and two sons?

25   A.    Yes.

84

1  Q.   Were either/or both of your sons, did they have

2       trouble with the law around then?

3     A.   Not that I'm aware of.  Whatever problem that

4       they have, I don't take it up in myself.

5  Q.   You never told Dr. Greer that your sons had been

6       arrested and that was causing you stress?

7     A.   That was way before that.

8  Q.   When was that?

9     A.   I don't recall exactly when, but it could

10      have been eight or nine months prior.

11  Q.  Did either/or both of your sons have to go to jail

12      for any period of time then?

13    A.   Yes.

14  Q.  How long did they have to go?

15    A.   Okay, the one who -- the youngest one, he was

16      a minor, he ended up in the Training School.

17  Q.  And for how long?

18    A.   Six months.

19  Q.  And did your other son ever have any problems with

20      the law?

21    A.   They both have legal problems, at the present

22      time they do.

23  Q.  Okay.  So both your sons have had problems with

24      the law over the last few years?

25    A.   No.  It was recently, about two or three

85

1    months ago they had some problems.  Both of them

2    are incarcerated now, but I won't pay any mind to

3    it.  About two or three months.

4  Q.  Just a couple more questions and we're done for

5    now.

6              THE WITNESS:  That's the reason in

7    the medical record I instructed them not to

8    mention things that had to do with my personal and

9    private life because they don't need to know

10   things, personal things about my life.

11 Q.  Since leaving Honeywell, have you applied for any

12   other work?

13 A.  No, not at all.  That's when I mentioned that

14   my depression has gotten worse.

15             MR. McNAMARA:  I think we'll suspend

16   for now and, Alicia, you're going to see about

17   that second note that neither you or I seem to

18   have, and about communications from Social

19   Security, and if I need to bring her back, it

20   would only be for maybe an hour or so.

21             MS. CONNOR:  I just have a couple of

22   questions, too, regarding the notes.  I think

23   there may be confusion regarding dates and order

24   because one of the documents you produced as an

25   exhibit today references the second note as the