# Excerpted Depo. Tr. Elizabeth A. Jennison, M.D.

12/9/2016                                           Elizabeth Jennison, M.D.

1

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND
C.A. NO. 15-CV-00179-S-LDA

- - - - - - - - - - - - - - - -

| | |
|---|---|
| MAYRA F. PENA, | : Video |
| | : |
| Plaintiff, | : Deposition of: |
| | : |
| v. | : ELIZABETH A. |
| | : JENNISON, M.D. |
| HONEYWELL INTERNATIONAL INC., | : |
| | : COPY |
| Defendant. | : |

- - - - - - - - - - - - - - - -

TRANSCRIPT of testimony as taken by and before MARGE TEILHABER, Certified Shorthand Reporter (NJ license No. 30XI00085600 expires 6/30/2018; CT license No. SHR.0000446 expires 12/31/16), NCRA Registered Diplomate Reporter, and notary public of the states of New York, New Jersey, and Connecticut, at Honeywell, Inc., 115 Tabor Road, Morris Plains, New Jersey, on Friday, December 9, 2016 commencing at 1:09 in the afternoon.

12/9/2016                                        Elizabeth Jennison, M.D.

14

```
 1   Virginia.
 2        Q.    Okay.  Did you ever practice medicine
 3   in an area other than occupational medicine?
 4        A.    No, I did not.
 5        Q.    Can you describe to us what your
 6   day-to-day duties are as the associate director of
 7   health services?
 8        A.    I help set minimum standards for our
 9   locations around the world in terms of their
10   performance in occupational health duties, and I
11   serve as internal consultant within the company
12   to various locations to talk with them about problems
13   they might have with occupational health.
14        Q.    Is one of your responsibilities to
15   make sure that employees don't get injured or sick
16   on the job because of chemicals or other workplace
17   safety issues?
18        A.    Can you rephrase that, please?
19        Q.    Yes.  Is one of your primary job
20   duties and responsibilities to insure that employees
21   don't get injured on the job because of chemicals or
22   other workplace issues?
23        A.    Since I'm not located at a physical
24   manufacturing location, I can only influence by the
25   policies that our corporation sets that we expect
```

12/9/2016                                              Elizabeth Jennison, M.D.

18

```
1       Q.      Was it in writing?
2       A.      I believe it was.
3       Q.      And can you explain what the policy
4   was?
5       A.      Our policy is that we follow the
6   government law on this topic.
7       Q.      Which is what?
8       A.      If we have an employee that's
9   requesting an accommodation, we follow the
10  reasonable accommodation process as described in
11  the Americans With Disabilities Act.
12      Q.      When you were in medical school,
13  Dr. Jennison, did you learn about psychological
14  disorders?
15      A.      We had a mandatory psychiatric
16  rotation as part of our medical school education.
17      Q.      Can you tell me about that?
18      A.      Be more specific about what you want
19  to know.
20      Q.      Well, how long was the rotation for?
21      A.      I believe it was six weeks.
22      Q.      Can you describe to me the rotation
23  and what it consisted of?
24      A.      The items I recall would be doing
25  individual patient interviews and observing
```

12/9/2016                                        Elizabeth Jennison, M.D.

                                                                    24

```
 1        A.    He does write that.
 2        Q.    When you read this note, did you draw
 3   the conclusion that Dr. Greer was treating her for
 4   anxiety?
 5        A.    I expect that I inferred that from the
 6   memo but it's -- yes, I would expect I inferred this
 7   from the memo.
 8        Q.    Okay.  And at that time did you
 9   believe that anxiety was a psychological disorder?
10        A.    Yes.
11        Q.    And at that time did you believe that
12   anxiety is a disability under the ADA?
13             MR. McNAMARA:  Objection.
14        Q.    You can answer.
15        A.    It could be a disabling condition
16   under the Americans With Disabilities Act.
17        Q.    Okay.  As a doctor would you agree
18   with me that in order to treat a patient for their
19   medical condition, you have to rely on themself
20   reporting their symptoms to you?
21        A.    That is not the only thing that you
22   would rely on.
23        Q.    That's one of the things you would
24   rely on.  Correct?
25        A.    It is one aspect of what you would
```

1   A.   He does write that.
2   Q.   When you read this note, did you draw
3   the conclusion that Dr. Greer was treating her for
4   anxiety?
5   A.   I expect that I inferred that from the
6   memo but it's -- yes, I would expect I inferred this
7   from the memo.
8   Q.   Okay.  And at that time did you
9   believe that anxiety was a psychological disorder?
10  A.   Yes.
11  Q.   And at that time did you believe that
12  anxiety is a disability under the ADA?
13       MR. McNAMARA:  Objection.
14  Q.   You can answer.
15  A.   It could be a disabling condition
16  under the Americans With Disabilities Act.
17  Q.   Okay.  As a doctor would you agree
18  with me that in order to treat a patient for their
19  medical condition, you have to rely on themself
20  reporting their symptoms to you?
21  A.   That is not the only thing that you
22  would rely on.
23  Q.   That's one of the things you would
24  rely on.  Correct?
25  A.   It is one aspect of what you would

12/9/2016                                      Elizabeth Jennison, M.D.

