# EXCERPTED DEPO. TRANSCRIPT OF MAYRA PENA

       EXHIBIT M (DEFENDANT'S EXHIBIT M MARKED FOR IDENTIFICATION)

Q. Ms. Pena, Exhibit M is your application summary that we received from Social Security after you authorized them to release it to us. In the middle of the page it says, "I became unable to work because of my disabling condition on March 8, 2013." How is it -- strike that. Did someone advise you to use the date March 8, 2013 on your application?

A. The thing is that from that date, the dose of medication for the depression was increased, and also I also got four more pills because of the tachycardia, and also I got medication to help me sleep.

Q. You say right after that sentence, "I am still disabled." When you said in the sentence, you know, "I became unable to work because of my disabling condition," did you mean that you were

1  unable to do any work?

2  A.  Yes, at that time when I stated that, yes,
3  because I was under a lot of medications, and my
4  depression increased.

5  Q.  Okay.  And as we've already discussed, your
6  application has been approved, and Social Security
7  found that you are fully disabled and, therefore,
8  unable to work; do you understand that?

9  A.  Yes.

10                 EXHIBIT N (DEFENDANT'S EXHIBIT N
11                 MARKED FOR IDENTIFICATION)

12  Q.  Ms. Pena, Exhibit N is the decision of the
13  Administrative Law Judge from Social Security
14  regarding your application for disability
15  benefits.  On the last page it says next to Number
16  5, "The claimant has been under a disability as
17  defined in the Social Security Act since March
18  8th, 2013, the alleged onset date of disability";
19  do you see that?  Do you understand that to mean
20  that the administrative law judge is saying that
21  he has determined that you are unable to perform
22  any sort of work and have been in that situation
23  since March 8, 2013?

24  A.  Yes.

25  Q.  So you agree that since March 8, 2013 you have

1    been unable to perform any work?
2    A.   Yes.
3    Q.   Do you understand that when you make a claim of
4         disability discrimination, you are alleging that
5         if you had received an accommodation, you could
6         have performed your job?
7              MS. CONNOR:  Objection.  Legal
8         conclusion.
9    A.   I was doing quite well, and they were the
10        ones that harmed me.
11   Q.   But you're saying they harmed you as of the first
12        day you went out?
13   A.   They ended up hurting me by not accommodating
14        me, and I felt useless after.
15   Q.   But that took place after March 8th, correct?
16   A.   Yes.
17   Q.   Okay.  In the decision the -- do you need to take
18        a few minutes?
19   A.   No.
20   Q.   On the third page of the decision, at the bottom
21        next to Number 3 it says, "The claimant has the
22        following severe impairment:  Somatoform
23        disorder."  You may not know the answer to this,
24        but do you know what a somatoform disorder is?
25             MS. CONNOR:  Objection.  Legal

       conclusion.

    A.   No.

Q.   Okay. As you know, we've talked about the fact that you -- strike that. You filed for bankruptcy in September of 2014, correct?

    A.   Yes.

Q.   And we don't need to make this an exhibit, but in your application you indicate that you are not employed and that you are disabled, correct?

    A.   Yes. I was waiting for the decision from disability.

          MR. McNAMARA: I understand.

Q.   Ms. Pena, can you explain why on the one hand you applied for disability benefits and said that you were unable to work at all as of March 8, 2013 and that was found to be accurate, and on the other hand you then assert a claim against Honeywell, which includes an assertion that if you had been given an accommodation, you could have done your job? Can you explain that to me?

          THE WITNESS: About the lawsuit when I went to see them?

          MR. McNAMARA: Yes.

    A.   I went to see them, but they asked me, Do you want to go back to work, and I said, I don't want

Mayra F. Pena - November 3, 2016

80

1       to see these people ever anymore.
2 Q.   Who said that?
3 A.   My daughter.  I told my daughter to tell the
4       lawyer that.
5 Q.   I understand that.  But that's not what I'm
6       asking.  What I'm asking is on the one hand you
7       agreed that you applied for Social Security
8       Disability benefits, and in that you said that you
9       were completely unable to work as of March 8,
10      2013, correct?
11 A.   In September.
12 Q.   In September you applied but you said that as of
13      March 8th?
14 A.   No.  When you fill out the application, they
15      ask you when was your last day of work.
16 Q.   That's not what the application says.  The
17      application says, "I became unable to work
18      because" --
19            THE WITNESS: Which application?
20            MR. McNAMARA: Exhibit M.
21 A.   I applied with the help of a lawyer.  It was
22      with a lawyer that I applied for Social Security.
23 Q.   But in any event, you are saying on the one hand
24      that you are completely unable to work, correct?
25 A.   Yes.

```
 1  Q.  And on the other hand, your complaint against
 2      Honeywell says that you could have done your job
 3      if you had received an accommodation.
 4  A.  When I was seeing Veronica Kot, I wanted my
 5      job back.
 6  Q.  Are you saying that during that period you could
 7      have worked?
 8  A.  No.  After that, since I was denied the
 9      accommodation, then my depression started to get
10      worse and worse.
11  Q.  So, you were receiving Social Security Disability
12      benefits effectively retroactive to March 8, 2013,
13      correct?
14  A.  About eight or nine months ago I received
15      that.
16  Q.  Right.  But the benefits are retroactive to March
17      8, 2013, correct?
18  A.  They haven't paid that to me yet, but they
19      claim -- they said I do -- I'm entitled to that.
20  Q.  Right.  And those are part of the documents you
21      said you've got, and you will give to Ms. Connor,
22      and she will give them to me.
23  A.  And because according to the computer,
24      Honeywell was giving me compensation, and that
25      wasn't happening.
```