29

```
 1    time.  We felt we needed additional information.
 2        Q.    Okay.  Well, just to clarify, you did.
 3    Right?
 4        A.    Yes.
 5        Q.    It was your -- who had the authority
 6    to grant or deny the accommodation at this time?
 7    Who other than you?
 8        A.    I never have the authority to grant or
 9    deny an accommodation.
10        Q.    What is your role in this process?
11        A.    I'm a medical consultant to the human
12    resources and plant leadership.
13        Q.    Who had the authority to grant or deny
14    the request for a reasonable accommodation?
15        A.    So the local human resources and plant
16    leadership would make that decision.
17        Q.    Was that Jose Gouveia?
18        A.    I don't know.
19        Q.    So your role was merely an advisory
20    one at this point.
21        A.    That's correct.
22              THE COURT REPORTER:  Say that,
23        repeat your question, please.
24        Q.    Your role was merely an advisory one
25    at this time.  Correct?
```

12/9/2016                                           Elizabeth Jennison, M.D.

37

```
 1        Q.      What about Plaintiff's Exhibit 4, the
 2   Request For Reasonable Accommodation Request form?
 3   Did you see that or review that document in or about
 4   April 2013?
 5        A.      I don't recall.
 6        Q.      How is it that you remember the first
 7   document that was March 4, 2013 but you don't
 8   remember if you saw the other two documents that
 9   were sent, dated about a month later?
10        A.      I wrote a letter to Dr. Greer
11   referencing the March document, so clearly I had
12   seen that document.  I do not recall seeing either
13   of the others.
14        Q.      Well, have you had a chance to read
15   Plaintiff's Exhibit 3, the April 2nd, 2013 letter?
16        A.      Yes, I have, but it was presented to
17   me on December 6 by Mr. McNamara.
18        Q.      That was the first -- okay.  When was
19   the first time you saw Plaintiff's Exhibit 3?
20        A.      I do not recall seeing it prior to
21   December 6 of 2016.
22        Q.      Now that you've had a chance to review
23   it, does this letter, does this letter, does the
24   information contained in this letter satisfy your
25   request from your letter to Dr. Greer?
```

12/9/2016                                                    Elizabeth Jennison, M.D.

44

1   the lower right-hand corner is numbered, starts with
2   HW, it's got a bunch of zeros, and then it's 53.
3        A.    I don't have that document.
4        Q.    What about do you have a doctor's note
5   from James Greer dated April 29, 2013?
6        A.    Excuse me just a minute while I refer
7   to the documents.
8              (Examining documents.)
9              Dated April 29th, yes, I do.
10       Q.    Okay.  So I'm going to represent to
11  you that that was a third doctor's note that Dr.
12  Greer wrote for Ms. Pena --
13       A.    Yes.
14       Q.    -- to give to Honeywell in her quest
15  to get an accommodation for her disability.  Did
16  you review this document on December 6, 2016?
17       A.    Yes.
18       Q.    And do you recall if you reviewed this
19  document in or about April of 2013?
20       A.    I do not recall.
21       Q.    When you said you don't recall seeing
22  the last two doctors' notes, does that mean you
23  could have seen them or you just don't remember?
24       A.    I would say it's more probable than
25  not that I had not seen them prior to December 6,

12/9/2016                                          Elizabeth Jennison, M.D.

45

```
 1    2016.
 2         Q.    Okay.  Let's take a look at his
 3    letter.  He writes in the second sentence that:
 4              "Ms. Pena has worked for
 5         Honeywell for eleven years prior to
 6         February 2013 and she was assigned a
 7         new work setting in the moulding
 8         room."
 9              And he writes:
10              "She has reported repeatedly
11         and consistently that she finds this
12         new environment to be highly stressful
13         referencing a variety of factors
14         which included increased noise level,
15         chemical odors, and the presence of
16         robotics in the moulding room which
17         have resulted in a significant
18         exacerbation of her anxiety symptoms."
19              Had you seen this note in April of
20    2013 and had you read that information, would that
21    have satisfied Honeywell's request for more specific
22    information so that it could determine the
23    appropriate accommodation for her?
24         A.    No.
25         Q.    Why not?
```

12/9/2016                                           Elizabeth Jennison, M.D.

47

```
 1      A.    It might have.
 2      Q.    Tell me about all the conversations
 3 you had with other folks at Honeywell about Mayra
 4 Pena's -- strike that.
 5            Who did you speak with at Honeywell
 6 about Mayra Pena's request for an accommodation of
 7 a disability?
 8      A.    I don't really remember.
 9      Q.    Did you speak to Mr. Gouveia?
10      A.    I really don't know.
11      Q.    Did you speak to the company attorney?
12      A.    I don't recall.
13      Q.    What about Jacqueline Rolfs?  Do you
14 know who she is?
15      A.    Yes, I do.  I don't recall if we ever
16 spoke about this matter.
17      Q.    Who is Jacqueline Rolfs?
18      A.    She's a labor attorney in the
19 corporation, and this was one of the facilities
20 that she supported at the time.
21      Q.    You don't recall if she ever, if you
22 ever talked to her about Mayra Pena's request for
23 an accommodation?
24      A.    No, I don't.
25      Q.    Okay.  I believe you testified earlier
```