1  Q.   At what point did you become unable to work at
2       all?
3  A.   The same moment that they denied me my job
4       without accommodating me, without any need to do
5       that.
6  Q.   Was that on March 8, 2013?
7  A.   For about four or five months during the time
8       that the lawyer was in constant communication with
9       them, and they were declining.
10 Q.   So, you can't tell me at what point specifically
11      you became completely unable to work?
12 A.   From the very first time they sent me to the
13      molding room, then my depression increased, and I
14      saw the psychiatrist.  He sent the first letter,
15      and from that point on it's been getting worse.
16 Q.   Okay.  I'll just try it once more.  So at what
17      point -- I understand you're saying that there was
18      an escalation of your depression, I understand
19      that.  At what point did it reach the point where
20      you were no longer able to work at all?
21 A.   I cannot be around a lot of people.  I am
22      bothered by even the noise from my grandchildren.
23      I was able to drive to New York before all by
24      myself, and I can't do that anymore.
25                 MR. McNAMARA:  I understand all that.

Mayra F. Pena - November 3, 2016

83

| | |
|---|---|
| 1 | A. They messed up my life. My life is all |
| 2 | messed up. |
| 3 | Q. But I'm looking to see if you can give me even an |
| 4 | approximate date when you were no longer able to |
| 5 | work at all. |
| 6 | A. When I was kicked out of that place, I had to |
| 7 | go see the psychiatrist, and that's when I started |
| 8 | having panic attacks, and he started giving me new |
| 9 | medication and increasing the dose. He said to me |
| 10 | you can no longer work because you are sleeping |
| 11 | during the day. |
| 12 | Q. And when you say you were kicked out, are you |
| 13 | referring to March 8th when you were sent home? |
| 14 | A. From that point on, that's when I started |
| 15 | getting worse. Every time the lawyer would tell |
| 16 | me that she would send letters, and then they |
| 17 | would decline, it got worse. |
| 18 | Q. Were there any other stressors in your life at |
| 19 | that point, Ms. Pena, that would affect your |
| 20 | mental health? |
| 21 | A. Not that I can recall. |
| 22 | Q. You said you have four children? |
| 23 | A. Yes. |
| 24 | Q. Two daughters and two sons? |
| 25 | A. Yes. |

1   Q.   Were either/or both of your sons, did they have
2        trouble with the law around then?
3   A.   Not that I'm aware of.  Whatever problem that
4        they have, I don't take it up in myself.
5   Q.   You never told Dr. Greer that your sons had been
6        arrested and that was causing you stress?
7   A.   That was way before that.
8   Q.   When was that?
9   A.   I don't recall exactly when, but it could
10       have been eight or nine months prior.
11  Q.   Did either/or both of your sons have to go to jail
12       for any period of time then?
13  A.   Yes.
14  Q.   How long did they have to go?
15  A.   Okay, the one who -- the youngest one, he was
16       a minor, he ended up in the Training School.
17  Q.   And for how long?
18  A.   Six months.
19  Q.   And did your other son ever have any problems with
20       the law?
21  A.   They both have legal problems, at the present
22       time they do.
23  Q.   Okay. So both your sons have had problems with
24       the law over the last few years?
25  A.   No.  It was recently, about two or three

|   |   |
|---|---|
| 1 | months ago they had some problems.  Both of them |
| 2 | are incarcerated now, but I won't pay any mind to |
| 3 | it.  About two or three months. |
| 4 | Q. Just a couple more questions and we're done for |
| 5 | now. |
| 6 | THE WITNESS:  That's the reason in |
| 7 | the medical record I instructed them not to |
| 8 | mention things that had to do with my personal and |
| 9 | private life because they don't need to know |
| 10 | things, personal things about my life. |
| 11 | Q. Since leaving Honeywell, have you applied for any |
| 12 | other work? |
| 13 | A. No, not at all.  That's when I mentioned that |
| 14 | my depression has gotten worse. |
| 15 | MR. McNAMARA:  I think we'll suspend |
| 16 | for now and, Alicia, you're going to see about |
| 17 | that second note that neither you or I seem to |
| 18 | have, and about communications from Social |
| 19 | Security, and if I need to bring her back, it |
| 20 | would only be for maybe an hour or so. |
| 21 | MS. CONNOR:  I just have a couple of |
| 22 | questions, too, regarding the notes.  I think |
| 23 | there may be confusion regarding dates and order |
| 24 | because one of the documents you produced as an |
| 25 | exhibit today references the second note as the |

Mayra F. Pena - November 3, 2016

86

1 note that we believe is the second note rather
2 than there being one in the middle, but I will
3 confirm to make sure.
4          MR. McNAMARA: If we can figure that
5 out, that would be great.  Thanks.
6          EXAMINATION BY MS. CONNOR
7 Q.  So, on March 8, could you work in the molding room
8     if they asked you to?
9 A.  No, I couldn't.  I got a panic attack that
10    same day when I had taken that letter that does
11    not appear, and I was unable to work.
12 Q.  If Honeywell had agreed to put you back in HEPA,
13    would you have been able to perform that job?
14 A.  That's why the lawyer was fighting for me to
15    be able to get back to my job.
16 Q.  And when did your doctor increase your medications
17    because of the symptoms you just described?
18 A.  After March 8th, after going through all
19    these problems.
20         MS. CONNOR: That's all I have.
21         MR. McNAMARA: That's it.
22         (DEPOSITION ADJOURNED AT 2:36 P.M.)